613 A.2d 1059

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
ROBERT O. MARSHALL, DEFENDANT–APPELLANT.

Argued January 21, 1992—Decided July 28, 1992.

110

*Dale Jones,* Assistant Public Defender, *Judith L. Borman,* First Assistant Deputy Public Defender, and *Bernadette De-Castro,* Assistant Deputy Public Defender, argued the cause for appellant (*Wilfredo Caraballo,* Public Defender, attorney).

*Boris Moczula* and *Janet Flanagan,* Deputy Attorneys General, argued the cause for respondent (*Robert J. Del Tufo,* Attorney General of New Jersey, attorney; *Boris Moczula, Janet Flanagan,* and *Anne C. Paskow,* Assistant Attorney General, of counsel; *Boris Moczula* and *Janet Flanagan,* on the briefs).

*Lawrence S. Lustberg* argued the cause for *amicus curiae* Association of Criminal Defense Lawyers of New Jersey (*Crummy, Del Deo, Dolan, Griffinger & Vecchione,* attorneys; *Lawrence S. Lustberg* and *John V. Jacobi,* on the briefs).

*David A. Ruhnke* argued the cause for *amicus curiae* American Civil Liberties Union of New Jersey (*Ruhnke & Barrett,*

attorneys; *David A. Ruhnke* and *Jean D. Barrett*, on the brief).

PER CURIAM.

In *State v. Marshall*, 123 *N.J.* 1, 586 *A.*2d 85 (1991) (*Marshall* I), this Court affirmed defendant's conviction for the murder of his wife and the resulting sentence of death. This appeal requires us to resolve the "proportionality" issue reserved in that case. *Id.* at 170, 586 *A.*2d 85. The Capital Punishment Act provides that on the "request of the defendant, the Supreme Court shall * * * determine whether the [death] sentence [imposed on a defendant convicted of capital murder] is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." *N.J.S.A.* 2C:11–3e. In the process of making that determination we also discuss the broader issue of the format of proportionality review.

In *State v. Ramseur*, 106 *N.J.* 123, 524 *A.*2d 188 (1987), we noted that "[t]he proportionality review provision in the Act is an important procedural mechanism to safeguard against the arbitrary and capricious imposition of the death penalty." *Id.* at 330, 524 *A.*2d 188. Observing that proportionality review implicated "difficult and sensitive issues," we forecasted that

> our efforts to devise a procedure of review that will adequately protect defendants from the arbitrary and capricious imposition of the death penalty prohibited by *Furman v. Georgia, supra,* 408 *U.S.* 238, 92 *S.Ct.* 2726, 33 *L.Ed.*2d 346, will be an evolving process. In addition to involving criminal justice experts, these efforts may involve experts from disciplines outside the law. We shall seek the advice of such experts to assist us in this process.
>
> [*Id.* at 328, 524 *A.*2d 188.]

Therefore, by Order dated July 29, 1988, this Court appointed Professor David C. Baldus of the University of Iowa Law School as Special Master to assist us in developing a system for proportionality review. We requested that the "Special Master * * * produce for the Court a data base and files sufficient to enable the Supreme Court to conduct proportionality reviews as required by statute." We authorized consideration of "the data

base that formed the basis of the report of the New Jersey Public Defender entitled 'the Re–Imposition of Capital Punishment in New Jersey' " and the collection of such "additional data * * * as may be needed." We directed that nothing in the Order shall "be construed by the Special Master or the parties to represent a position of the Court on any issue, nor shall the recommended findings and conclusions of law of the Special Master include any determination concerning the excessiveness or disproportionality of any death sentence imposed in any case."

In an earlier proceeding, *In re Proportionality Review Project,* 122 *N.J.* 345, 585 *A.*2d 358 (1990), we declined to determine in advance the appropriate "universe" of cases against which to compare challenged death sentences in order to assure proportionality. The Attorney General had contended that the only appropriate universe is one comprised exclusively of cases in which a death sentence has been imposed under our Capital Punishment Act and that establishing such a universe would be consistent with the practice of a majority of other jurisdictions that have developed proportionality-review systems. In addition, we noted that defining the universe of cases available for proportionality review would not automatically determine which cases within the universe will be used in the review of any specific death sentence. We awaited the Master's Final Report, which was received on September 24, 1991.

Following oral argument, the Legislature amended the Capital Punishment Act to provide that "[p]roportionality review * * * shall be limited to a comparison of similar cases in which a sentence of death has been imposed." *L.*1992, *c.* 5 (eff. May 12, 1992). Although that amendment is to "take effect immediately," the Legislature did not state whether it intended the amendment to apply to pending appeals. The Attorney General has filed a letter memorandum suggesting that the 1992 amendment be applied to this appeal. Were the amendment to be applied to pending appeals, we would undoubtedly be required to resolve whether, as applied to offenses committed before its

effective date, the Act might constitute an ex post facto law. In *Collins v. Youngblood*, 497 *U.S.* 37, 110 *S.Ct.* 2715, 111 *L.Ed.*2d 30 (1990), the United States Supreme Court summarized the meaning of the ex post facto clauses:

> "It is settled, by decisions of this Court so well known that their citation may be dispensed with, that any statute which punishes as a crime an act previously committed, which was innocent when done; which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with crime of any defense available according to law at the time when the act was committed, is prohibited as ex post facto."

> [*Id.* at ——, 110 *S.Ct.* at 2719, 111 *L.Ed.*2d at 39 (quoting *Beazell v. Ohio*, 269 *U.S.* 167, 169–70, 46 *S.Ct.* 68, 68, 70 *L.Ed.* 216, 217 (1925)).]

The Attorney General argues that *L.*1992, *c.* 5 "clarifies" the prior law and thus does not transgress those bounds. Because of the long pendency of this appeal, we decide this appeal under prior law. Furthermore, given our rejection of the disproportionality challenge, the new law, clearly strengthening such rejection, could not affect the outcome. We therefore have no occasion to consider either its applicability or validity. Hence, our references to a "universe" of cases required for statutory proportionality review are to be understood to refer to the statutory provisions in effect at the time of this offense. Because there are several capital appeals pending under the prior law, we address the issues in sufficient detail to deal with those appeals as well as this, depending on the ultimate effect of *L.*1992, *c.* 5.

Much of the discussion is designed to explain the process of record-gathering and the methods of analyses, both of science and law, that can be used to conduct proportionality review and to assess the relevance of the data to system-wide claims of unconstitutional infliction of the death penalty. Because we address both the individual death sentence and the format for proportionality review under our capital-sentencing scheme, we refer either to defendant, Robert O. Marshall, or the Public Defender where appropriate to the context.

Although we recognize that proportionality is not a scientific determination, we have attempted to make our determinations as precise in terms of their bases and reasoning and as objective as possible. We have used scientific and statistical measures, when helpful, although we recognize that a value judgment is built into practically every measurement. A life is at stake, and although some degree of subjective value judgment may be required, we have attempted to make those judgments explicit so that they can be analyzed and tested against whatever objective measurements are applicable.

Parts of this opinion, then, that deal with the computer-based process of record-gathering are technical in nature; the remainder is more traditional legal analysis. For convenience, we outline the different aspects of the appeal.

## TABLE OF CONTENTS

Introduction ......................................... 117
I. Facts .............................................. 121
II. Proportionality Review Defined ................... 124
III. The "Universe" from which "Similar Cases"
 are Drawn ....................................... 131
IV. Identifying the Comparison Group of "Similar
 Cases" in the Universe .......................... 141
 A. The Catalog of the Cases ..................... 141
 B. The Methods of Selecting a Comparison
 Group of Similar Cases from the Catalog ..... 143
 1. By Salient Factors ........................ 146
 2. By Aggravating/Mitigating Factors ........ 146
 3. By Common Characteristics · Relating
 to all Life/Death Outcomes ............... 147
 C. The Criteria for Comparing the Cases for
 Disproportionality ........................... 148
 1. Frequency Analysis—Will Statistics
 Demonstrate that a Sentence is Dis-
 proportionate? ............................ 152
 2. Precedent–Seeking Analysis—What
 Specifics of Comparison Cases will
 Demonstrate that a Sentence is Dis-
 proportionate? ............................ 154
 D. Should we Consider an Alternative Method
 of Analysis by Categories of Culpability

Derived Solely from the Statutory Aggravating Factors? .........................159
V. Application of the Methods of Proportionality Review to Robert O. Marshall .................166
 A. Frequency Analysis—Suggests a Relatively High Degree of Blameworthiness in Contract–Killing Cases......................166
 B. Precedent–Seeking Comparison with Specific Cases does not Demonstrate Disproportionate Exercise of Sentencing Power ......................................174
VI. That Juries in New Jersey do not "Generally" Return Death Verdicts does not Undermine the Deterrent Value of the Death Penalty to Such an Extent as to Render it a "Cruel and Unusual Punishment." .........................188
VII. Geographic Patterns of Charging and Prosecuting Capital Cases do not Demonstrate an Arbitrary Exercise of the Prosecutorial Function ........................................195
VIII. Neither the Race of the Victim Nor the Race of the Defendant Has Been Shown to be an Impermissible Invidious Factor in the Imposition of the Death Penalty...................207
IX. Revisions That Can be Made Now and in the Future to Simplify the Data–Gathering Process .........................................216
X. Conclusion ......................................218

I

*Facts*

The facts of the *Marshall* I case are more fully stated in the Court's earlier opinion. 123 *N.J.* at 28–62, 586 *A.*2d 85. We repeat only a general outline of the facts that the jury could have found as drawn from the State's brief.

Defendant, a Toms River insurance agent, began an extramarital affair with Sarann Kraushaar, a married woman, in June 1983. As early as December 1983, defendant mentioned

to Kraushaar the idea of killing his wife, Maria. In May 1984, defendant met Robert Cumber of Louisiana and questioned him about hiring an "investigator." Defendant later telephoned Cumber, who referred defendant to Billy Wayne McKinnon, a former sheriff's officer from Louisiana. Defendant agreed to pay McKinnon $5,000 to meet him in Atlantic City, New Jersey.

Defendant met McKinnon at Harrah's Casino in Atlantic City on June 18, 1984, and offered to pay him $65,000 to kill his wife. In addition to the $5,000 that McKinnon had already received, defendant agreed to pay him $10,000 up front and $50,000 from the expected insurance proceeds on his wife's life. At that meeting defendant paid McKinnon $7,000 and gave him a picture of his wife. Defendant told McKinnon to kill her that evening, when defendant would be present. In preparation for the killing, defendant and McKinnon discussed various ways to kill Maria. Defendant believed that he would not be considered a suspect because he was considered an outstanding citizen with influence in the community.

McKinnon did not carry out the murder at that time, but instead returned to Louisiana. Defendant communicated with him on numerous occasions and sent him additional money. Under pressure from defendant to complete the job, McKinnon returned to Atlantic City on July 19, 1984, and met with defendant, who proposed a second plan for the killing to take place that evening. Defendant told McKinnon that he would leave his wife in their car to be executed while defendant went into a restaurant under the pretense of using the bathroom facilities. However, McKinnon did not commit the murder at that time either.

Defendant, persistent in his efforts to have his wife killed, offered McKinnon an "extra fifteen" ($15,000) if he would return to New Jersey a third time to do the "job" before Labor Day. McKinnon agreed, and, on September 6, 1984, he and defendant met at a service area parking lot located south of Toms River. Together they selected a spot on the Garden State

Parkway to carry out Maria's murder and made final plans for the slaying, which was to occur that evening. The plan was to make the murder look like a robbery.

Defendant took his wife to Harrah's Casino in Atlantic City on the night of September 6, 1984, under the pretext of an evening of dining and gambling. He met McKinnon outside Harrah's at approximately 9:30 p.m. and told him that he and Maria would be leaving the casino at about midnight. Defendant also asked McKinnon for the return of the photographs of Maria and of their home that he had given him in June.

As previously arranged with McKinnon, defendant pulled into the Oyster Creek picnic area at milepost seventy-one on the Garden State Parkway at about 12:30 a.m. on September 7. While his wife lay sleeping on the front seat, defendant got out of the car under the ruse of needing to repair a flat tire. Defendant squatted down to prepare himself for being hit on the head as part of the simulated robbery. Maria Marshall was shot in the back twice. She died immediately.

When the police arrived on the scene, defendant continued to make the murder look like a robbery. The State argues that defendant showed no remorse after the crime, but pretended to join his three sons in grieving over the loss of their mother. The State argued at the trial level that he even staged a suicide attempt. Defendant protested his innocence then and continues to do so now in explanation of his conduct.

Defendant's claims of innocence soon unraveled. Telephone records traced him to McKinnon, who turned State's evidence. In exchange for a plea to conspiracy to commit murder, McKinnon implicated Marshall and identified a Louisiana man, Larry Thompson, as the triggerman.

Investigation disclosed that during his planning, defendant had been increasing the insurance policies on his wife's life. At the time of her death, Maria Marshall's life was insured for about $1,400,000. Defendant had been paying his wife's premiums while neglecting his own. Defendant hastened to complete

an application for a policy for a home mortgage before the murder. On the last day of her life, Maria underwent a physical examination for that policy. The State offered proof that defendant could have been motivated to kill by rising debts incurred in his business, including a $128,000 home-equity loan and a short-term bank debt in excess of $40,000. While amassing those large insurance policies, defendant also continued his relationship with Sarann Kraushaar, with whom he had intended to live after the murder.

A jury acquitted Thompson of the murder but accepted McKinnon's version of defendant's role and found him guilty of conspiracy to commit his wife's murder and of murder-by-hire. The only aggravating factor submitted to and found by the jury was that defendant had hired another to commit murder. *N.J.S.A.* 2C:11–3c(4)(e).[1] The two mitigating factors submitted to and found by the jury were that defendant had no history of criminal activity, c(5)(f), and the catch-all mitigating factor, c(5)(h). At the time of the offense defendant was forty-four years of age, and had been involved in charitable and community activities. The jury unanimously found beyond a reasonable doubt that the aggravating factor outweighed the mitigating factors. The trial court sentenced defendant to death.

## II

### *Proportionality Review Defined*

#### A.

The best way to understand the concept of proportionality review is to understand its origin. In *Furman v. Georgia,* 408 *U.S.* 238, 92 *S.Ct.* 2726, 33 *L.Ed.*2d 346 (1972), the Supreme Court invalidated Georgia's death-penalty statute as violating

---

[1] *N.J.S.A.* 2C:11–3 contains the New Jersey Criminal Code's murder provisions. The death-penalty provisions are found in subsections c to e of that section. When referring to those subsections we shall, for instance, use c(4)(e) to refer to *N.J.S.A.* 2C:11–3c(4)(e).

the Eighth Amendment's prohibition against cruel and unusual punishment. The teaching of *Furman* was that a state may not leave the decision of whether a defendant lives or dies to the unfettered discretion of the jury because such a scheme inevitably results in death sentences that are "wantonly and * * * freakishly imposed" and "are cruel and unusual in the same way that being struck by lightning is cruel and unusual." *Id.* at 309–10, 92 *S.Ct.* at 2762–63, 33 *L.Ed.*2d at 390 (Stewart, J., concurring). Prior to that decision, the capital-sentencing procedures in most states delegated to judges and juries plenary authority to decide when a death sentence should be imposed. The sentencer was given "practically untrammeled discretion to let an accused live or insist that he die." *Id.* at 248, 92 *S.Ct.* at 2731, 33 *L.Ed.*2d at 355 (Douglas, J., concurring).

Following the *Furman* decision, many states revised their capital punishment acts. In a series of cases decided four years after *Furman,* the Court upheld the capital-sentencing statutes of Texas, Florida, and Georgia, concluding that those statutes contained safeguards that promised to eliminate the constitutional defects noted in *Furman.* See *Jurek v. Texas,* 428 *U.S.* 262, 96 *S.Ct.* 2950, 49 *L.Ed.*2d 929 (1976); *Proffitt v. Florida,* 428 *U.S.* 242, 96 *S.Ct.* 2960, 49 *L.Ed.*2d 913 (1976); *Gregg v. Georgia,* 428 *U.S.* 153, 96 *S.Ct.* 2909, 49 *L.Ed.*2d 859 (1976). The Supreme Court based its conclusion on the premise that those statutes insured that sentencers would be "given guidance regarding the factors about the crime and the defendant that the State, representing organized society, deems particularly relevant to the sentencing decision." *Gregg, supra,* 428 *U.S.* at 192, 96 *S.Ct.* at 2934, 49 *L.Ed.*2d at 885 (plurality opinion of Stewart, Powell, and Stevens, JJ.).

Justice Stewart's plurality opinion in *Gregg* cited two features of Georgia's scheme that would guide and channel the exercise of sentencing discretion. Georgia's statute had a bifurcated procedure for deciding a defendant's guilt first and sentence later, and also provided for "the further safeguard of

meaningful appellate review" of every death sentence. *Id.* at 195, 96 *S.Ct.* at 2935, 49 *L.Ed.*2d at 887.

When New Jersey reintroduced its Capital Punishment Act, it modeled its statute on Georgia's statute, which had generally followed the Model Penal Code's provisions with respect to the enumeration of aggravating and mitigating factors and the provision of the bifurcated procedure. *Ramseur, supra,* 106 *N.J.* at 183, 202–09, 524 *A.*2d 188. Hence, as enacted, the New Jersey Capital Punishment Act required that the Supreme Court conduct proportionality review to determine whether the death sentence imposed on a defendant is "disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." *L.*1982, *c.* 111.

Following the Supreme Court's decision in *Pulley v. Harris,* 465 *U.S.* 37, 104 *S.Ct.* 871, 79 *L.Ed.*2d 29 (1984), that proportionality review was not an essential constitutional requirement of a state capital-sentencing scheme, our Legislature amended the statute to make proportionality review an option for defendants. *L.*1985, *c.* 478. We assumed that most defendants who receive a death sentence would request proportionality review. *Ramseur, supra,* 106 *N.J.* at 327, 524 *A.*2d 188. As noted, the Legislature has since limited statutory proportionality review to a comparison of death-sentenced cases.

### B.

What did our Legislature intend when it provided for proportionality review in the context of *Gregg v. Georgia?* To answer that question we must digress to distinguish between two aspects of proportionality review. The first has been referred to as "substantive" proportionality review, the second as "procedural" proportionality review. *See* Lisa G. Bradley, *Proportionality in Capital and Non–Capital Sentencing: An Eighth Amendment Enigma,* 23 *Idaho L.Rev.* 195, 206–08, 211–15 (1986–87). We may think of those two aspects of proportionality review as offense-oriented and offender-orient-

ed. Simply stated, the substantive or offense-oriented proportionality review looks to whether the punishment of death is excessive for a particular offense, while procedural or offender-oriented review examines whether, when compared to factually similar cases involving the same offense, a defendant's death sentence is excessive. *See* David C. Baldus, Charles A. Pulaski & George Woodworth, *Comparative Review of Death Sentences: An Empirical Study of the Georgia Experience*, 74 *J.Crim.L. & Criminology* 661, 665–66 (1983) (hereinafter Baldus and Pulaski I).

*Gregg* is particularly instructive because it illustrates the two differing aspects of proportionality review and gives insight into the most probable meaning of our statutory provision. The *Gregg* Court spoke of the useful function of proportionality review and characterized it as assuring that " 'no death sentence is affirmed unless in similar cases throughout the state the death penalty has been imposed generally * * *.' " *Gregg, supra*, 428 *U.S.* at 205, 96 *S.Ct.* at 2939, 49 *L.Ed.*2d at 892 (quoting *Moore v. State*, 233 *Ga.* 861, 213 *S.E.*2d 829, 832 (1975)); *see also Jarrell v. State*, 234 *Ga.* 410, 216 *S.E.*2d 258, 270 (1975) (asking whether "juries generally throughout the state have imposed the death penalty"), *cert. denied*, 428 *U.S.* 910, 96 *S.Ct.* 3223, 49 *L.Ed.*2d 1218 (1976).

The kind of proportionality review that asks whether the death penalty is "generally" imposed is an Eighth Amendment inquiry into substantive proportionality—does the punishment fit the crime? (That analysis has also been used to analyze Eighth Amendment disproportionality for certain *classes* of offenders, *e.g.*, minors, *Stanford v. Kentucky*, 492 *U.S.* 361, 109 *S.Ct.* 2969, 106 *L.Ed.*2d 306 (1989), or mildly retarded, *Penry v. Lynaugh*, 492 *U.S.* 302, 109 *S.Ct.* 2934, 106 *L.Ed.*2d 256 (1989).)

That type of substantive review is best perceived in the context of cases such as *Coker v. Georgia*, 433 *U.S.* 584, 97 *S.Ct.* 2861, 53 *L.Ed.*2d 982 (1977), and *Enmund v. Florida*, 458

*U.S.* 782, 102 *S.Ct.* 3368, 73 *L.Ed.*2d 1140 (1982). In *Coker,* for example, the Court held that the imposition of the death penalty for rape violated the Eighth Amendment's prohibition against cruel and unusual punishment because it was "grossly disproportionate and excessive punishment" for the commission of that crime. 433 *U.S.* at 592, 97 *S.Ct.* at 2866, 53 *L.Ed.*2d at 989. In reaching that conclusion, the Court paid particular attention to such factors as "public attitudes concerning a particular sentence—history and precedent, legislative attitudes, and the response of juries reflected in their sentencing decisions." *Ibid.*

Similarly, in *Enmund,* the Court found that the imposition of the death penalty is disproportionate for one who "aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." 458 *U.S.* at 797, 102 *S.Ct.* at 3376, 73 *L.Ed.*2d at 1151. Tracking the analysis followed in *Gregg* and *Coker,* the *Enmund* Court held that when "[t]he evidence is overwhelming that American juries have repudiated imposition of the death penalty for [particular] crimes [such as rape or accomplice-murder]," *id.* at 794, 102 *S.Ct.* at 3374, 73 *L.Ed.*2d at 1150, death is an unconstitutional penalty absent a showing that the actor killed, attempted to kill, or intended to participate in or facilitate a murder. *Id.* at 798, 102 *S.Ct.* at 3377, 73 *L.Ed.*2d at 1152. The Court observed that "if prosecutors rarely sought the death penalty for accomplice felony murder * * * it would tend to indicate that prosecutors, who represent society's interest in punishing crime, consider the death penalty excessive for accomplice felony murder." *Id.* at 796, 102 *S.Ct.* at 3376, 73 *L.Ed.*2d at 1151. When "legislatures and juries [have] firmly rejected the penalty of death," *id.* at 814, 102 *S.Ct.* at 3385, 73 *L.Ed.*2d at 1162 (O'Connor, J., dissenting), for a particular offense, then the imposition of the death penalty for that crime is a substantially disproportionate and excessive punishment.

In later applications of that doctrine, as in *Tison v. Arizona,* 481 *U.S.* 137, 107 *S.Ct.* 1676, 95 *L.Ed.*2d 127 (1987) (imposition of death penalty for reckless indifference murder not overwhelmingly repudiated), the Court has adhered to that basic premise of substantive or Eighth Amendment disproportionality. Only in that context must the type of near-unanimous generality be found, and it is not a case-by-case generality but rather a jurisdiction-by-jurisdiction generality of rejection.

When the *Gregg* court spoke favorably of the Georgia Supreme Court's requirement that the offense be one in which the death penalty has been imposed generally, it was actually referring to the Eighth Amendment, substantive analysis, because *Gregg* involved two sentences of death: one for armed robbery and one for murder. (At that time armed robbery standing alone was a statutory basis for capital punishment in Georgia.) The Georgia court vacated the death sentence for armed robbery but affirmed the sentence of death for murder. *Gregg v. State,* 210 *S.E.*2d 659, 667 (1974). In the case of robbery, it simply noted that the imposition of death sentences for that crime were "unusual in that they are rarely imposed for [armed robbery]." *Id.* at 667. Recognizing that the magnitude of the punishment imposed must be related to the degree of harm inflicted on the victim, absent the victim's murder, juries generally would not impose the sentence of death for armed robbery.

■ But that offense-oriented analysis is not the review that we exercise here. Rather, we ask whether the "punishment fits the criminal." The procedural, offender-oriented proportionality review undertaken by the Georgia Supreme Court with respect to the murder count consisted simply of a recital of a series of cases considered by that court in making its proportionality analysis and a statement that "[a]fter considering both the crimes and the defendant and after comparing the evidence and the sentences in this case with those of previous murder cases, we are * * * of the opinion that these two sentences of

death are not excessive or disproportionate to the penalties imposed in similar cases." *Ibid.* That court did not suggest or require that the sentence of death be "generally imposed" in the sense of near unanimity in the comparison cases.

### C.

When the Supreme Court later held in *Pulley v. Harris* that proportionality review was not constitutionally required, it made clear that it was not discarding the Eighth Amendment proportionality analysis. The *Pulley* Court emphasized:

> At the outset, we should more clearly identify the issue before us. Traditionally, "proportionality" has been used with reference to an abstract evaluation. of the appropriateness of a sentence for a particular crime. Looking to the gravity of the offense and the severity of the penalty, to sentences imposed for other crimes, and to sentencing practices in other jurisdictions, this Court has occasionally struck down punishments as inherently disproportionate, and therefore cruel and unusual, when imposed for a particular crime or category of crime.

> \* \* \* \* \* \* \* \*

> The proportionality review sought by Harris \* \* \* and provided for in numerous state statutes [referring specifically to Georgia's] is of a different sort. This sort of proportionality review presumes that the death sentence is not disproportionate to the crime in the traditional sense. It purports to inquire instead whether the penalty is nonetheless unacceptable in a particular case because disproportionate to the punishment imposed on others convicted of the same crime.

> [465 *U.S.* at 42–43, 104 *S.Ct.* at 875–76, 79 *L.Ed.*2d at 35–36 (footnotes omitted).]

The dissenting members in *Pulley* suggested not that in any sense there be a requirement of generality or nearly unanimous death verdicts for those convicted of the same crime, but rather suggested only " 'that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action'," *id.* at 63, 104 *S.Ct.* at 886, 79 *L.Ed.*2d at 49 (Brennan, J.) (quoting *Gregg, supra,* 428 *U.S.* at 189, 96 *S.Ct.* at 2932, 49 *L.Ed.*2d at 883), and have " 'insiste[d] that capital punishment be imposed fairly, and with reasonable consistency,

or not at all.' " *Ibid.* (quoting *Eddings v. Oklahoma,* 455 *U.S.* 104, 112, 102 *S.Ct.* 869, 875, 71 *L.Ed.*2d 1, 9 (1982)). In their view, proportionality review, "[a]lthough clearly no panacea, * * * often serves to identify the most extreme examples of disproportionality among similarly situated defendants." *Id.* 465 *U.S.* at 71, 104 *S.Ct.* at 890, 79 *L.Ed.*2d at 53.

That, we believe, is an acceptable understanding of the intentions of the framers of our Act—that statutory proportionality review should seek to ensure that the death penalty is being administered in a rational, non-arbitrary, and evenhanded manner, fairly and with reasonable consistency. That review serves as "a means through which to monitor the imposition of death sentences and thereby to prevent any impermissible discrimination in imposing the death penalty." *Ramseur, supra,* 106 *N.J.* at 327, 524 *A.*2d 188.

In conducting such proportionality review, then, one need not search for the nearly unanimous degree of generality that attends the Eighth Amendment rejection of the death penalty for particular crimes or categories of crimes as being disproportionate punishment. The quest in some ways is for the antithesis of that argument. Maryland has expressed its search for proportionality thus: "[A] death sentence is comparatively excessive if other defendants with similar characteristics generally receive sentences other than death for committing factually similar offenses in the same jurisdiction." *Tichnell v. State,* 297 *Md.* 432, 468 *A.*2d 1, 17 n. 18 (1983) (citing David C. Baldus, Charles A. Pulaski, George Woodworth & Frederick A. Kyle, *Identifying Comparatively Excessive Sentences of Death: A Quantitative Approach,* 33 *Stan.L.Rev.* 1 (1980) (hereinafter Baldus and Pulaski II)).

### III

*The "Universe" from which "Similar Cases" are Drawn*

The first step in any proportionality review undertaking is to establish the "universe" of cases that the Court will consider.

In our earlier decision, *In re Proportionality Review Project, supra,* 122 *N.J.* 345, 585 *A.*2d 358, we declined to make a preliminary determination of the relevant universe of cases. The Attorney General had contended that the only appropriate universe is one comprised exclusively of those cases in which a death sentence has been imposed. The Legislature has since adopted the Attorney General's view. *L.*1992, *c.* 5.

In the *Final Report,* the Master expressed the view that "penalty-trial cases are the narrowest universe that could support a coherent proportionality review system," noting that at least nine other state courts conduct proportionality review on the basis of penalty-trial cases. David C. Baldus, *Death Penalty Proportionality Review Project: Final Report to the New Jersey Supreme Court,* 1, 45 (Sept. 24, 1991) (hereinafter *Final Report* ). Nevertheless, the Master recommended that the universe also include clearly death-eligible homicide cases that did not advance to a penalty-phase hearing because of prosecutorial decisions not to seek the death penalty.

Although the universe issue has been vigorously contested, we consider the controversy to be significantly overstated. How detailed a compilation of homicide cases is required to facilitate an adequate proportionality review of a given death sentence depends on the purposes to be served by that review. We assume that the basic difference in the respective positions of the parties about the breadth of the field of homicide cases to serve as a source for proportionality review stems from disagreement about the objectives to be achieved by proportionality review. By identifying those objectives we shall also determine the appropriate universe of cases.

### A.

We offer this preliminary observation. The Attorney General, in briefs and at oral argument, objects to the inclusion of non-penalty-phase homicide cases in the universe, contending that consideration of such cases questions the correctness of

the prosecutor's discretion to seek or not to seek a death penalty in a specific case. In our view, that objection misconceives the issue. Courts that conduct proportionality review by considering both death-sentenced cases and life-sentenced penalty-phase cases focus not on whether the jury decision was correct, but rather on whether the differences in the dispositions of comparable homicide cases are relevant to whether the death sentence under review may be disproportionate. Similarly, a universe that includes death-eligible homicides that prosecutors elect not to prosecute as capital cases may also be relevant to proportionality review for purposes of comparison with a specific death sentence, irrespective of the merits of the prosecutor's discretionary decision not to treat the homicide as a capital murder case.

In *Ramseur*, we specifically acknowledged that the basic purpose of the proportionality review afforded by our Capital Punishment Act is to determine whether the death penalty in a specific case is " 'disproportionate to the punishment imposed on others convicted of the same crime.' " 106 *N.J.* at 326, 524 *A.*2d 188 (quoting *Pulley v. Harris, supra,* 465 *U.S.* at 43, 104 *S.Ct.* at 875, 79 *L.Ed.*2d at 36).

Were the Court to limit the focus of proportionality review to that inquiry—whether a specific death sentence is disproportionate to the punishment imposed on others convicted of the same crime—comparison with only cases in which a death sentence was imposed would be inadequate. A simple example illustrates the point. On the assumption that 100 robbery-felony-murder cases are prosecuted as capital crimes, all defendants are convicted and one defendant is sentenced to death, a comparison of the death-sentenced defendant's punishment with the punishment imposed only on other death-sentenced defendants would exclude from the proportionality-review process the ninety-nine robbery-felony-murder defendants that juries did not sentence to death. Indisputably, the determination whether that single death sentence is disproportionate can be made only by comparing it with the life sentences imposed on

the ninety-nine defendants convicted of the same crime. We therefore consider it self-evident that the universe for proportionality review must, at a minimum, include all penalty-trial cases.

Comparison of a specific death sentence with the punishments imposed on other defendants convicted of capital murder and sentenced *either* to death or life imprisonment addresses the possibility that a *jury* may impose a disproportionate death sentence on a specific defendant. A closely-related issue is raised by the argument that a death sentence may be disproportionate, at least in part, because prosecutors frequently exercise their discretion not to seek the death penalty for a specific type of homicide. We first adverted to that expanded function of proportionality review in *Ramseur,* where we raised the question whether

> to expand the potential cases for comparison to include all those in which the death penalty could have been requested by the State. Here we may anticipate considering whether to address concerns about possible misuse of prosecutorial discretion * * * including in the review all cases in which a prosecutor had the discretion to seek the death penalty.

[106 *N.J.* at 329, 524 *A.*2d 188 (citation omitted).]

We reiterated that concern in *State v. Koedatich,* 112 *N.J.* 225, 548 *A.*2d 939 (1988), *cert. denied,* 488 *U.S.* 1017, 109 *S.Ct.* 813, 102 *L.Ed.*2d 803 (1989), noting that the development of prosecutorial guidelines for the selection of capital cases would "promote uniformity in the administration of the death penalty, which will be an additional safeguard against arbitrariness and an assistance to this Court in its developing proportionality review." *Id.* 112 *N.J.* at 258, 548 *A.*2d 939. More recently, in *State v. Kiett,* 121 *N.J.* 483, 582 *A.*2d 630 (1990), we again acknowledged that disproportionality can originate in both prosecutorial and jury decisions. *Id.* at 498, 582 *A.*2d 630.

The point may best be illustrated by the prior example of 100 robbery-felony-murder defendants, only one of whom is sentenced to death. Were we to assume that the remaining ninety-nine defendants were prosecuted and convicted of *non-capital*

murder because of prosecutorial decisions not to seek the death penalty, the disproportionality of the single defendant's death sentence would arise not because of a disproportionate jury determination but because the prosecutorial decision to seek the death penalty was unique. That type of disproportionate death sentence could not be identified by a proportionality-review process that was limited to capital cases tried to a penalty phase; it could be identified, however, by a universe that included clearly death-eligible homicides that were not prosecuted as capital cases.

The Master's report emphasizes that prosecutorial decisions not to seek the death penalty for certain death-eligible homicides are influenced by the prosecutors' predictions of death-worthiness, *i.e.*, the likelihood that a jury would impose the death penalty after a penalty-phase trial. Accordingly, one of the purposes served by a universe expanded to include such death-eligible homicides not prosecuted as capital crimes is that the proportionality-review process can then consider *both* jury and prosecutorial decisions about deathworthiness in determining whether a specific death sentence is disproportionate.

We identified yet a third potential purpose for proportionality review in *Ramseur*—the prevention of "any impermissible discrimination in imposing the death penalty." 106 *N.J.* at 327, 524 *A.*2d 188. We stated that "[d]iscrimination on the basis of race, sex, or other suspect characteristic cannot be tolerated," *ibid.*, and noted that "factors such as race, sex, and socioeconomic status might also be appropriate considerations for reviewing proportionality." *Id.* at 330, 524 *A.*2d 188. In that connection, we considered preliminarily in *Koedatich, supra,* 112 *N.J.* at 255–58, 548 *A.*2d 939, the contention that county-by-county as well as race-of-victim related disparities had already been detected in the prosecution of death-penalty cases. Elsewhere in this opinion we address those portions of the Master's report that consider the geographic distribution of capital-charging and sentencing decisions within the state, *infra* at 195–207, 613 *A.*2d at 1102–1108, as well as the report's sugges-

tion of a possible discrepancy in capital-sentencing rates that may be correlated with the race of the victim or the race of the defendant. *Infra* at 207–215, 613 *A*.2d at 1108–1113. We note that our history and traditions "would never countenance racial disparity in capital sentencing," *infra* at 207, 613 *A*.2d at 1108. We consider and evaluate the statistical data in the Master's report suggesting the possibility that a black defendant has a substantially greater risk of being sentenced to death than do other defendants, *infra* at 208–215, 613 *A*.2d at 1109–1112, as well as data suggesting that certain white-victim homicides are substantially more likely to advance to penalty trial than homicide cases involving non-white victims. *Infra* at 210, 613 *A*.2d at 1110.

Although our evaluation of those data persuades us that the observed deviations do not "compel a conclusion of substantial discriminatory effect" in the administration of our death-penalty law, *infra* at 212, 613 *A*.2d at 1111, we note that the Master's statistical data concerning race-of-defendant and race-of-victim disparity necessarily include death-eligible homicides that did not advance to penalty trial. Similarly, the report's data concerning the geographic distribution of capital-charging and capital-sentencing decisions also rely on death-eligible homicides that were not charged as capital murder. The conclusion is inescapable that a universe restricted to penalty-phase cases would be inadequate to enable us to verify that our capital-sentencing procedure does not tolerate "discrimination on an impermissible basis, including, but not limited to, race and sex." *Ramseur, supra,* 106 *N.J.* at 330, 524 *A*.2d 188.

We note that courts in a few other jurisdictions have acknowledged the appropriateness for proportionality-review purposes of considering death-eligible homicides that did not advance to a penalty-phase hearing. *See Tichnell v. State, supra,* 468 *A*.2d at 18 (concluding proportionality-review process may take into account non-capital murder cases); *State v. Moore,* 210 *Neb.* 457, 316 *N.W.*2d 33, 44 (conducting proportionality review by comparison with all other first-degree-murder convic-

tions), *cert. denied,* 456 *U.S.* 984, 102 *S.Ct.* 2260, 72 *L.Ed.*2d 864 (1982); *State v. Williams,* 205 *Neb.* 56, 287 *N.W.*2d 18, 28–29 (1979) (same), *cert. denied,* 449 *U.S.* 891, 101 *S.Ct.* 255, 66 *L.Ed.*2d 120 (1980); *Commonwealth v. Pursell,* 508 *Pa.* 212, 495 *A.*2d 183, 198 (1985) (conducting proportionality review by comparison with other first-degree-murder cases in which evidence could support an aggravating circumstance); *State v. Rupe,* 108 *Wash.*2d 734, 743 *P.*2d 210, 229 (1987) (concluding that for purposes of proportionality review, similar cases include cases in which defendant convicted of first-degree murder regardless of whether death penalty was sought), *cert. denied,* 486 *U.S.* 1061, 108 *S.Ct.* 2834, 100 *L.Ed.*2d 934 (1988); *State v. Harris,* 106 *Wash.*2d 784, 725 *P.*2d 975, 982–83 (1986) (conducting proportionality review of death sentence for contract killing court considered contract-murder cases in which death penalty was not sought by prosecutor), *cert. denied,* 480 *U.S.* 940, 107 *S.Ct.* 1592, 94 *L.Ed.*2d 781 (1987).

Accordingly, we hold that the purposes to be achieved by proportionality review require that the universe include clearly death eligible homicides in which the prosecutor elected not to seek the death penalty. We are also satisfied with the process by which the Master identified those death eligible cases that did not proceed to a penalty trial. A short summary of that process will be sufficient to explain the methodology used.

B.

By a review of statistics compiled by the New Jersey State Police, the Master reviewed the 3200 homicides committed in New Jersey since August 6, 1982. He eliminated homicides that were clearly not death eligible, such as cases involving juveniles, death-by-auto, or acquittal in a murder trial. He did the same with other non-penalty trial homicide cases that involved indictments for less than murder. The only cases to survive the preliminary screen were (a) pleas to murder, felony murder, and aggravated manslaughter when the original

charge was a form of murder, and (b) jury convictions for any form of murder. Approximately 1500 cases remained.

The second stage involved the evaluation of the death eligibility of the remaining cases in terms of the defendant's conduct, the mental state involved, and the presence of statutory aggravating circumstances. The Master and staff provided through the Administrative Office of the Courts (AOC) consulted presentence reports and court records, trial counsel, and/or appellate records. Based on information gained from those sources, the cases were provisionally coded as (1) clearly death eligible, (2) questionable concerning death eligibility, or (3) clearly not death eligible. As the cases were screened, progress reports were sent to the offices of the Attorney General, the County Prosecutor's Association, and the Public Advocate. Although meetings were held, neither the Attorney General's Office nor the County Prosecutor's Association responded to requests for information on specific cases.

All penalty-trial cases were listed initially as "clearly death-eligible." Some were later reclassified because of changes in the law or because no aggravating factors were found at the penalty trial. Non-penalty-trial cases were classified as death eligible if the prosecutor had declined to prosecute the case capitally but there was evidence to support conclusions (a) that the defendant had intended to kill the victim, (b) that the defendant had killed the victim by his own conduct or paid another to kill the victim, and (c) that at least one statutory aggravating factor had been present.

Those cases were further classified as clearly death eligible, questionable, and clearly not death eligible. On the basis of evidentiary standards, the case would remain in the clearly death-eligible category only if its evidentiary strength was strong or overwhelming.

The study started with 3,200 homicides. After the threshold screen that excluded cases involving death-by-auto, juvenile defendants, and acquittals, 1496 cases remained. Following the

factual-case screen, the evidentiary-strength screen, and the screen of the penalty-trial cases, the Master identified 246 clearly death-eligible cases. Of the clearly death-eligible cases, 132 had resulted in capital-murder convictions and had advanced to a penalty trial and 114 were cases in which the prosecutor had not sought the death penalty. Two hundred and fifty questionable cases were excluded from the universe.

We realize that other courts throughout the country have used different measures of comparison. For example, the Georgia Supreme Court uses all capital-felony cases that have been appealed for comparison purposes. *Ross v. State*, 233 *Ga.* 361, 211 *S.E.*2d 356 (1974), *cert. denied*, 428 *U.S.* 910, 96 *S.Ct.* 3222, 49 *L.Ed.*2d 1217 (1976). That court found that preventing the imposition of an arbitrary sentence "is ably served by reference to appealed cases which represent a sufficient cross section of similar cases upon which an adequate comparative review can be made." *Id.* 211 *S.E.*2d at 359. Maryland's universe of cases is comprised solely of "those first degree murder cases in which the State sought the death penalty * * * whether it was imposed or not." *Tichnell, supra,* 468 *A.*2d at 17. Similarly, Delaware's universe consists of a comparison between the subject case and "the penalties in all first degree murder cases which have gone to trial and a penalty hearing." *Dawson v. State,* 581 *A.*2d 1078, 1108 (1990) (citations omitted), *judgment vacated,* 503 *U.S.* ——, 112 *S.Ct.* 1093, 117 *L.Ed.*2d 309 (1992). The Pennsylvania Supreme Court uses a universe that requires "an independent evaluation of all cases of murder of the first degree convictions which were prosecuted or could have been prosecuted [as capital cases]." *Commonwealth v. Frey,* 504 *Pa.* 428, 475 *A.*2d 700, 707, *cert. denied,* 469 *U.S.* 963, 105 *S.Ct.* 360, 83 *L.Ed.*2d 296 (1984).

We do not doubt that a pool of all cases that go to a penalty trial would form a reasonably-reliable data base or that a pool of cases in which aggravating factors have been served would also be a reliable pool. The State's expert, Dr. Herbert I. Weisberg, suggests the use of a penalty-trial pool in which at

least one aggravating factor has been found. We discuss Dr. Weisberg's report further in Part IV, section D, *infra* at 159–166, 613 *A.*2d at 1085–1088. That too is obviously a reasonably-reliable pool of cases.

Had it appeared to be an insurmountable task to examine all "clearly death eligible cases," we might have made a mid-course correction. *In re Proportionality Review, supra,* 122 *N.J.* 345, 585 *A.*2d 358. During the proceedings involved in that appeal we learned that approximately ten to fifteen additional cases per year might have to be added to the pool of death-noticed cases to establish a pool of clearly death-eligible cases. *Id.* at 347, 585 *A.*2d 358.

We routinely gather information concerning all aspects of the criminal-justice system. The Task Force on Minority Concerns has evaluated, on a system-wide basis, the effect of race in the criminal-justice system. See *Interim Report of the New Jersey Supreme Court Task Force on Minority Concerns* (Aug.1989) (hereinafter *Interim Report*). The New Jersey Code of Criminal Justice requires that the Criminal Disposition Commission review "all aspects of the criminal justice system relating to the disposition of criminal offenders," and submit an annual report detailing its findings and recommendations concerning the disposition of criminal offenders. See *N.J.S.A.* 2C:48–1 to –4. The New Jersey Code of Juvenile Justice, *N.J.S.A.* 2A:4A–20 to –91, has likewise created a Juvenile Delinquency Commission, *N.J.S.A.* 2A:4A–49(b), "to study and review the provisions of the [Code of Juvenile Justice] and all aspects of the juvenile justice system with particular reference to delinquency trends and dispositions."

Because of the use that we intend to make of the data, as we shall explain them throughout the course of this opinion, we see no need to address in detail the claimed deficiencies in the data-gathering process undertaken by the Master. Suffice it to observe that while the litigation was pending, his efforts were hampered by the adversarial interests of the parties for which

no blame is to be assessed. We shall, in Part IX of this opinion, *infra* at 216, 613 *A*.2d at 1113, suggest a means to address those claimed deficiencies.

## IV

### *Identifying the Comparison Group of "Similar Cases" in the Universe*

#### A.

##### *The Catalog of the Cases*

■ Once the universe of cases has been identified for comparison, there are two further steps to the process of proportionality review. The first is the development of the set of characteristics that will identify a comparison group of similar cases and similar defendants; the second is the development of methods of analysis that will enable the Court to identify disproportionality.

The first step requires the creation of what is today called a data base. Another generation of lawyers and judges would have thought of that process in terms of a series of index cards with the details of cases on them. One wishing to sort the cases into groups of "similar cases" would read the cards for distinguishing characteristics, such as a rape-murder, and place them within one pile. Within that group of rape-murders, one might sort the cases further by noting the cards that showed torture or mutilation of the victim or a prior murder as aggravating factors or, in contrast, the cards that revealed recognized mitigating factors, such as remorse or cooperation with the authorities.

That type of sorting process is described as an *a priori* or clinical approach to case comparisons. Here, the lawyer's basic skills developed from the case-method analysis taught in law school are used. The reviewing court uses intuition or experience to select features that it determines probably influenced the life/death decision.

If there is a sufficient number of cards with a definable pattern of similar characteristics, a court can evaluate whether a particular death sentence fits the pattern established by the case characteristics. A good illustration of that process is found in the dissenting opinion of Judge Davidson of the Maryland Court of Appeals in which he considered a series of cases involving the shooting deaths of public officials or other victims in the course of a robbery and the various aggravating and mitigating factors in those cases. *Tichnell, supra,* 468 *A.2d* at 27. The National Center for State Courts recommends that a court begin its process of review similarly by examining cases on "all fours" with the subject case. David C. Baldus, Charles A. Pulaski, Jr. & George Woodworth, *Arbitrariness and Discrimination in the Administration of the Death Penalty: A Challenge to State Supreme Courts,* 15 *Stetson L.Rev.* 133, 176 & n. 89 (1986) (hereinafter Baldus and Pulaski III).

If there is an insufficient number of cases fitting that pattern, a court might wish to consider developing a pattern of similar characteristics by matching features in other classes of cases. That matching process would require some form of cross-index from different piles of cards and would produce yet another set of cases with a broader cross-section of converging characteristics—for example, all felony-factor cases, whether rape, robbery, or kidnapping, that displayed similar characteristics such as no prior record or the influence of extreme mental or emotional disturbance.

A second type of sorting might start with no preconceived notions of what might bring about either a life verdict or a death verdict. Then one would look at all the cards and attempt to choose from them the features that are common to life outcomes and those that are common to death outcomes. That method of case comparison is described as an actuarial or empirical analysis of the cases. That method recalls that of the epidemiologist. For instance, if a heavy smoking habit is found

in 90 out of 100 cases of lung cancer, smoking may be thought to be a cause of the cancer.

The empirical approach to classifying capital cases as similar or dissimilar seeks to employ "those characteristics of the cases that best explain the sentences actually imposed." Baldus and Pulaski III, *supra*, 15 *Stetson L.Rev.* at 181. Not all jurisdictions have or maintain the data necessary to use the empirical approach. In combining aspects of the two approaches, for example, the case method with the statistical method, the Master has taken advantage of the available data to sort out the cases on the basis of the characteristics that both prosecutors in the charging process and juries in the deliberative process deem most relevant.

Without minimizing the effort required to collate the data in that way, we may describe the process engaged in by the Master as a form of electronic-index-card sorting. Under the Master's direction, our AOC took the information on the index cards and fed it into a computer using a series of codes that will allow the information to be retrieved from the computer.

### B.

#### *The Methods of Selecting a Comparison Group of Similar Cases from the Catalog*

The next step in the process is to develop the methods of analysis, that is, the manner in which the Court must look at the electronic-index cards to find the similarities. The mathematical and statistical concepts that underlie the process are set forth in the *Final Report* and the *Weisberg Report* submitted by the Attorney General. Further background may be found in the Report of the National Center for State Courts or the works of Professor Baldus and his colleagues. See Baldus and Pulaski II, *supra*, 33 *Stan.L.Rev.* 1.

We need give only a broad outline of the concepts and have enough familiarity with them ourselves so that the product of

the analysis will enable us to accomplish our function of review-
ing similarities to determine whether there has been a meaning-
ful distinction in the imposition of the death penalty.

 As noted, there are two ways of approaching the data.
Under the first method, using the index-card illustration (for
example, the robbery-murders of police officers), the reviewing
court will establish *a priori* (that is, before the fact) what it
believes are the similar characteristics that influence the life/
death decision. Under the second method, the reviewer assem-
bles all the life/death verdicts and attempts to extract from
those the distinguishing characteristics that appear to present a
pattern of life/death decisions. One familiar with the scientific
method of analysis will recognize that a pattern of decision will
develop. The Court will not rely on either method exclusively.
Rather, we will use each as a check on the other in reviewing
the proportionality of Robert Marshall's sentence. As we have
explained in Part II, *supra* at 124, 613 *A.*2d at 1066, we believe,
as does the United States Supreme Court (albeit in the more
limited context of Eighth Amendment proportionality, see *Cok-
er, supra*, 433 *U.S.* 584, 97 *S.Ct.* 2861, 53 *L.Ed.*2d 982), that the
charging decisions of prosecutors, as well as the sentencing
decisions of juries, both representing society's interest in pun-
ishing crime, will demonstrate when a death sentence is exces-
sive and thus should be factored into any analysis of relative
disproportionality.

Recognizing, for example, that rarely, if ever, will compari-
son crimes of offenders be on "all fours" (*e.g.*, no two conve-
nience-store-holdup murders are exactly the same), a broader
search for similarity is required. One method of evaluating
substantive disproportionality, which allows the Court to broad-
en its base of similar cases, is that of "blameworthiness,"
mentioned by Justice O'Connor in her dissenting opinion in
*Enmund.* 458 *U.S.* at 823–25, 102 *S.Ct.* at 3390–91, 73 *L.Ed.*2d
at 1168–70. The concept of "blameworthiness" can serve in

procedural disproportionality review as well. Building on that concept, the Master has sorted the index cards to measure similar cases in terms of objectively-verified measures of blameworthiness derived from comparing assumed and empiric characteristics with actual results in the implementation of New Jersey's death penalty. A thumbnail sketch of that process is:

### 1. The Salient–Factors Measure

That measure defines "similar cases in terms of factual comparability." *Final Report, supra,* at 80. It is based on both *a priori* or assumed considerations (*e.g.,* that a murder by a defendant with a prior murder conviction will be more blameworthy than not), and by empirical considerations (*e.g.,* the data collected showed that factor is statistically and practically important in explaining the decisions of prosecutors and juries). Take, for example, the convenience-store-robbery murder by a previously-convicted murderer. Although in each case the crime is the same, experience in the form of actions of prosecutors and juries confirms the intuitive judgment that the first-time offender is less blameworthy. By sorting out those factual patterns (typologies) of cases in terms of statutory aggravating and mitigating factors, see *N.J.S.A.* 2C:11–3c(4) & (5), as well as other non-statutory aggravating and mitigating circumstances that are "important conceptually or statistically," *Final Report, supra,* at 84, the data cards are catalogued to rank cases in order of the predicted probability of receiving a death sentence. Those electronic-index cards arranged by weighted sorting yield a sample of "similar cases" in terms of factually-related blameworthiness.

### 2. Numerical Preponderance of Aggravating and Mitigating Factors

Aside from the type of case, *e.g.,* a rape-murder or robbery-murder, intuitively we are convinced that a case with more aggravating factors and fewer mitigating factors would be more likely to result in the imposition of a death sentence. A convenience-store robbery murder committed by a repeat killer to escape detection is more likely to produce a death sentence. Hence, these raw numbers may be used as a measure of blameworthiness. The *Final Report* has confirmed that intuition. For instance, the results of the Master's analysis reveal that "in cases with a single aggravating factor, the death-

sentencing rate declines sharply in the presence of one or more mitigating factors (the average rate among those cases is .10 (5/50))." *Final Report, supra,* at 90. Thus, the index of cards will yield samples of similar cases in terms of the numbers of factors. That is one method used by Pennsylvania. See *Commonwealth v. Pirela,* 510 *Pa.* 43, 507 *A.*2d 23, 32 (1986).

The problem with that analysis is that it assumes that prosecutors and juries weigh aggravating and mitigating factors equally. For example, the "grave risk of death to another" factor, c(4)(b), carries much less weight than the "cop-killer" factor, c(4)(h). Hence, the Master weighted the statutory factors to reflect what the data showed. Finally, he added non-statutory aggravating and mitigating factors, for example, victimization that falls short of the torture/depravity factor, c(4)(c), but which is characteristically found to influence prosecutors and juries. That produces the final method of sorting cases to determine the class of similar cases.

### 3. Index–of–Outcomes Test

The Master refers to that as a "logistic multiple-regression" analysis. *Final Report, supra,* at 92. The index produced "reflects the differential weights placed by jurors on the different statutory and nonstatutory aggravating and mitigating circumstances." *Id.* at 92–93. It adds to our *a priori* assumptions what experience has taught us—for example, that

> there is a penalty-trial death-sentencing rate of only .12 in the grave risk [to others] (4b) cases versus a rate of .67 in the pecuniary gain killer (4d) and police-victim (4h) cases. The impacts of the individual mitigating factors also vary. The defendant's age (5c) has the greatest mitigating effect, while in contrast, the (5b) factor, victim contribution to the homicide, may have an aggravating effect.

[*Id.* at 92.]

Testing the weighted statutory and non-statutory aggravating and mitigating factors present in both penalty-trial cases and in all clearly death-eligible cases yielded a scale of overall defendant culpability "as measured by the presence or absence in the cases of factors that appear to influence prosecutorial

and jury decision-making." *Id.* at 93. The cluster of cases ranked near the subject case on the index yields a sample of cases that are similar in culpability. The end-product of the electronic sorting is a series of cases not unlike the series of index cards that we started with in our analogy.

## C.

### *The Criteria for Comparing the Cases for Disproportionality*

The data having been assembled and the means having been established to sort them to identify the comparison group of "similar cases," the final step in the process is to develop criteria for evaluating when a particular sentence is disproportionate in relation to the other "similar cases" identified.

Jurisdictions that conduct proportionality review use varied criteria to evaluate when a death sentence is disproportionate. Missouri classifies similar cases as those "in which both death and life imprisonment were submitted to the jury, and which have had been affirmed on appeal." *State v. Mercer,* 618 *S.W.*2d 1, 11, *cert. denied,* 454 *U.S.* 933, 102 *S.Ct.* 432, 70 *L.Ed.*2d 240 (1981). Without elaboration, the *Mercer* court concluded that those cases supported affirmance of the death penalty in the subject case, stating "defendant's sentence to death for the murder * * * is not excessive or disproportionate to the penalty imposed in similar cases considering the crime and the defendant." *Id.* at 11.

Following prompting by Justice Exum in his dissenting opinion in *State v. Pinch,* 306 *N.C.* 1, 292 *S.E.*2d 203, 230, *cert. denied,* 459 *U.S.* 1056, 103 *S.Ct.* 474, 74 *L.Ed.*2d 622 (1982), the North Carolina Supreme Court articulated its method for comparing similar cases. That court uses all cases arising since the effective date of its capital punishment statute that have been "tried as capital cases and reviewed on direct appeal by this Court and in which the jury recommended death or life imprisonment or in which the trial court imposed life imprisonment

after a jury's failure to agree upon a sentencing recommendation within a reasonable period of time" as a pool for comparison purposes. *State v. Williams,* 308 *N.C.* 47, 301 *S.E.*2d 335, 355, *cert. denied,* 464 *U.S.* 865, 104 *S.Ct.* 202, 78 *L.Ed.*2d 177 (1983). North Carolina does not "propose to attempt to employ mathematical or statistical models involving multiple regression analysis or other scientific techniques, currently in vogue among social scientists, which have been described as having 'the seductive appeal of science and mathematics.'" *Ibid.* (quoting *Blake v. Zant,* 513 *F.Supp.* 772, 827 (S.D.Ga.1981)). It believes that a reviewing court might tend to "disregard the experienced judgments of its own members in favor of the 'scientific' evidence resulting from quantitative analysis." *Id.* at 356. Thus, the court concluded that it would rely on its own case reports in the "similar cases" forming the pool that would be used for comparison purposes. *Ibid.*

The methodology of comparison used in *Williams* consisted of an identification of those cases (without description), a recital of the facts of the case being reviewed (a bestial torture-rape of an one-hundred-year-old woman), and a conclusion that the murder was "so brutal and so utterly senseless as to lead us to conclude that the sentence of death imposed in this case is not disproportionate or excessive considering both the crime and the defendant." *Id.* at 357.

As stated previously, Georgia's universe of cases includes all capital-felony cases that are appealed. In order to determine proportionality, the Georgia court selects for comparison cases those that are factually similar to the subject case. *See Godfrey v. State,* 248 *Ga.* 616, 284 *S.E.*2d 422, 430 (1981). It lists those cases in an appendix to its proportionality review. Without reviewing the facts of the cases in its opinion, it noted that juries had returned seven death verdicts in "domestic murder" cases. In "multiple murder" cases (Godfrey killed his wife and mother-in-law) seven death verdicts were returned. In three of those seven cases, juries returned death sentences despite the

fact that the defendants had good records and a history of psychiatric disorders. *Ibid.*

Maryland establishes a pool of similar cases for comparison purposes by examining those with similar facts. As a second factor, Maryland considers the aggravating and mitigating circumstances. *Tichnell, supra,* 468 *A.*2d at 20–22. It recites the facts of the comparison cases in its opinion. For instance, in *Tichnell* it reviewed five killings committed during a robbery that involved either a police-officer or non-police-officer victim. Although four life sentences had been imposed, the court found sufficient differences in the mitigating circumstances or the actors' role in the crime to sustain Tichnell's sentence despite the pattern of life sentences found in similar cases. *Ibid.*

In Delaware, the court looks to those cases in which a capital-sentencing proceeding has been conducted to select its pool of similar cases, *Flamer v. State,* 490 *A.*2d 104, 139 (Del.1984). From that group, the court draws cases with similar objective factors to determine the proportionality of the death sentence in the subject case. *Dawson, supra,* 581 *A.*2d at 1108. Delaware is quite explicit in its analyses. Although it recognizes that "definitive comparison of cases is almost impossible and necessarily touches upon the realm of speculation," *Flamer, supra,* 490 *A.*2d at 144, it does search for "a pattern of death sentences," *e.g.,* multiple murders of helpless elderly, *ibid.,* and other objective distinctions, *e.g.,* perpetrators were surprised during burglary, or were juvenile "show-offs." *Ibid.*

Finally, as noted, Pennsylvania uses the measure of aggravating factors in a case. *See Pirela, supra,* 507 *A.*2d at 32; *Commonwealth v. Maxwell,* 505 *Pa.* 152, 477 *A.*2d 1309, 1318, *cert. denied,* 469 *U.S.* 971, 105 *S.Ct.* 370, 83 *L.Ed.*2d 306 (1984). Pennsylvania also looks to the salient factors that may bear on a defendant's character. *Commonwealth v. Travaglia,* 502 *Pa.* 474, 467 *A.*2d 288, 304 (1983), *cert. denied,* 467 *U.S.* 1256, 104 *S.Ct.* 3547, 82 *L.Ed.*2d 850 (1984).

Justice Utter, in his separate dissent in *State v. Jeffries*, 105 *Wash.*2d 398, 717 *P.*2d 722, *cert. denied*, 479 *U.S.* 922, 107 *S.Ct.* 328, 93 *L.Ed.*2d 301 (1986), suggested the use of a "balancing approach superimposed upon a 'salient factors' approach" to identify the pool of similar cases.[2] *Id.* 717 *P.*2d 722 at 744. That approach involves two steps. The first step requires a court to select similar cases from the statutorily-defined pool by choosing "three or four of the most important factors of the subject case." *Ibid.* The second step would "compute the frequency of death sentences within the pool of similar cases." *Ibid.* That would assure that "no death sentence is affirmed unless in similar cases throughout the state the death penalty has been imposed *generally* and not 'wantonly and freakishly imposed.'" *Id.* at 743 (citing *Moore v. State*, 233 *Ga.* 861, 213 *S.E.*2d 829, 832 (1975), *cert. denied*, 428 *U.S.* 910, 96 *S.Ct.* 3222, 49 *L.Ed.*2d 1218 (1976) (quoting *Furman v. Georgia, supra*, 408 *U.S.* at 310, 92 *S.Ct.* at 2763, 33 *L.Ed.*2d at 390 (Stewart, J., concurring))).

The National Center summarizes the various approaches as follows:

> The first is to rely on "generalized notions of reasonableness," based on the court's "own values, experience, and general familiarity with prior cases." * * * The second is the "precedent-seeking approach." Using this approach, the court: (a) identifies the relevant aggravating and mitigating factors; (b) makes a judgment regarding the proportionality or excessiveness of the sentence based upon those factors; and (c) identifies one or more comparable cases that support its decision. The third is the "frequency approach." This method involves: (a) specifying which features of the review case should be used to find comparable cases; (b) identifying the other cases that share the selected characteristics; (c) determining the percentage of defendants in the similar cases who were sentenced to die; and (d) deciding whether death sentences

---

[2] A Washington statute defines the universe of cases to include all "'cases reported in the Washington Reports or Washington Appellate Reports since January 1, 1965, in which the judge or jury considered the imposition of capital punishment regardless of whether it was imposed or executed,'" *and* cases that had been reported under a statutory proceeding of "aggravated first-degree murder." *Jeffries, supra*, 717 *P.*2d at 742 (Utter, J., dissenting) (quoting RCW 10.95.130(2)(b)).

were imposed with sufficient frequency within this "class of similar cases [so] as to * * * serve as an effective deterrent * * * or to constitute a justifiable form of retribution in light of contemporary community standards."

[National Center for State Courts, *Proportionality Review Project* 2-3 (1984) (footnotes omitted) (quoting Baldus and Pulaski I, *supra,* 74 *J.Crim.L. & Criminology* at 668-69).]

We discuss the frequency method first.

### 1. Frequency Approach

As noted, Justice Utter believed that the frequency analysis is the most acceptable approach to proportionality review. Use of the word "generally" suggested to him that the threshold frequency at which a death sentence becomes appropriate is "significantly greater than 50 percent." *Jeffries, supra,* 717 *P.*2d at 744. He viewed that approach as simple, maintaining a reasonable amount of objectivity "by defining a genuine 'threshold frequency,'" and identifying the "specific factors by which to select 'similar cases.'" *Ibid.* Nonetheless, he had to concede that to employ that test "in some cases where a limited selection of salient factors will make the case unique" is not feasible. *Ibid.* In such situations, the court, in his view, probably would have "to turn to a more subjective comparison of the 'severity' of dissimilar cases." *Id.* at 745.

The Public Defender, we believe misperceiving the *Gregg* reference to whether death sentences have been imposed "generally in similar cases," has suggested that we are bound to disapprove a sentence of death whenever there is a predictable frequency rate of less than eighty percent. As we noted in Part II, these concepts of "generally imposed" are not transferrable from the Eighth Amendment context. In *Ramseur, supra,* we predicted the difficulty of reconciling the concepts of predictability of sentencing with individualized sentencing. 106 *N.J.* at 330-31, 524 *A.*2d 188. We believe that in the individualized-sentencing process mandated by *Lockett v. Ohio,* 438 *U.S.* 586, 98 *S.Ct.* 2954, 57 *L.Ed.*2d 973 (1978), and by our own

Capital Punishment Act, that death be neither normal nor general in capital sentencing is inevitable.

If we are correct that death need not be normal or general to be a licit sentence, the frequency approach will not provide a sole-source, fail-safe method of proportionality review. For even were we to establish a threshold level of acceptability (let us say the fifty percent suggested by Justice Utter), to ignore striking disproportion between death-sentenced cases and those in the life-sentenced pool could be unfair to those in the death-sentenced pool. Given the inevitable role of mercy in the death-sentencing process, there will be those whose life sentences will not yield to statistical analysis.

Although the Master endorses the frequency approach, he has not suggested that we substitute a numerical process for a reasoned process of decision.

> [The Master's] endorsement of the frequency approach does not carry with it, however, a recommendation that the Court quantify mathematically its judgments of the death-sentencing frequency among similar cases. Several courts have expressed concern that the application of a strictly quantitative approach to the subject could lead to arbitrary line drawing and limit the legitimate exercise of judicial discretion. More importantly, such an approach may inappropriately suggest that the complex judgments involved in proportionality determinations can be expressed with mathematical precision.

[*Final Report, supra,* at 42–43.]

Rather than employ the frequency method as a cutoff, we believe that it will serve as a coefficient of consistency. The higher the frequency of a death sentence among the comparison group of "similar cases," the more certain the determination that the sentence is proportionate. The lower the frequency, the more strictly the Court must scrutinize the case for the possible influence of impermissible factors.

We believe that the frequency approach will help us to review cases in terms of the substantive principle that we believe should be controlling in these cases, namely, "[a] death sentence is comparatively excessive if other defendants with similar characteristics generally receive sentences other than death

for committing factually similar offenses in the same jurisdiction." *Tichnell, supra,* 468 *A.*2d at 17 n. 18. We need not go so far as to suggest that the ratios tip very strongly in the opposite direction to justify the invalidation of a sentence on the basis of the frequency approach. Within its limits, the scientific method is an aid to the Court.

> A frequency approach with a broad universe can cull a group of comparable cases from a larger group of death-eligible cases. In this way, the proportion of life and death sentences within this similar group can be estimated and an empirical assessment of comparative excessiveness can be made.

[Raymond Paternoster & AnnMarie Kazyaka, *An Examination of Comparatively Excessive Death Sentences in South Carolina 1979–1987,* 17 *N.Y.U.Rev.L. & Soc.Change* 475, 486 (1989–1990).]

■ The greater the statistical frequency of life sentencing in the comparison group of similar cases, the greater will be the need for the Court to focus on the "real people" involved in the defendant's and other similar cases. We have a data base system that can define similar cases in three ways: salient factors, the numerical preponderance of aggravating and mitigating factors, and the index of outcomes. Examining each of those pools in terms of relative frequency will help us to identify comparable cases and to determine whether offenders like Marshall have received, or usually will receive, a life sentence. If so, then those comparable pools will allow us to consider what characteristics in Marshall's case might sustain the imposition of a death sentence.

2.

*The Precedent–Seeking Approach of Comparative Proportionality Review*

■ The final step, then, is the familiar judicial process of case-by-case comparison of life-sentenced and death-sentenced similar cases. (Life-sentenced cases include, under some systems of analyses, plea bargains and other non-capital disposi-

tions.) This is the second of the methods outlined in the National Center for State Courts' Report. As noted, we see it operating in functional relationship to the frequency approach.

To return to our analogy, having taken the cards containing "similar cases" from the file, we must determine what information on the cards we should consider in evaluating whether the sentence is disproportionate. The Master suggests a comparison of similar cases according to the defendant's criminal culpability. His model uses non-statutory case characteristics defined in terms of three basic elements: (1) a defendant's moral blameworthiness, (2) the degree of victimization, and (3) the character of the defendant. A sketch of the Master's precedent-seeking model is:

The Public Defender believes that the Court should not undertake a "subjective moralistic judgment[ ] based on non-statutory factors." Rather, he argues in favor of what he describes as an "objective analysis focusing on the facts underlying the statutory aggravating and mitigating factors." Recall that in sorting out the cases, the Master had taken note of

and recorded on the index cards fed into the computer both statutory and non-statutory factors that appeared to reflect the deathworthiness judgments of juries.

We agree that courts are ill-fitted to make moralistic judgments about who should live or who should die under a capital-sentencing scheme. We have no intention of translating concepts that fall outside the Code of Criminal Justice into the capital-sentencing structure. However, we believe that we can examine the data on the cards to see whether there is evidence of objective factors (beyond the listed c(4) statutory aggravating factors) that will assist us in determining why a jury has regarded one defendant as more deathworthy than another.

We understand the basic premise of the counter-argument. The Legislature has given us a list of factors (the statutory aggravating factors that made the murder death eligible, for example, c(4)(a) (a prior murder) or c(4)(c) (aggravated assault/torture)) that it deems relevant to the death-sentencing process. *See Trimble v. State,* 300 *Md.* 387, 478 *A.*2d 1143, 1167 (1984) ("We see no bright line by which this Court can say when death shall be imposed. Moreover, we believe the guidelines established by the legislature represent the clearest course of action in attempting to resolve this problem."), *cert. denied,* 469 *U.S.* 1230, 105 *S.Ct.* 1231, 84 *L.Ed.*2d 368 (1985). If factors beyond the statutory factors are given weight, the Capital Punishment Act will lose all structure and revert to the wholly-random pre-*Gregg* process under which sentences were imposed randomly and freakishly.

We think that argument misperceives the function of statutory aggravating factors. Those factors perform the function of "categorical narrowing," *Zant v. Stephens,* 462 *U.S.* 862, 879, 103 *S.Ct.* 2733, 2744, 77 *L.Ed.*2d 235, 251 (1983), to channel the discretion of juries. Once channeled, deathworthiness requires that an "individualized assessment of the defendant" be undertaken. *Ramseur, supra,* 106 *N.J.* at 331, 524 *A.*2d 188 (citing

*Lockett v. Ohio, supra,* 438 *U.S.* at 605, 98 *S.Ct.* at 2965, 57 *L.Ed.*2d at 990).

If we did not consider the circumstances of the case beyond the c(4) aggravating factors in a search for disproportionality, we would be ignoring the reality of the situation and perhaps disadvantaging defendants. For example, if we had a defendant with a previously-blameless life who had impulsively killed a police officer with a single shot, we would be unable to say that his crime was less deathworthy than that of one with a similar past life who had premeditated a taunting, execution-style revenge killing of the officer. None of those is a statutory aggravating factor, yet it seems that they inevitably reflect on deathworthiness.

Other examples of factors that would not make a murderer death eligible but that help to explain the jury judgments are the type of victimization that might not constitute a statutory aggravating factor—for example, the particularly vulnerable victims found in *State v. Gerald,* 113 *N.J.* 40, 549 *A.*2d 792 (1988), and *State v. Zola,* 112 *N.J.* 384, 548 *A.*2d 1022 (1988), *cert. denied,* 489 *U.S.* 1022, 109 *S.Ct.* 1146, 103 *L.Ed.*2d 205 (1989). In noting that such factors bear on relative deathworthiness, we impart no judge-made concepts of ethics or morality. We often have to give definition to the Capital Punishment Act. *See Ramseur, supra,* 106 *N.J.* at 210, 524 *A.*2d 188 (defining the c(4)(c) depravity factor by the absence of recognized human emotions).

Another example is the extent of mutilation. That can fall outside of the c(4)(c) factor because to prove that a defendant had an intent to inflict any more pain than that necessary to kill may be difficult. *See State v. Harvey,* 121 *N.J.* 407, 413–14, 581 *A.*2d 483 (1990), *cert. denied,* — *U.S.* —, 111 *S.Ct.* 1336, 113 *L.Ed.*2d 268 (1991). Those are not subjective moralistic considerations. Many of the so-called "non-statutory" aggravating factors in the "card index" in fact appear to be recognized sentencing factors. For example, *N.J.S.A.* 2C:44–1a(2), which

prescribes the authority of a court in sentencing, specifically requires courts to consider the

> gravity and seriousness of harm inflicted on the victim, including whether or not the defendant knew or reasonably should have known that the victim of the offense was particularly vulnerable or incapable of resistance due to advanced age, ill-health, or extreme youth, or was for any other reason substantially incapable of exercising normal physical or mental power of resistance.

[*Ibid.*]

■ Surely, the other so-called non-statutory aggravating factors present in the data-collection system—such as the scene of the crime, that is, whether the crime involved an intrusion in the victim's home or a kidnapping, or whether the killing was with an axe, was a particularly brutal stomping or beating, or was a planned homicide—do not appear to us to present a subjective, value-laden approach. Yet, although we agree that one who protests one's innocence should not be faulted for a lack of remorse, the factor need not be discarded because its presence may be appropriate to consider in certain cases. Hence, we think that a proportionality comparison that limits itself to the presence of statutory aggravating and mitigating factors fails fully to explain the sense of proportion in the jury verdicts. The statutory aggravating factors do not encompass all of the characteristics that affect the blameworthiness or deathworthiness of persons who commit murders.

At least the Public Defender appears to recognize the use of the factors mentioned by Justice Utter in his dissenting opinion in *Jeffries, supra,* namely, "(1) the number of victims; (2) the conscious amount of suffering imposed on the victim; (3) the degree of premeditation; (4) the aggravating circumstances found; and (5) the personal background of the accused." 717 *P.*2d at 745. Although those criteria are helpful in any attempt to explain a jury's verdict, they do not exhaust the logical objective criteria by which the deathworthiness of cases may be compared.

Hence, in conducting a precedent-seeking comparative-culpability review we shall identify the relevant aggravating and mitigating factors in the comparison cases (including the so-called non-statutory factors). Examples of such an exercise in precedent-seeking are found in the dissenting opinions of Judge Davidson in *Tichnell, supra,* 468 *A.*2d at 27, and Justice Utter in *Jeffries, supra,* 717 *P.*2d at 742. We shall attempt to confine ourselves to objective criteria rooted in traditional sentencing guidelines. *See N.J.S.A.* 2C:44–1. By reference to those specifics in the comparison cases, we shall suggest which factors might reasonably explain the difference between a death-sentenced and a life-sentenced case and why the cases may be "similar." As noted, *supra* at 153, 613 *A.*2d at 1081, the higher the frequency of life sentences in the pool of similar cases, the more searching will be the inquiry to test whether comparison with the life-sentenced cases (or more culpable death-sentenced cases) suggests that Marshall's sentence was disproportionate in the sense of his having been singled out unfairly for capital punishment.

### D.

### *Should we Consider an Alternative Method of Analysis by Categories of Culpability Derived Solely from the Statutory Aggravating Factors?*

Before applying the system we must evaluate the alternatives that have been suggested to us. The State advocates matching cases by selecting those with the same configurations of statutory aggravating factors. The State points out that the advantage of such an approach is that it is objective and simpler. Relying solely on aggravating factors would, in the State's expert's view, give the Court a consistent definition of similar cases.

In support of that position, the State relies on a report, prepared and submitted by its consultant, Herbert I. Weisberg, Ph.D., entitled *Proportionality Review of Death Sentences in*

*New Jersey: An Independent Analysis of Data on Capital Charging and Sentencing* (Nov. 26, 1991) (the *Weisberg Report*). At the request of the New Jersey Attorney General's Office, Dr. Weisberg conducted an independent analysis of available data on the administration of the death penalty. Although he pointed out a list of apparent errors discovered by staff of the Attorney General, his report relied primarily on the AOC data base, supplemented by limited information provided by the Attorney General.

1.

Dr. Weisberg began his analysis by questioning what he regarded as an inconsistent use of data by the Master, derived from cases decided under legal interpretations that were later held to be incorrect. In some instances, he asserts, the Master found such sentences to be a "valuable source" of information; in others (including the geographic analysis) the Master excluded cases that are not death eligible under current law. *Weisberg Report, supra,* at 9–10. In addition, Dr. Weisberg questioned the Master's method of determining death eligibility by a set of aggravating and mitigating factors that are objectively present in a case, while limiting his evaluation in penalty trials to factors actually found by the penalty-phase decisionmaker.

Dr. Weisberg questioned further the Master's treatment of the jury decision as a simple dichotomy—death versus life. He believed that the analysis failed to distinguish between a unanimous life-sentence verdict and a hung jury. In Dr. Weisberg's view, a deadlock falls somewhere between a unanimous life sentence and a unanimous death sentence as an indicator of culpability. He attempted, then, to analyze jury deadlocks on the weighing of aggravating and mitigating factors. *Id.* at 11.

Hence, he attempted to "separate cleanly" the prosecutorial component from the jury component and to identify the relevant data and cases for each. For prosecutorial-charging decisions, he would examine only whether a notice of factors had been served, regardless of any subsequent guilt-trial decision.

Finally, he challenged what he called the "highly elaborate statistical manipulations involved in the 'logistic regression' models." *Id.* at 13. In his view, the models included "far too many potentially predictive independent variables" that might distort the association, and errors associated with predictions would thus increase. *Ibid.*

In Dr. Weisberg's view, to accept and work within what he calls "existing realities" is preferable. He does not regard the goal of estimating future death-sentencing frequencies as feasible. He envisions a more modest role for quantitative analysis of past decisions. In his view, "[s]tatistical analysis is potentially capable of providing the Court with valuable insight into the main factors that influence prosecutors and juries. Such general information can serve as a useful backdrop against which particular circumstances of a case can be arrayed and evaluated." *Id.* at 15.

2.

We shall try to illustrate Dr. Weisberg's method in terms of our concept of the electronic-index cards. As we understand it, Dr. Weisberg recommends the use of a "universe" of penalty trials in which at least one aggravating factor was found. He examined the outcomes for each possible combination of aggravating factors found and also for every combination of factors served by the prosecutor. He focused primarily on the aggravating factors found at the penalty trial. *Ibid.*

In other words, Dr. Weisberg sorted the electronic-index cards on the basis of the aggravating factors actually found at penalty trials. He found twenty-one distinct combinations of factors appearing among the 108 cases in which at least one factor was found. *Ibid.* He attempted to group cases on the basis of the proportion of death sentences and deadlocks. Dr. Weisberg reported that cases involving factors c(4)(a) (prior murder), c(4)(d) (hired gun), and c(4)(h) (cop-killer) *always* resulted in at least a deadlock, as did cases involving a combina-

tion of c(4)(c) (torture/depravity), c(4)(f) (escaping detection), and c(4)(g) (in commission of felony). *Ibid.*

Conversely, cases involving only one or more factors, c(4)(b) (grave risk to another), c(4)(f) (escaping detection), and c(4)(g) (in commission of felony) received mostly life-sentence verdicts, with the exception of those involving *both* factors c(4)(f) and c(4)(g). He reported further that there was only one death sentence among those cases. *Ibid.* His index-card sorting indicated to him that cases fall into a rough hierarchy in terms of deathworthiness. Here we use his style of referring to the factors in capital letters.

Category I: Any of factors A, D, E, H or CFG combination
Category II: None of above, but CF or CG combinations
Category III: None of above, but C or FG
Category IV: None of above, but (B, F, G, BF, or BG)

Dr. Weisberg declined to incorporate analysis of mitigating factors because of the multiplicity of combinations and the uncertainty of the relationship with outcomes. He concluded that further sorting was made complex by the fact that mitigating factors need not be found unanimously, and especially without data on the number of jurors who actually voted for the factor. *Id.* at 16.

Dr. Weisberg thus sorted the cases into four culpability categories. Category I, the highest culpability category, included those cases "always resulting in at least a deadlock." He placed every configuration of aggravating factors[3] with a deadlock or death-sentencing frequency of 1.0 in Category I (*i.e.,* any of the factors A, D, E, H, and CFG combinations). *Id.*

---

[3] For convenience, we have supplied the code to the aggravating factors:

A. prior murder
B. grave risk of death to another
C. torture, depravity
D. killed for money
E. hired a killer
F. escaping detection
G. in commission of rape, robbery, etc.
H. murdered a public servant

at 15–16. Weisberg made two exceptions. Finding that the three E cases (contract killer) were "similar" to D cases already in Category I, Weisberg added those cases to Category I. *Id.* at 15. Weisberg also placed the CF combination in Category II.

Weisberg next sorted the cases into Category IV, the lowest culpability category. Category IV cases included those aggravating-factor combinations with a zero death-sentencing frequency. Weisberg found that cases involving only one or more of factors B, F, and G received mostly life sentences, with the exception of FG combinations. *Id.* at 15–16.

Weisberg sorted the remaining cases at the fifty-percent mark. That is, when the majority of cases with certain combinations of aggravating factors resulted in death, Dr. Weisberg classified them as Category II cases. If the majority of cases received life sentences, Weisberg placed them in Category III. *Id.* at 15.

The results of that three-outcome, four-level approach are presented in Table 9 of the *Weisberg Report,* reprinted below.

| | Death | Life | Deadlock |
|---|---|---|---|
| I: A, D, E, H or CFG comb. | 0.72 (18/25) | 0.08 (2/25) | 0.20 (5/25) |
| II: CF or CG comb. | 0.56 (10/18) | 0.28 (5/18) | 0.17 (3/18) |
| III: C or FG comb. | 0.21 (6/29) | 0.48 (14/29) | 0.31 (9/29) |
| IV: B, F, G, BF or BG comb. | 0.03 (1/36) | 0.72 (26/36) | 0.25 (9/36) |

If the Court were to adopt a system of case categorization similar to that developed in Dr. Weisberg's research, then all penalty-trial cases in the same category would form a class of roughly "similar" cases.

The proportion of cases in this category that resulted in a death sentence would provide useful insight, as would also the proportion of hung juries. However,

this quantitative data would represent only a starting point. Detailed qualitative comparisons among the cases within the category would be necessary to refine the Court's culpability assessment.

The Special Master's vision of a more mechanized approach to proportionality review is seductive. However, the attempt to push statistical analysis beyond a more limited role may simply open the door to methodological controversy that will ultimately frustrate and confuse the Court.

[*Weisberg Report, supra,* at 38–39.]

The defense characterizes Weisberg's approach as inconsistent and incomplete. In general, the defense notes that because the model is based solely on aggravating factors, the character of the defendant is ignored. In addition, Weisberg's approach does not remedy the alleged flaws in Baldus's study, specifically, the small sample size, which reduces the confidence one has in the conclusions and the factual dissimilarity between the cases in the culpability categories.

The Public Defender makes several specific challenges to Weisberg's approach. He charges that Weisberg does not treat deadlock cases consistently. In creating Category I, Weisberg equates a deadlock with a death sentence; however, he equates the deadlock with life sentences in forming the other culpability categories. Defendant claims that treating deadlock cases the same as a death sentence is insupportable. Important to proportionality review is the outcome of the jury's decision. Deadlocked cases cannot be properly characterized as reflecting deathworthiness judgments.

The Public Defender raises a variety of other concerns related to the model's statistical consistency. Most importantly, that after establishing numerical rules for Category I, which place factor c(4)(d) (killed for money) cases in Category I, Weisberg deems factor c(4)(e) (hired a killer) cases similar, because both involve contract killings. The Public Defender claims that that manipulation was designed to place Marshall, the sole E case to receive a death sentence, in the highest culpability category. In fact, the three E cases have a frequency rating of .33, which would place Marshall in culpability

Category III, not I. Dr. Weisberg was candid to recognize that he felt "least certain" about the assignment of Marshall's E case to Category I because of the "paucity of available data." *Weisberg Report, supra,* at 15.

Obviously, any analytical method can be found to be subject to improvements. The exclusion of mitigating factors from the State's approach is especially problematic for us. Merely using the statutory aggravating factors skews the process because New Jersey's aggravating factors focus primarily on the crime. Only the c(4)(a) factor (prior murder conviction) relates to characteristics of the defendant. *N.J.S.A.* 2C:11-3e instructs the Court to assess similarity in terms of "the crime and the defendant." Accordingly, the mitigating factors must be used because they focus on the defendant's characteristics. *Ramseur, supra,* 106 *N.J.* at 330, 524 *A.2d* 188 (emphasizing that both components are important in identifying similar cases).

The issue of treatment of mitigating factors arose during the preparation of the *Final Report.* Mitigating factors need not be found unanimously. *State v. Bey,* 112 *N.J.* 123, 159-61, 548 *A.2d* 887 (1988) (*Bey* II). If a mitigating factor received one or more votes, the Master coded the factor as being present in that case. *Final Report, supra,* at 13 n. 10. The State argues that statutory mitigating factors should be considered, but the actual vote should be recorded. The State's position reflects the concern that a case in which only two jurors found the c(5)(a) factor (emotional or mental disturbance) should be weighted differently from a case receiving ten votes on that factor. Because the number of jurors voting for each mitigating factor is not always available, Baldus's statistics indicate the average effect of the particular mitigating factor having been found or not found in the case. *Ibid.*

Although the lack of complete information on mitigating factors is a concern, the State's approach creates a greater concern because it does not use any mitigating factors in defining a comparison group of cases. The greater overall

measure of completeness in the Master's data base better serves the Court's need to assess disproportionality in terms of "the crime and the defendant."

## V

### *Application of the Methods of Proportionality Review to Robert O. Marshall*

Having developed both the means and methodology for analyzing whether a subject case is disproportionate to the sentences imposed in "similar cases," we undertake now the proportionality review of Robert O. Marshall's sentence. We have not included the names of all cases used in the analysis. Those cases have been included in the Master's reports. The cases that we have selected under the "Precedent–Seeking" approach will all be identified in this opinion.

### A.

### *The Frequency Analysis*

■ At the most transparent level, there appears to be an appalling disproportionality in sentencing Robert O. Marshall to death. Alone among the 246 death-eligible cases, his conviction of capital murder stands affirmed.[4] Sooner or later, however, that day had to come. But simply because Marshall may be the first does not mean that his death will be disproportionate under our statute. There may be more paradox than disproportion in his sentence. For no matter how upstanding or prominent his former life may have been, the data show that among those for whom death is a fitting punishment, contract killers,

---

[4] Although the penalty-retrial conviction and sentence of Marko Bey have been affirmed in a judgment filed this day, 129 *N.J.* 557, 610 *A.2d* 814 (1992), during the pendency of this case Marshall was the only defendant whose sentence had been affirmed. In addition to *Bey,* an appeal by John Martini awaits decision by this Court. Several other penalty-trial cases are pending before the Law Division.

whether principal or agent, are among the more frequent recipients of the death sentence.

■ As noted, we do not believe that an eighty-percent predictability rate is a prerequisite to a sentence of death. Nor do we believe that a fifty-fifty chance of life or death (as exemplified in this case by the stark contrast between Robert Marshall's death sentence and William Engel's life sentence, which is discussed *infra* at 179, 613 *A.*2d at 1095), is a necessary prerequisite. We do find, however, evidence of the reliability of Robert Marshall's sentence in the frequency analyses performed under the three evaluative methods for assessing criminal culpability: the salient factors, the numerical preponderance of aggravating and mitigating factors, and the index of outcomes.

Although acknowledging "the difficulty of estimating reliable death-sentencing frequencies on the basis of a small sample of similar cases," David C. Baldus, *State v. Robert Marshall, Death Penalty Proportionality Review Project: A Report to the New Jersey Supreme Court* 1, 10 (Sept. 24, 1991) (hereinafter *Marshall Report*), the Master nevertheless concluded that the frequency data are relevant and can be validated "through close comparisons of the cases involved." *Id.* at 16. That procedure will "provide a valuable supplement to the court's prior experience and knowledge." *Id.* at 16–17.

■ There is a preliminary issue of whether Marshall's case should be considered in the count of death cases among similar cases for frequency-analysis purposes. Because the purpose of frequency calculations is to estimate death-sentencing rates among cases that are similar to the defendant's, it would seem that the subject case should not be included. On the other hand, because the case before the Court is a partial reflection of community values, even if aberrational, it should be considered. Because we do not attach a conclusive life/death determinant to a statistical analysis, we shall consider the frequency data under both theories. Finally, although we have chosen all

death-eligible cases as our universe, we furnish the penalty-trial statistics for informational purposes.

### 1. The Salient–Factors Measure

■ Because this "facts-of-the-case" type analysis has a presumptive objectivity (the criteria for inclusion are almost intuitive), it seems most persuasive here. The "typologies" of the data-gathering process were not an *ad hoc* construct for the *Marshall* case. These were, and are, the *a priori*, that is, not after-the-fact assumptions as to which cases are similar. Contract killings are the type of killings that prosecutors and juries have regarded as highly blameworthy. Thirty percent of contract murderers (principals and hitmen) have initially received a death sentence. That figure is significant considering only thirty-two cases of all death-eligible cases have received the death penalty.

#### Contract–Murder Principals

The most factually-comparable cases to advance to a penalty trial, the c(4)(e) contract-murder principals (W. Engel, H. Engel, and Brand) all received life sentences. Tabulations are as follows:

| | Penalty–Trial Universe | Eligible Universe |
|---|---|---|
| Including Marshall | .33 (1/3) | .25 (1/4) |
| Excluding Marshall | .00 (0/2) | .00 (0/3) |

#### Contract–Murder Hitmen

*N.J.S.A.* 2C:11–3c(4)(d) makes one who "commit[s] the murder as consideration for the receipt, or in expectation of the receipt of anything of pecuniary value" death eligible. In *State v. DiFrisco*, 118 *N.J.* 253, 571 *A.*2d 914 (1990), we explored the question of whether society regards as more reprehensible the principal or the agent in a contract killing. Because of the

close relationship between c(4)(d) and c(4)(e), one who procures the commission of the offense "by payment or promise of payment of anything of pecuniary value," the Master includes hitman cases as factually comparable, and we agree.

This contract-murder hitmen pool includes six cases.[5] The death-sentencing rate among the penalty-trial cases is .50 (2/4) and .33 (2/6) for all death-eligible hitman cases.

Thus, the figures for the entire contract-murder pool are as follows:

| | Penalty–Trial Universe | Eligible Universe |
|---|---|---|
| Including Marshall | .43 (3/7) | .30(3/10) |
| Excluding Marshall | .33 (2/6) | .22(2/9) |

Among the five triggerman c(4)(d) cases in the proposed universe, four advanced to a penalty trial with the c(4)(d) factor charged: Melendez, Michael Rose, Clausell (death sentenced), and DiFrisco. Among those four cases the jury found the c(4)(d) factor present in three cases and imposed a death sentence in two. The Court vacated Clausell's death sentence on appeal and he was later sentenced on the non-capital murder charge. *Clausell, supra*, 121 *N.J.* at 307, 580 *A.*2d 221. We

---

[5] The Master includes *State v. Clausell*, 121 *N.J.* 298, 580 *A.*2d 221 twice: death on the first trial and life on the second. Rather than rework the figures, we present the Master's figures. We recognize that the death sentences of DiFrisco and Clausell have been reversed; however, we will not disregard those cases. In *Clausell*, the State elected to accept the life sentence because of the *Gerald* issue, rather than retry the case. In *DiFrisco*, there was an absence of a finding of corroboration by the sentencing judge. The Court does not believe that those procedural infirmities undermine the findings of deathworthiness. We acknowledge that there is no certainty that either case would or will produce a death verdict on a retrial. We have been candid to acknowledge that there is no scientific infallibility in the frequency data that we cite. We know only what we know—that of the 246 death-eligible cases there were thirty-two death verdicts. Three of the thirty-two (including Marshall) involved contract killings.

vacated DiFrisco's sentence and he is awaiting disposition on the remand. *DiFrisco, supra,* 118 *N.J.* at 283, 571 *A.*2d 914. The *Marshall Report* concludes that "[t]his very high death-sentencing rate, albeit in a small sample of cases, produced in our principal penalty-trial analysis a large and statistically significant multiple regression coefficient for the 4d [hired killer] factor." *Marshall Report, supra,* at 23.

### *Spousal Murders Involving High Levels of Blameworthiness and a Defenseless Victim.*

The Master has also analyzed the frequency of spousal murders that involved a high level of blameworthiness and a defenseless victim. The *Marshall Report* compares Marshall with three cases involving highly-premeditated, cold-blooded murders of a defenseless wife. Those comparison cases are Collins, Dreher, and Williams. Only Collins and Williams advanced to a penalty trial at which both defendants received a life sentence. Thus, all three defendants received life sentences. The figures are as follows:

| | Penalty–Trial Universe | Eligible Universe |
|---|---|---|
| Including Marshall | .33 (1/3) | .25 (1/4) |
| Excluding Marshall | .00 (0/2) | .00 (0/3) |

### *Premeditated Robbery/Kidnap Murder Cases Involving Extensive Premeditation, a Pecuniary Motive, Deception/Entrapment of the Victim, and a Defenseless Victim*

The Master also compared this fourth group of cases with Marshall. Of the five cases considered, three advanced to a penalty trial and one, Martini, resulted in a death sentence. In terms of criminal culpability, the Master ranked Martini higher than Marshall, finding that Martini's case involved two aggravating circumstances, extreme blameworthiness, substantial victimization, and a defendant with a poor character.

A review of all of the categories of factually comparable cases shows a death-sentencing frequency of .22 (4/18) when Marshall is included. Excluding Marshall, the death-sentencing rate is .18 (3/17).

2. The Numerical Preponderance of Aggravating and Mitigating Factors.

██ This test is more problematic than either the salient-factors or the index-of-outcomes analyses. Abstractly, we sense that a quantitative rather than a qualitative analysis will be rather unproductive. No matter how many aggravating factors and how few mitigating factors are presented, the jury's decision is intensely qualitative. We realize that the Master's data do not reflect a numerical analysis but rather reflect the weight that prosecutors and juries give to a specific factor; for example, a rape-murder will be viewed as more blameworthy than a robbery-murder. Still, a degree of abstraction exists that may not be present in the other frequency-analysis measures. We have repeatedly emphasized that juries are to make a qualitative, and not a quantitative, analysis of aggravating and mitigating factors.

Hence, when we measure Robert Marshall's case against other cases with one aggravating factor and two mitigating factors, we are concerned about the infrequency.

| Cases with One Aggravating Factor and Two Mitigating Factors | Penalty–Trial Universe | Eligible Universe |
|---|---|---|
| Including Marshall | .20 (3/15) | .07 (3/44) |
| Excluding Marshall | .14 (2/14) | .05 (2/43) |

| Cases With One Aggravating Factor | Penalty–Trial Universe | Eligible Universe |
|---|---|---|
| Including Marshall | .10 (5/50) | .04 (5/123) |
| Excluding Marshall | .08 (4/49) | .03 (4/122) |

As shown by the data, the overall death-sentencing frequency among capital cases involving a single aggravating factor is .08 (4/49). Among penalty-trial cases that, like Marshall, include one aggravating factor and two mitigating factors, the rate is .14 (2/14). However, death-sentencing frequencies among cases involving the c(4)(a) (prior murder) factor, c(4)(d) (hired gun) factor, c(4)(e) (payment for murder) factor, and c(4)(h) (cop-killer) factor have "above-average death-sentencing rates." *Marshall Report, supra,* at 31 and Appendix H, Table 9 to the *Final Report.*

### 3. Index-of-Outcomes Test

This method of analysis also indicates no significant dispro-portionality in Robert Marshall's sentence.

 Recall that this measure looks not only at the "salient factors," or the "number of factors," but at all of the facts and all of the cases to determine a pattern of capital sentencing. In this process we have spread all of the index cards on the table and have sought to identify the characteristics common to the cases in terms of their degree of blameworthiness as perceived by prosecutors and juries. These cases may be as factually dissimilar as a killing by a child molester or killing by a bank robber. All that they have in common is a roughly-equivalent measure of blameworthiness in the eyes of prosecutors and juries.

Even under this largely empirical standard (*i.e.,* derived from the actual experience within the system), the measure of Robert Marshall's blameworthiness is significant. His support of fami-ly, community involvement, and prior good record do not coun-terbalance the other measures of blameworthiness found in similarly-blameworthy case records involving premeditation of the act, helplessness of the victim, and baseness of the motive.

Under the index-of-outcomes analysis, using the expanded indices that include non-statutory factors, the predicted probability of a death sentence in Robert Marshall's case is .50 among all penalty-trial cases. The Master cautions, however, that that estimate is quite unstable because of the small number of c(4)(e) penalty-trial cases. The predicted probability of death for Marshall's case among all death-eligible cases is .17. Here again, the Master cautions that that estimate is uncertain because of the small sample number.

After reranking the cases to reach a qualitative culpability level, based on blameworthiness, victimization, and character of the defendant,[6] the overall death-sentencing rate for the ten cases most comparable to Marshall's in the penalty-trial model is .60 (6/10). Including Marshall, the rate is .64 (7/11). Among all death-eligible cases the overall death-sentencing rate among the ten cases nearest Marshall's is .20 (2/10), excluding Marshall. With Marshall, the death-sentencing rate is .27 (3/11).

When the indices are limited to statutory aggravating and mitigating circumstances, the predicted likelihood of a death sentence in the penalty-trial model for Marshall is .52 and among all death-eligible cases the probability of death is .27. Reranking the cases as above, among the cases nearest Marshall's in the penalty-trial model the death-sentencing rate is .69 (11/16), excluding Marshall. With Marshall, the rate is .71 (12/17). Among all death-eligible cases the death-sentencing rate among the ten cases nearest Marshall's is .50 (11/22), excluding Marshall. With Marshall, the rate is .52 (12/23).

Summarizing all of the data, the Master concludes:

[B]ecause of the small number of 4e cases, and no 4e cases that match Marshall on both the blameworthiness and victimization dimensions, we have a much less solid basis for saying that cases like his either will or will not be associated with frequent death sentencing over the long run. Because of this small sample

---

[6] As noted, we have attempted to limit our analysis as much as possible to objective criteria. Hence, we state these reranked results not to justify our decision but only to report them.

problem, there is no way to resolve with confidence the uncertainty associated with predicting the future for defendants like Marshall.

[*Marshall Report, supra,* at 41.]

On balance, by using the composite of these measures of frequency we conclude that capital death sentencing for contract murderers is not random or aberrational. *See Tyler v. State,* 247 *Ga.* 119, 274 *S.E.*2d 549, 555 (1981) (reasoning that "[a]lthough lesser sentences than death are frequently imposed in domestic murder cases, it does not follow that the death penalty would not be authorized for the murder of one spouse by another under any circumstances").

### B.

### *Precedent–Seeking Approach*

We turn now to the precedent-seeking comparison of defendant's death sentence with those imposed "in similar cases, considering both the crime and the defendant." *N.J.S.A.* 2C:11–3e.

In his well-reasoned brief, the Public Defender has challenged the Master's conclusion that "in terms of moral blameworthiness *Marshall* exceeds that found in the three other 4e cases, and as far as we can determine, all other cases in our universe of New Jersey cases." *Marshall Report, supra,* at 12. In particular, the Public Defender questions the Master's reliance on what he perceives to be a subjective evaluation that because adultery is so morally blameworthy, Marshall's crime is viewed as more reprehensible than, for example, the killing of a wife and a child solely for insurance proceeds when another woman is not involved. He challenges, as well, the Master's reliance on Robert Marshall's double life—"plotting [his wife's] death and sleeping with his paramour while living and sleeping with his wife and pretending that all was well" as giving "an additional aggravating edge to the case." *Id.* at 13–14 & n. 13. In addition, he questions the reliance on a "total

lack of remorse for his crime," *id.* at 14, as inconsistent with defendant's right to assert his innocence.

We share some of the Public Defender's concerns. In this section we evaluate Marshall's case on the basis of objective characteristics by comparing cases that appear to be found within familiar sentencing patterns. For purposes of analysis, we proceed along the lines set forth in the Public Defender's brief and identify the cases and characteristics that bear on Marshall's relative blameworthiness. We use primarily the Public Defender's factual description of the cases; some of those are more fully set forth in the appendices to the *Final Report.* At least one of the cases is on appeal before us so we give no stamp of approval to those factual versions but give to defendant the benefit of his view of the facts.

### 1. First-time murderers of spouses.

The Public Defender asserts that among comparable first-time offenders who murdered their wives and who cannot plead excuse for lack of education and intelligence, only Robert Marshall received a death sentence. We consider each of those cases.

### *Walter Williams*

Williams, a twenty-seven-year-old police officer, murdered his wife by poisoning her with potassium cyanide. Williams allegedly had a two-fold motive for killing his wife: to hide his bigamous marriage to another woman and to obtain the proceeds of his wife's estate.

Williams's web of deceit began when he met his second wife, then a high-school junior, while on duty at a high-school function in 1979. Their relationship intensified and, in November 1984, Williams and she married. Williams deceived both his second wife and the minister who performed the ceremony by providing a falsified judgment of divorce, complaint of divorce, and a birth certificate.

He lied to his wife to whom he was legally married by telling her that he had to be treated for Agent Orange in the evenings at the Veterans' Hospital. During that time Williams had been living with his "new wife" in her parents' home. Williams's wife became suspicious of his bigamous relationship and confronted him on different occasions. Williams obtained potassium cyanide and hydrochloric acid in July 1984, using his official position as a police officer to assist him in purchasing the chemicals.

Williams's wife died of cyanide poisoning six months later, on January 31, 1985, after again having confronted Williams earlier that day. The State served notice of aggravating factors c(4)(d), pecuniary motive, and c(4)(f), killing to escape detection. The defense offered mitigating factors c(5)(c), age (thirty-four years of age at time of the offense); c(5)(f), no significant criminal history (no prior convictions, no alcohol or drug abuse); and c(5)(h), any other factor (served in the military during the Vietnam war, trustee at church).

The jury found aggravating factor c(4)(f) and mitigating factors c(5)(f) and c(5)(h), but found the aggravating factor in equal balance with the two mitigating factors. (Had the jury imposed a death sentence on the basis of the c(4)(f) (killing to escape detection) factor in that case, we might not have sustained the imposition of the death sentence. *See State v. Hightower*, 120 *N.J.* 378, 420–21, 577 *A.*2d 99 (1990) (defining the c(4)(f) factor).) Williams received a life sentence with thirty-years parole ineligibility for the crime of purposeful and knowing murder.

*John Dreher*

Because the Appellate Division has reversed John Dreher's conviction and remanded his case for retrial, *State v. Dreher*, 251 *N.J.Super.* 300, 598 *A.*2d 216 (1991), we repeat again our caveat that the facts below are as alleged by the State and here by Marshall. We evaluate the *Dreher* case on those assumptions.

Dreher brutally murdered his wife in the basement of their home. His was an aggravated, cold-blooded murder. He contemplated the crime for months, attempting to obtain a gun two to three months before the murder. Like Marshall, he too had been having an extra-marital affair for two years before his wife's murder and had asked his paramour what she would think of him if he killed his wife.

On the day of the murder, Dreher had asked his paramour to meet him at the family home at 7:30 a.m. for a "confrontation" with his wife. After his sons left for school, Dreher dragged his wife unwillingly into the basement, as she begged him not to hurt her. The murder was brutal. He tied her hands behind her back and tied a rope around her neck, which was then tied to a column in the basement. Dreher then ordered his paramour to bring him something sharp; she complied. As Dreher tightened the rope around his wife's neck with one hand, he stabbed her in the neck with the other. His paramour struck her on the head several times with a heavy tool and stabbed her in the back.

The medical examiner determined that Dreher's wife had died of strangulation, and found that she had been stabbed eight times in the back and once in the throat. In his opinion, the back wounds were inflicted while she lay dying. Following the murder, Dreher tried to make the murder appear as if it had occurred during a robbery. He callously disposed of his wife's jewelry, and lacked remorse.

In the prosecutor's view, however, despite all of its horror, the case lacked the c(4)(c) statutory aggravating factor that the defendant had intended to inflict torture on his wife beyond the pain of killing. The prosecutor thus declined to prosecute the case capitally. A jury found Dreher guilty of murder and the judge sentenced him to life imprisonment with a minimum parole-ineligibility term of thirty years. Significantly, a principal ground of defense both at trial and on appeal was that the

perpetrator of this offense was not Dreher but the paramour. *See State v. Dreher, supra,* 251 *N.J.Super.* 300, 598 *A.*2d 216.

### Darrell Collins

Collins plotted the murders of his wife and eighteen-month-old son to obtain insurance proceeds on their lives. This, too, was a brutal murder. Collins, a martial-arts enthusiast, slashed his wife in the throat, face, and breasts with a sharp weapon, and then beat and suffocated his eighteen-month-old son as he lay in his crib.

Collins was twenty-six years of age and worked as a chef at the time of the murders. He had no prior criminal record and had completed one year of college. The Public Defender argues that although the case is not technically in the Master's universe, it should be considered because Collins murdered a defenseless family member for pecuniary gain.

The jury found Collins guilty of the non-capital murder of his wife and of the capital murder of his son. The jury, however, did not find either the c(4)(d) aggravating factor of killing for pecuniary gain or the c(4)(f) factor of killing to escape detection. The trial court sentenced him to life with a thirty-year period of parole ineligibility for the murder of his wife, and to thirty years with a thirty-year period of parole ineligibility for the murder of his son, consecutive to the first term.

### Thomas Johnston

Although it was not included in the Master's universe, we have considered Johnston's case because it involved the planned murder of a defenseless victim, his wife. The Master found insufficient evidence to substantiate either the c(4)(c) (torture/assault) or c(4)(d) (pecuniary motive) aggravating factors, but the Public Defender strongly suggests that both factors were present.

Johnston killed his wife by hitting her in the head with a hammer over twenty-five times. The severity of the beating was evidenced by the injuries she sustained—a fractured jaw, a

depressed skull, five skull fractures, and lacerations to her left cheek. After the murder, Johnston attempted to cover up his crime. Johnston dragged her body into the woods near their home, leaving one shoe and her purse beside her car to make it appear as if she had been abducted. He arranged her clothes to give the appearance that she had been sexually assaulted, and then covered her body with a rototiller cover.

The murder was apparently precipitated by one of many arguments that the couple had had over financial matters during what for many years had been a stormy, abusive relationship. In 1980 Johnston had become financially dependent on his wife, and five years later she filed for divorce on the grounds of extreme cruelty. The State argued that the impending divorce had provided Johnston with a pecuniary motive for killing his wife. The defense asserted that Johnston had suffered from severe mental problems and that on the night of his wife's murder, he had consumed a large amount of alcohol.

*William and Herbert Engel*

The murder committed by William and Herbert Engel is, for us, the most difficult because that case bears striking similarities to the subject case. William and Herbert Engel are brothers who were tried capitally for the murder of William's ex-wife. The facts and background of this case are familiar to the Court because it participated in earlier bail-release applications, see *State v. Engel*, 99 *N.J.* 453, 493 *A.*2d 1217 (1985), and has reviewed defendants' petitions for certification from the convictions of non-capital murder. 130 *N.J.* 393, 614 *A.*2d 616 (1991).

William procured his ex-wife's murder with the assistance of his brother, Herbert, apparently because of jealousy and an obsession with his ex-wife. William delegated to Herbert the task of hiring a contract killer, much like McKinnon in Marshall's case, one month before the murder, and had told a private investigator the year before that he wanted to get rid of his ex-wife. Herbert pressured an employee, McFadden, into

agreeing to commit the murder-for-hire of his ex-sister-in-law by plying him with liquor and promising him money.

The murder was committed in a warehouse owned by William Engel. Engel lured his ex-wife to the warehouse on the false pretext that they were going shopping for birthday and Christmas gifts for their five-year-old daughter. Once inside, Engel pretended that the warehouse lights were not working when he escorted her past the bathroom door where McFadden waited, ready to strangle her.

William stood over his ex-wife and watched, smoking a cigarette, while McFadden strangled her to death. At one point during the four-minute ordeal, William called her a "bitch." The two men then loaded her body into a waiting car, and, as planned, McFadden and a cohort, Pee Wee Wright, transported it to South Carolina where it was burned beyond recognition. (Herbert later ordered McFadden to execute the person who had helped dispose of the body because he feared that the executioner would tell the police of the murder.)

William Engel's deception continued after the murder, when he twice telephoned his ex-wife's house and reported first to her grandfather and then to her daughter that the victim had not arrived to meet him as planned. He told her mother that she had never arrived at their first meeting.

Like Marshall, William Engel was a well-educated, successful businessman, who had a good reputation in the community, was involved in charitable work, and had no prior criminal record. Unlike Marshall, however, William Engel's murder of his ex-wife lacked a pecuniary motive: he killed solely out of a jealous anger towards his ex-wife. The jury spared the brothers' lives, finding the presence of mitigating factors c(5)(a) (mental/emotional disturbance) and c(5)(e) (duress), in addition to c(5)(f) (no prior criminal record) and c(5)(h) (any other factor). The jury found that those mitigating factors outweighed the sole aggravating factor, c(4)(e) (hired a killer). The trial court sentenced

the brothers to life imprisonment with a thirty-year period of parole ineligibility.

The Public Defender suggests that one factor that may have saved the two brothers was the testimony of their elderly father, who told the jury of his own experiences in Austria during World War I and how his own father had been killed in a concentration camp. Defense counsel managed to suggest to the jury that Herbert felt beholden to William for his job. Overall, the criminal culpability of William Engel seems no different from that of Robert Marshall. The two husbands came from the same economic stratum. The victims were not strikingly dissimilar. The shattering impact on the families was the same.

The ultimate question concerns whether the fact that a jury spared the Engel brothers requires the invalidation of Robert Marshall's death sentence. We do not believe that statutory disproportionality ever contemplated that two New Jersey juries must reach identical verdicts even in closely-similar circumstances. Our search should be for some impermissible or invidious factor or pattern that has been broken. That the Engel brothers were spared their lives does not establish a pattern of life-sentencing for such killings. We do not sense that some invidious factor tainted Marshall's sentencing process.

The remaining spousal murders are distinguishable. Both Walter Williams and Darrell Collins escaped death when a jury found that they had not killed for pecuniary gain. John Dreher was thought by the prosecutor not to have met the criteria for a c(4)(c) aggravating factor.

### 2. Contract killers (principals).

This is another category of similar cases that we must consider. Because the Engel brothers were essentially contract principals, we need not discuss their cases further. We agree that there are no striking factual dissimilarities between their case and Robert Marshall's, other than the fact that William

Engel did not murder his wife for money. One cannot say with any degree of confidence that there is a significant difference in blameworthiness in either situation.

We now address the remaining contract principals and then discuss the hitmen and the principals associated with their cases.

### Francis Brand

The Public Defender describes Francis Brand as the "remaining contract principal" who is compared to defendant in the *Marshall Report.* Arthur Brand, Francis's older brother, had physically and mentally abused his family for years and had sold drugs from the family home. Francis, living in fear of his brother for years, procured the assistance of Randy Burroughs, a long-time friend, to kill his brother. Burroughs, who had a limited educational background, had tried to resist Brand's attempts to convince him to kill, but after Francis Brand had urged him for about eighteen months and with the promise of money, Burroughs agreed. Burroughs shot Arthur Brand twice with a shotgun and killed him as he awoke.

The prosecutor did not seek to prosecute Francis capitally, perhaps because of the victim's violent assaults on other family members and history of drug abuse. Those factors suggest less blameworthiness in Brand's case.[7]

---

[7] We have considered the other contract-principal cases set forth in the Public Defender's brief. Lazaro Trimino hired Miguel Melendez to murder the victim. Trimino claimed to have served as the intermediary between the actual principal, Pedro Gerome, who is still a fugitive, presumably in Nicaragua. Although the reports do not show a clear motive for the killing, the relationship between the absent procurer of the murder and the victim undoubtedly would establish the motive. Trimino pled guilty to conspiracy.

We have also considered the remaining two principals suggested by the Public Defender: Zoran Cveticanin, the principal in *State v. Rose,* and Anthony Franciotti, the principal in *State v. DiFrisco.* The latter hired Anthony DiFrisco to murder the victim, a pizzeria owner. We do not know if the police have apprehended him. Zoran Cveticanin hired Michael Rose to murder Cveticanin's step-mother, who was eight-months pregnant, to prevent her from inheriting his father's money. Cveticanin fled to Yugoslavia, where he was tried and

### 3. Contract killers (hitmen).

*Anthony DiFrisco*

The Court is familiar with the facts of that cold-blooded, execution-style killing. Anthony DiFrisco agreed, for $2,500 in cash and cancellation of a $500 drug debt, to kill a pizzeria owner because he was going to inform the police about DiFrisco's employer's drug dealings. DiFrisco, a drug addict, carried out the "hit" by shooting the owner four times in the head and once in the body as he reached to fill a soda order.

DiFrisco's moral blameworthiness is at least equivalent to Robert Marshall's. By his own account, he committed the contract murder to earn himself a professional reputation with a crime syndicate. The trial court sentenced DiFrisco to death after finding that the two aggravating factors, c(4)(d) (pecuniary motive) and c(4)(f) (killing to escape detection), outweighed the only mitigating factor, c(5)(g) (substantial assistance to the State in the prosecution of another for murder).

On appeal, we affirmed DiFrisco's conviction of murder, but reversed his death sentence because of the absence of any extrinsic corroboration of his connection with the contract principal. *DiFrisco, supra,* 118 *N.J.* 253, 571 *A.*2d 914. We take it that the police are investigating the responsibility of the contract principal for that senseless killing.

*James Clausell*

We are familiar with this case, too, having heard the capital appeal. *Clausell, supra,* 121 *N.J.* 298, 580 *A.*2d 221. Clausell appears to have an overall culpability greater than Robert Marshall because of the absolute inanity of the killing. Like DiFrisco, Clausell's motive for killing the victim was to receive $2,000 in cash and to develop a reputation as a hitman. The principal, a known drug dealer, hired Clausell to seek revenge

---

convicted of murder and sentenced to thirty-years hard labor. We find sufficient distinction in those cases to rule out a finding of disproportion.

on his neighbor who had filed a municipal-court complaint against him concerning his dog.

Clausell and a cohort carried out the "hit" by firing two shots through the front door of the victim's house. One bullet fatally struck the victim in the chest, the other narrowly missed his daughter. A jury sentenced Clausell to death after finding the presence of c(4)(b) (grave risk) and c(4)(d) (pecuniary motive) aggravating factors. All that saved him from the imposition of the death penalty was some evidence that showed that he might have intended only to intimidate the victim and not to kill him, entitling him to a *Gerald* retrial. The contract principal in his case was given a life sentence, but again there was a residual doubt with respect to the mission on which he had dispatched Clausell.

### Miguel Melendez

Miguel Melendez shot his victim twice in the head, killing him in the presence of the victim's daughter after being hired by Lazaro Trimino for $2,500 to do so. Melendez had no role in planning the murder; even the handgun was supplied to him. Evidence suggested that he was at least mildly-mentally retarded and suffering from organic brain damage, had been abandoned by his father as a child, and had been institutionalized in state hospitals for most of his childhood. In addition, he cooperated with the police and confessed that Trimino had hired him to commit the murder, and at the trial expressed remorse for his part in the murder. For those reasons, his criminal culpability appears less than Robert Marshall's.

### Michael Rose

Michael Rose brutally murdered Kathryn Cveticanin for the payment of $540 in cash. The principal, Zoran Cveticanin, hired Rose to kill his step-mother to prevent her from inheriting his father's estate. Rose, who also is mildly-mentally retarded, carried out that task in a vicious fashion—he stabbed his pregnant victim eighty-three times and beat her over the head with a blunt object approximately twenty times. When the victim became too weak to defend herself, Rose smoked a

cigarette and then proceeded to beat her head and neck with a sump pump.

A jury found aggravating factor c(4)(c) (torture, depravity of mind), and mitigating factors c(5)(e) (duress), c(5)(f) (no prior record), c(5)(g) (substantial assistance to the State), and c(5)(h) (any other relevant factor). Because the jury could not reach a decision on the weighing of the factors, Rose received a sentence of life imprisonment with thirty-years parole ineligibility. His case is close; the jury was hung. The factors of duress and assistance to the State distinguish it.

*Randy Burroughs*

Burroughs killed Arthur Brand with the promise of $2,000 from the contract-principal, Francis Brand, the victim's younger brother. After eighteen months of constant pressure to kill from Francis, Burroughs, without any planning, opened Arthur's bedroom door and fired twice with a shotgun, killing him instantly. The evidence showed that Burroughs, who was mildly-mentally retarded, had killed not only for the money but to help his friend rid the family of his abusive brother.

Burroughs confessed to the killing and implicated Francis Brand in the conspiracy, later testifying for the State at Brand's trial. He received a sentence of life imprisonment, with thirty-years parole ineligibility. The Public Defender recognizes that Burroughs's blameworthiness is less than Marshall's but believes that Burroughs's lower blameworthiness would increase the contract-principal's overall criminal culpability.

In sum, contract killers, like contract principals, appear to be recognized as significantly blameworthy. DiFrisco and Clausell were sentenced to death; Melendez, Rose, and Burroughs appear to have been somewhat less blameworthy because of their mild mental retardation; Burroughs showed the highest degree of remorse.

Although there is little point in debating whether society regards contract principals, who are less likely to repeat the

crimes, as more blameworthy than contract hitmen (who appear to have no motives other than money), there is no clear line of demarcation that would indicate to us that to sentence Robert Marshall to death is disproportional. Many of the spousal or companion murders that we review, *e.g., State v. Moore*, 122 *N.J.* 420, 585 *A.*2d 864 (1991) (S. Moore) (killing of wife and child with hammer during fit of rage), and *State v. Erazo*, 126 *N.J.* 112, 594 *A.*2d 232 (1991) (killing of wife after an evening of drinking and arguing), result from violent outbursts of emotion. Marshall's killing did not arise from a fit of rage. His involved a long period of premeditation without the slightest showing of any controlling emotion overcoming societal norms. Delaware finds particularly deathworthy those few who are "guilty of committing an unprovoked, cold-blooded murder of a person who lacked the ability to defend herself, solely for pecuniary gain." *Dawson, supra*, 581 *A.*2d at 1108 (citing *Riley v. State*, 496 *A.*2d 997, 1027 (1985)).

4. Premeditated robbery or kidnapping murder cases.

These cases have some factual comparability with *Marshall*.

*John Martini*

John Martini received a death sentence for the kidnap-murder of a businessman.[8] After receiving $25,000 ransom money from the victim's wife, Martini completed his well-devised plan by shooting his victim, execution-style, three times to the back of the head.

Martini, fifty-eight years of age at the time of the killing, raised a diminished-capacity defense, claiming that a severe cocaine-abuse problem impaired his capacity to commit the crimes purposefully or knowingly. Marshall argues that he is far less culpable than Martini and thus deserves a life sentence.

*David Mark Russo*

David Mark Russo planned the robbery of a gas station and the murder of its employees. Russo carried out the robbery by

---

[8] John Martini's death-penalty appeal is currently pending before this Court.

first attempting to execute his three victims as they lay on the floor. He shot each person at point-blank range, killing one and seriously injuring the other two.

Russo was thirty-two years of age at the time he committed his crimes and had a history of alcoholism, cocaine abuse, and depression. The penalty-trial jury found the c(5)(a) (emotional disturbance) and c(5)(d) (mental impairment) mitigating factors, and sentenced him to life imprisonment. Because of the high level of blameworthiness and victimization, the Master found Russo as criminally culpable as Robert Marshall.

### Terrence Scales and Howard Thompson

Terrence Scales and Howard Thompson murdered their victim, whom they had met in a tavern, in order to steal his new car. After luring him back to their apartment, Scales and Thompson strangled their victim with a clothesline, and when he resisted, they beat him. After the victim's death, the two men wrapped his body in a blanket and callously disposed of it on a river embankment.

Scales and Thompson each received a sentence of life imprisonment. Scales's case proceeded to a penalty phase in which the jury deadlocked on the issue of death after it had found aggravating factor c(4)(f) (escape detection) and mitigating factors c(5)(d) (mental impairment) and c(5)(h) (catch all). Thompson's case did not advance to a penalty trial.

### Vernon McIver

Vernon McIver, a nineteen-year-old male prostitute, murdered his homosexual client by plunging a large butcher knife into his neck as he lay on the bed. After the killing, McIver stole the victim's wallet and car. He pleaded guilty to felony murder and received an aggregate forty-year prison term with a thirty-year period of parole ineligibility.

We are unable to agree that those cases demonstrate the disproportionality of Robert Marshall's death sentence. That

John Martini may be more deathworthy than Robert Marshall does not establish that Marshall's sentence is disproportionate. In the *Russo* case the jury found mitigating factors not present in Marshall's. The *Scales/Thompson* and *McIver* cases are far too dissimilar to aid in the proportionality review of Marshall's death sentence.

### 5. Other cases.

We have considered as well, although we do not discuss in detail, each of the other cases mentioned in the Public Defender's brief. They concern Eugene Berta, who committed a possibly pecuniary-motive killing of a girlfriend; Salvatore Ferrari, who killed his mother by his own hand, allegedly in order to obtain over $30,000; William Todd Lewis, who killed his twin brother to inherit a share of his estate; Nelson Jalil, who murdered his pregnant wife to relieve himself of the impending financial strain of a child; Jose Machado (a case with which we are familiar), who brutally killed his pregnant girlfriend; Edward Freeman, who poisoned his wife to gain his freedom; Bert Rindner, who killed a business partner; Joseph Presher, who brutally killed a close woman friend.

Although each of those cases demonstrates deathworthiness to some degree, each contains sufficient factual differences, *i.e.*, not contract killings, and either the absence of specific findings of the statutory aggravating factors or evidentiary problems concerning the aggravating or mitigating factors that do not require us to invalidate Marshall's death sentence.

### VI

*That Juries in New Jersey do not "Generally" Return Death Verdicts does not Undermine the Deterrent Value of the Death Penalty to Such an Extent as to Render it a "Cruel and Unusual Punishment."*

In *Ramseur, supra*, 106 *N.J.* at 166–82, 524 *A.*2d 188, this Court upheld the death-penalty statute on both federal and

state grounds against a facial claim that the statute constituted cruel and unusual punishment. The Court agreed with the plurality in *Gregg, supra,* 428 *U.S.* 153, 96 *S.Ct.* 2909, 49 *L.Ed.*2d 859, that although the death penalty is severe and irrevocable, it is not an excessive or disproportionate penalty for the crime of murder.

The Court stated in *Ramseur* that "although the view is not unanimous, it is a widely held belief, and a strongly held one in our society, that the appropriate penalty for murder may be death." 106 *N.J.* at 172, 524 *A.*2d 188. Citing information supplied by the Public Defender, the Court noted that "[i]f the actions of jurors are to be taken as a true reflection of society's morality, the most recent evidence strongly supports the view that the death penalty does not violate contemporary standards of decency. Since the restoration of capital punishment in 1982, juries in this state have imposed twenty-six sentences of death." *Id.* at 173, 524 *A.*2d 188.

The Public Defender asks us to reconsider that conclusion, arguing that as a result of the work of the Proportionality Review Project, this Court now has before it complete evidence that strongly supports the conclusion that the decisions rendered by New Jersey's juries demonstrate that the death penalty violates contemporary standards of decency.

### A.

The Public Defender's argument is drawn from the premise of Justice White's concurring opinion in *Furman, supra,* 408 *U.S.* at 310, 92 *S.Ct.* at 2763, 33 *L.Ed.*2d at 390. He wrote:

I begin with what I consider a near truism: that the death penalty could so seldom be imposed that it would cease to be a credible deterrent or measurably to contribute to any other end of punishment in the criminal justice system. * * * But when imposition of the death penalty reaches a certain degree of infrequency, it would be very doubtful that any existing general need for retribution would be measurably satisfied. Nor could it be said with confidence that society's need for specific deterrence justifies death for so few when for so many in like circumstances life imprisonment or shorter prison terms are

judged sufficient, or that community values are measurably reinforced by authorizing a penalty so rarely invoked.

[*Id.* at 311–12, 92 *S.Ct.* at 2763, 33 *L.Ed.*2d at 391.]

Justice White reasoned that in such a circumstance death would then be "the pointless and needless extinction of life with only marginal contributions to any discernible social or public purposes." *Id.* at 312, 92 *S.Ct.* at 2764, 33 *L.Ed.*2d at 391. Justice White concluded that "[a] penalty with such negligible returns to the State would be patently excessive and cruel and unusual punishment violative of the Eighth Amendment." *Id.* at 312, 92 *S.Ct.* at 2764, 33 *L.Ed.*2d at 391–92. In *Gregg,* the opinion announcing the judgment observed that "[t]he death penalty is said to serve two principal social purposes: retribution and deterrence of capital crimes by prospective offenders." 428 *U.S.* at 183, 96 *S.Ct.* at 2929–30, 49 *L.Ed.*2d at 880. Unless the death penalty measurably contributes to one or both of those goals, it "is nothing more than the purposeless and needless imposition of pain and suffering," and hence is an unconstitutional punishment. *Coker, supra,* 433 *U.S.* at 592, 97 *S.Ct.* at 2866, 53 *L.Ed.*2d at 989.

That thread of Supreme Court jurisprudence has remained constant. Thus, the Court has embraced the view that "when legislatures and juries [have] firmly rejected the penalty of death," *Enmund, supra,* 458 *U.S.* at 814, 102 *S.Ct.* at 3385, 73 *L.Ed.*2d at 1162 (O'Connor, J., dissenting), the penalty of death is substantially disproportionate to the offense.

### B.

The Public Defender argues that that point has come in the administration of New Jersey's Capital Punishment Act. He relies on the Master's Report to this Court:

The principal trend in New Jersey's capital charging and sentencing system between 1983 and 1991 has been a marked decline in the frequency with which death sentences are imposed among death-eligible cases. * * * The overall rate before 1988 was .21 (29/140), while the overall rate after 1987 has been .06

(5/87). Among the death-eligible murders committed since January 1, 1987, a death verdict has been returned in only two cases.

[*Final Report, supra,* at 15.]

The Public Defender argues that the average level of frequency for all death-eligible cases over the past nine years is .15. *Id.* at Table 1. The data in Table 2 of the *Final Report* indicate that only during the first calendar year of the statute's operation did the frequency level, in all penalty-trial cases, rise to .50, and in only one other calendar year, 1987, did the level of frequency in all penalty-trial cases rise to .43. Overall, the average level of frequency is .30. *Id.* at Table 2. The Public Defender suggests that when recent penalty trials are added, the average rates are even lower.

After discussing various suppositions in the Master's Report with respect to the causes for such a decline in death-sentencing rates, the Public Defender argues that whether those prosecutorial judgments are a function of attempts to predict jury-sentencing behavior or resource allocations, the trend in prosecutorial decisionmaking lends further support to the proposition that the death penalty offends current standards of decency in New Jersey.

The Public Defender thus argues from the Master's writings that to satisfy Justice White's constitutional concern over "[a] penalty with such negligible returns to the State," *Furman, supra,* 408 *U.S.* at 312, 92 *S.Ct.* at 2764, 33 *L.Ed.*2d at 391, the frequency of death sentencing must be "substantial," noting that "imposing the death penalty in only one out of every two factually similar cases does not satisfy conventional notions of evenhandedness," and that a death-sentencing frequency rate less than .80 is "too low to comply with notions of evenhandedness or regularity." David C. Baldus, George Woodworth & Charles A. Pulaski, *Equal Justice and the Death Penalty: A Legal and Empirical Analysis,* 76–77 n. 50 (1990).

## C.

We disagree that the declining rate of the imposition of the death penalty by New Jersey juries makes it a cruel and unusual punishment. In *Ramseur*, we emphasized that there was no way in which a capital-sentencing system could be produced that could mechanically predict the outcome of capital trials. We explained in the face of a dissent questioning the procedural protections afforded under the Act: "If the suggestion is that capital defendants are entitled to perfection, to totally consistent, accurate and reliable procedures, obviously not only this Act but any death penalty act would be unconstitutional." 106 *N.J.* at 192, 524 *A*.2d 188.

In the face of claims that the statute could be arbitrarily and capriciously applied, we have attempted to set standards to narrow the class of death-eligible murderers. In *Ramseur*, we undertook to "narrow imprecise [c(4)(c)] statutory language in order to render it constitutional." 106 *N.J.* at 200, 524 *A*.2d 188. In *Gerald, supra,* 113 *N.J.* at 89, 549 *A*.2d 792, we interpreted the Act to limit the sentence of death to those who intended to kill, not just injure. In *Bey* II, *supra,* 112 *N.J.* at 165, 548 *A*.2d 887, we rejected any idea of a mechanical or numerical balancing of factors in the death-sentencing process. We made it clear that jurors must be instructed that it is they who must make the qualitative judgment about who shall live or who shall die. *Ibid.* In *Zola, supra,* 112 *N.J.* at 428–31, 548 *A*.2d 1022, we recognized the request that defendants be permitted to plead for life at the hands of a jury. In *State v. Davis,* 96 *N.J.* 611, 618–21, 477 *A*.2d 308 (1984), we allowed any relevant evidence bearing on the defendant's potential for rehabilitation to be presented to a jury in a capital-sentencing phase.

That individualized assessments would be made of defendants was inevitable in those rulings. In *Ramseur*, we noted that "the Supreme Court has categorically rejected blind unifor-

mity in the sentencing of capital defendants. Under constitutionally approved sentencing schemes, the process must guarantee an individualized assessment of the defendant." 106 *N.J.* at 331, 524 *A.*2d 188 (citation omitted). The strangest anomaly would result if those guarantees, intended to insure recognition of common humanity in even the most shocking of crimes, were thought to make punishment under the Act "cruel and unusual." On the contrary, the very humanity of the sentencing process, channeled as best the Legislature can channel it, is what makes the Act constitutional. In *Woodson v. North Carolina*, 428 *U.S.* 280, 293, 96 *S.Ct.* 2978, 2985–86, 49 *L.Ed.*2d 944, 954 (1976), the Court concluded that a mandatory death sentence that would surely produce statistical uniformity would just as surely violate the Eighth Amendment.

The premise of the *Coker/Enmund* analysis, as explained by Justice O'Connor in her dissenting opinion in *Enmund* [9] is fourfold. 458 *U.S.* at 801, 102 *S.Ct.* at 3379, 73 *L.Ed.*2d at 1154. That analysis involves (1) the evaluation of "contemporary standards" of decency drawn from two sources, (a) legislatures and (b) juries; and (2) evaluation of punishment in relation to (a) the degree of harm (the question of inflicting death for a nonfatal rape), as well as (b) the degree of blameworthiness. *Id.* at 825–26, 102 *S.Ct.* at 3391, 73 *L.Ed.*2d at 1169–70.

In this case that the magnitude of harm inflicted on the victim (death) and the degree of blameworthiness (intentional contract killing) surpass any measure of constitutional restraint is clear. In the context of mandatory sentencing, the Eighth Amendment is violated only when "[t]he two crucial indicators of evolving standards of decency respecting the

---

[9] We make reference to that dissent because it is based on a differing view of the *evidence* of rejection of the death penalty, not on a differing view of the concepts of Eighth Amendment jurisprudence.

imposition of punishment in our society—jury determinations and legislative enactments—both point conclusively to the repudiation" of the death penalty. *Woodson, supra,* 428 *U.S.* at 293, 96 *S.Ct.* at 2986, 49 *L.Ed.*2d at 954 (opinion of Stewart, J.). Although one could argue that twenty-six [10] death sentences out of 246 death-eligible cases is a "credible threat essential to influence the conduct of others," *Furman, supra,* 408 *U.S.* at 311, 92 *S.Ct.* at 2763, 33 *L.Ed.*2d at 391 (White, J., concurring), we need not debate the point because we are convinced that a low level of jury death verdicts would not render the Act unconstitutional.

 That New Jersey juries have reserved the death penalty for a small segment of the death eligible does not make a sentence arbitrary and capricious so long as adequate standards are in place and there is no evidence of impermissible factors influencing the jury. As the Public Defender has noted in his race-of-victim, race-of-defendant analysis, *infra* at 210, 613 *A.*2d at 1110, jury behavior is quite predictable at the high and low ranges of aggravating and mitigating factors. In that respect, New Jersey juries may be seen to be fulfilling the Legislature's wish that the death penalty be but rarely invoked:

> [T]he bill has some rather rigorous provisions in it for the protection of the defendant, the theory being that ultimate penalty is paid, as difficult as that will be on all of us who have a part in it, when that day comes, we want to at least feel we have tried to cover every possible contingency for the protection of the defendant and hopefully it will be utilized only in the most extreme cases.

---

[10] The Public Defender argues that even those figures are suspect. He suggests that after removing from the thirty-two death verdicts those cases that do not meet the statutory criteria, *e.g., Marie Moore, Bey* I, we should remove, as well, all reversals that have not resulted in retrial-death verdicts. Of those thirty-two vacated death verdicts, only four have gone to a remand-penalty trial, and in only two were the defendants sentenced to death. We believe, however, as does the Master, that the original penalty trials, although reversed for various reasons, most often for the burden-of-proof and *Gerald* issues, have reflected juror values of deathworthiness in terms of deterrent effect.

[Public Hearing, N.J.Senate Judiciary Committee, Senate No. 112, at 1 (Feb. 26, 1982) (statement of the bill's sponsor, Senator John Russo).]

## VII

*Geographic Patterns of Charging and Prosecuting Capital Cases do not Demonstrate an Arbitrary Exercise of the Prosecutorial Function.*

██ Next, we consider defendant's claim that New Jersey's Capital Punishment Act is unconstitutional because the geographic distribution of capital-charging and sentencing decisions within the state demonstrate that capital punishment is arbitrarily imposed. Defendant claims that decisional disparities between the counties render imposition of death sentences inconsistent, unfair, and arbitrary, contrary to the Eighth Amendment to the United States Constitution and Article I, Paragraph 12 of the New Jersey Constitution.

In addition, defendant advances a more particularized argument regarding his death sentence. Defendant asserts that his sentence should be vacated because he was twice adversely affected by geographic variations in the pursuit and implementation of capital sentences. Defendant was indicted for capital murder in Ocean County at a time when, according to his calculations, such prosecutions were undertaken without exception. Afterwards, because of a change of venue, defendant was tried and sentenced in Atlantic County, which he asserts has a higher-than-average conviction rate in capital cases. Defendant argues that this unique geographic combination meant that his chance of receiving a death sentence was greater than that of any other defendant in the universe of capital cases.

After a careful review of the statistical evidence submitted by the Master and the State's expert, we conclude that defendant has not shown that any variations in capital-prosecution and sentencing practices in the state amount to a constitutional deficiency in the application of the death penalty. We remain mindful of the potential for abuse of prosecutorial discretion in

capital decisionmaking and the threat it poses to the desired uniformity in pursuit of such sentences. However, the data presented in this appeal do not establish the existence of such arbitrariness on the part of prosecutors.

## A.

We recognized the potential for arbitrariness in prosecutorial decisionmaking with respect to capital cases early in our experience with the death-penalty statute. In *State v. McCrary*, 97 *N.J.* 132, 141, 478 *A.*2d 339 (1984), we acknowledged the significant consequences that flow from a decision to seek a death sentence and found ourselves persuaded "that some judicial scrutiny of prosecutorial charging [was] necessary." Thus, we held that defendants who had been served with a notice of an aggravating factor could, through summary proceedings before the trial court, challenge the sufficiency of the evidence to support that factor when evidence is clearly lacking to support the charge. *Id.* at 142, 478 *A.*2d 339. Our stated goal was "to effect only a minimal intrusion into this area of prosecutorial discretion" in light of the "broad discretionary powers" historically exercised by prosecutors in determining charges. *Ibid.*

When undertaking our first examination of a death sentence, we upheld the Act against a broad-based constitutional attack but recognized that we would eventually be asked to review "concerns about possible misuse of prosecutorial discretion" in seeking the death penalty. *Ramseur, supra,* 106 *N.J.* at 329, 524 *A.*2d 188. Our prediction in *Ramseur* was fulfilled the next year in *Koedatich, supra,* 112 *N.J.* 225, 548 *A.*2d 939, when the defendant asserted that the death-penalty statute provided prosecutors with unfettered discretion to determine which defendants would be exposed to the possibility of a capital sentence, in violation of the Constitution. Koedatich claimed that "[w]hile limiting jury sentencing discretion helps to assure that those sentenced to death are a rational subset of those *actually* charged of capital crimes, it does not at all

assure that those convicted are a rational subset of those who *could* be charged with a death-eligible offense." *Id.* at 251–52, 548 *A.*2d 939. Koedatich did not make a claim of individualized abuse of discretion in the selection of his case for capital prosecution. Instead, he relied, as defendant in this appeal does, on statistical data that suggested that cases were prosecuted as capital matters in a manner that was inconsistent from county to county.

We began our analysis in *Koedatich* by noting that *Gregg, supra*, 428 *U.S.* 153, 96 *S.Ct.* 2909, 49 *L.Ed.*2d 859, holds that the federal Constitution "does not require limits on prosecutorial discretion beyond the aggravating factors outlined in the statute." 112 *N.J.* at 252, 548 *A.*2d 939. We looked beyond that requirement, however, and found that "the New Jersey Constitution * * * mandates consistency and reliability in the administration of capital punishment." *Id.* at 251, 548 *A.*2d 939 (citing *Ramseur, supra*, 106 *N.J.* at 190, 524 *A.*2d 188). Of course, "[t]o ensure a complete absence of discretion at each stage of decisionmaking would be an impossible task for the Legislature or for this Court. Indeed, to restrict discretion completely at the prosecutorial stage would be unconstitutional." *Id.* 112 *N.J.* at 252, 548 *A.*2d 939. "[C]apital defendants are not 'entitled to perfection, to totally consistent, accurate and reliable procedures.'" *Id.* at 251, 548 *A.*2d 939 (quoting *Ramseur, supra*, 106 *N.J.* at 192, 524 *A.*2d 188).

Instead, we held that

[t]he critical question in assessing prosecutorial discretion is what standards are applied to move a case from death-possible to death-eligible status. To assist in answering this question, this Court cannot rely solely on county-by-county statistical discrepancies or on findings that are developed exclusively by defense counsels' evaluation of the case included in the data base.

That there are differences among the counties in the likelihood that a prosecutor will pursue—or the coincidence that the prosecutor has more often pursued—a capital prosecution does not, standing alone, demonstrate that the death penalty is being arbitrarily imposed. Surely, there are a myriad of reasons why a prosecutor handles different cases differently, such as the willingness of a defendant to plead guilty, the strength of the State's case, a defendant's cooperation in the State's case against a co-defendant, the relative

weight of the statutory aggravating and mitigating factors, the availability and relative credibility and persuasiveness of witnesses, and the resources of the county prosecutor's office, to list only a few.

[*Id.* 112 *N.J.* at 256, 548 *A.*2d 939.]

Although we were reluctant to draw conclusions from the preliminary statistical data submitted in *Koedatich,* we nevertheless "recognize[d] the need for greater guidance for prosecutors as they attempt to perform their constitutional duty of enforcing this statute." *Id.* at 258, 548 *A.*2d 939. Therefore, we "strongly recommend[ed] that the Attorney General, and the various County Prosecutors, in consultation with the Public Defender, adopt guidelines for use throughout the state by prosecutors in determining the selection of capital cases." *Ibid.* We predicted that such guidelines would "promote uniformity in the administration of the death penalty, [and would] be an additional safeguard against arbitrariness and an assistance to this Court in its developing proportionality review." *Ibid.*

In considering defendant's challenge, we operate in a more informed atmosphere than that which was available at the time we decided *Koedatich.* First, we now have before us highly-developed data compiled by our Special Master as well as a statistical report submitted by an independent expert hired by the State. In addition, the Guidelines for Designation of Homicide Cases for Capital Prosecution were adopted in February 1989, and prosecutors throughout the state have been operating pursuant to them since that time.

### B.

The Master's *Final Report* examines both the prosecutorial-selection process and jury determinations in the various counties. The Report categorizes geographic-sentencing disparities in three ways: (1) the state's twenty-one counties are divided into three regions: "north," "northwest," and "southern;" (2) they are classified as "urban" or "non-urban;" and (3) the state is examined as a whole. The Report concludes that the overall

death-sentencing rate among death-eligible offenses is more than twice as high in non-urban as in urban areas. In addition, the Report determines that a substantially-higher death-sentencing rate in the southern part of the state makes the overall rate there approximately two times higher than it is in the north and northwest.

. The Attorney General challenges the Report's method of classifying counties as "urban" or "non-urban." For example, the Report labels as "urban" those counties that Professor Baldus determined to embrace a major urban center: Camden, Essex, Hudson, Mercer, Middlesex, Passaic, and Union. But absent from that list is Bergen County, which, like all remaining counties, was classified as "non-urban." However, Bergen County, with its substantial population, sits adjacent to three large cities: Paterson, Passaic, and Clifton, and shares a border with Manhattan and the Bronx in New York. Additionally, the county is home to major industrial development, highly-travelled highways, and concentrated retail establishments. Although some of the county is decidedly suburban in character, it should have been included in the urban counties for purposes of the Report.

Furthermore, the urban/non-urban classifications group substantially different counties together. For example, suburban Morris County in the northern part of the state shares non-urban status with rural Salem County far to the south. In addition, the Report does not account for counties that have both significant urban and significant rural characteristics. Atlantic County embraces Atlantic City, a municipality that could hardly be more urban. At the same time, however, the western end of the county is quite rural. Classification of the county solely as one or the other cannot accommodate those characteristics.

The Attorney General also questions the classification of the regions. Instead of dividing the state into the familiar north, central, and south, the Report uses regions of north, northwest,

and south. For example, Monmouth and Ocean Counties, which are clearly within the ring of counties comprising the New York metropolitan area, see Metropolitan Regional Report, are classified as part of South Jersey.

We note that the foregoing issues underscore the difficulty of packaging the various counties into neat, absolute categories for the purpose of statistical comparison and to explain why we do not accept the Final Report's findings in this area as conclusive. Although the *Final Report* is not perfect in its statistical analysis (such a standard cannot reasonably be expected), nevertheless, its overall findings are instructive on the general trends in capital-charging and sentencing decisions and serve as a useful basis from which to examine the geographic application of the death-penalty statute.

### C.

The *Final Report,* using the above classifications, determines that prosecutors in non-urban counties seek the death penalty at a rate 1.6 times more frequent than their urban counterparts. In addition, regional disparities demonstrate that prosecutors in the northwest region seek the death penalty at a rate 1.6 times more frequent than do prosecutors in the north and 1.3 times more frequent than do prosecutors in the south. When individual counties are considered, the *Final Report* shows about a sixty-eight-percentage-point spread, from a low penalty-trial rate of .32 to a high in two counties where all cases determined by Baldus to be death eligible advanced to a penalty trial. Although those figures are worthy of concern, they come nowhere near the aberrations noted in Maryland. In one Maryland county prosecutors seek the death penalty in "100% of the death-eligible cases, whereas in Baltimore City, they seek that penalty in only 1.8%." *Tichnell, supra,* 468 *A.*2d at 31–32 (Davidson, J., dissenting).

With respect to jury behavior, the Report indicates that the overall death-sentencing rate is more than twice as high in non-

urban than in urban counties. In addition, the death-sentencing rate in the southern part of the state is approximately two times higher than it is in the north and northwest. Notably, almost one-fourth of the counties have a death-sentencing rate of zero, compared to three counties that have a rate of fifty percent.

In response, the *Weisberg Report*, submitted by the Attorney General, attempts to explain the unreliability of Professor Baldus's geographic determinations. Dr. Weisberg first observes that the sample sizes for most counties are simply too small for any significant statistical analysis. Overlooking that flaw, however, Dr. Weisberg concludes that the *Final Report* discloses only raw numerical disparities, which demonstrate neither statistical significance nor constitutional deficiency.

Most significantly, the *Weisberg Report* argues that the *Final Report* fails to take into consideration the case-mix differences across the state, which could account for some of the variations in prosecution rates between the counties. In other words, the Special Master's figures are unadjusted because they do not consider the aggravating or mitigating circumstances attendant to each case. To illuminate this point, Dr. Weisberg divides the universe of cases into four culpability categories beginning with Category I (the most culpable) and ending with Category IV (the least culpable).

Without reciting the data, we note that the Weisberg Report's ultimate conclusion is that

the variation in penalty-trial rates * * * across areas of the state is primarily attributable to the different case mixes in these areas. After adjustment for culpability level, these differences are greatly reduced and fail to achieve statistical significance. Thus, the notion that prosecutors differ substantially in terms of their personal propensities to seek the death penalty appears implausible.

[*Weisberg Report, supra*, at 37.]

Defendant challenges the validity of Dr. Weisberg's conclusions. Defendant first asserts that the *Weisberg Report* does

not address county-by-county disparities in prosecution and sentencing practices because its culpability categories are applied only by region and urban/non-urban classifications. Second, defendant argues that the *Weisberg Report* supports a conclusion that the entire capital-punishment system is flawed because it demonstrates that some variation in prosecution and sentencing exists even after application of Dr. Weisberg's culpability categories.

Defendant argues that because prosecutors operate with a county-wide jurisdiction and not on a regional or urban/non-urban basis, Weisberg's report does nothing to address discretion of individual prosecutors. Again, we note that Dr. Weisberg's report, like any other statistical study of capital-punishment practices, does not address every possible combination of death-penalty practices in the state. However, Dr. Weisberg's statistics are helpful because they shed light on capital-prosecution and sentencing practices throughout the state, and we view his findings as informative in our review of defendant's arguments.

### D.

Defendant argues that the *Final Report* portrays a "crazy-quilt" of prosecutorial decisionmaking practices that have rendered the Prosecutorial Guidelines nugatory and that result in an unpredictable and unconstitutional application of capital sentences. The Master's Report and Dr. Weisberg's rejoinder together demonstrate that capital-prosecution decisions are not carried out with complete uniformity. Yet, we do not accept the proposition that the exercise of any discretion on the part of the prosecutor renders our system of capital punishment unconstitutional. Prosecutors must make determinations regarding the likelihood of successfully securing a death sentence when deciding whether to commit resources to the effort to do so. That process appropriately involves evaluation of the evidence and predictions about the ability of the State to prove beyond a

reasonable doubt that the aggravating factor or factors out-weigh those in mitigation.

Inevitably, in some cases that could result in a capital convic-tion a prosecutor will determine that accepting a plea to murder would be a prudent course of action based on an evaluation of the evidence. Another prosecutor presented with the same case will have no slide rule to tell him or her when the expenditure of resources in pursuit of a capital sentence can wisely be undertaken. Such a variation does not offend the State Constitution. Although the statistics suggest the possi-bility that different norms and cultures (and societal conditions) may be producing different outcomes not desirable under our notions of equal justice, and although we are disturbed by that possibility, nevertheless ensuring that all twenty-one prosecu-tors would make the same capital-charging decision in every case is simply unattainable and constitutionally unnecessary.

Of course, we would find unacceptable any suggestion that a particular prosecutor or group of prosecutors had engaged in a charging decision that amounted to an aberration and related not to evidentiary strength but to some other impermissible consideration. The guidelines adopted by the New Jersey County Prosecutors Association require prosecutors to hew closely to the statutory requirements of the Act and to evaluate the weight of the evidence to sustain any aggravating factor. The guidelines also require avoidance of any extraneous influ-ences of race, sex, status of defendant or victim, or of notoriety of any case or the resources to prosecute it. The guidelines explicitly negate "any substantive or procedural rights." The guidelines provide no system of administrative review at the county or state level.

Aside from the concerns about the race of the victim and race of the defendant that we shall discuss in Part VIII, *infra* at 207, 613 *A.*2d at 1108, the *Final Report* presents no other evidence of impermissible bias in the prosecutory function. Although capital-charging decisions vary to some extent from

county to county, we do not find the deviations constitutionally significant. Nor does the statistical evidence suggest that jurors in a particular county or counties are acting arbitrarily. Jury deliberations will, by their nature, vary to some degree. Long before capital jurisprudence, defense counsel resisted transfers of venue from metropolitan areas to less-urban ones. That was not done here. Defendant sought a transfer from non-urban Ocean County because of adverse pretrial publicity. Atlantic County, except for Atlantic City, shares much of the flavor of Ocean County.

If all death-penalty cases resulted in a death sentence in South Jersey and none of the death-penalty cases in North Jersey resulted in a death sentence, then our system might be unconstitutional. However, the community for death-penalty purposes is the entire State of New Jersey. Thus we do not find that the system as a whole is unconstitutional simply because death-sentencing rates may vary somewhat from county to county. The statutory aggravating factors as well as limits on prosecutorial decisionmaking ensure that only death-eligible cases arrive before a penalty-phase jury. Jurors must unanimously find aggravating factors and are required to determine beyond a reasonable doubt that such factors outweigh those in mitigation. Absent evidence of impermissible systemic bias, some variation among juries with respect to sentencing is inevitable; it does not equate with unconstitutional application of our Capital Punishment Act.

### E.

█ Defendant also challenges his specific sentence as arbitrary and capricious because of the unique circumstances of having been charged with capital murder in a county with a higher-than-average indictment rate and sentenced to death in a county with a higher-than-average death-sentencing rate.

Defendant argues that at the time of his indictment the Ocean County Prosecutor exercised no discretion with regard to

seeking the death penalty. According to defendant, such a rate of prosecution was twice the state-wide average. Thus, defendant contends that had he murdered his wife a little further south on the Parkway in Atlantic County, the likelihood of his being subject to a capital prosecution would have gone from 100% to 43%. For his argument, defendant relies on the statistics contained in the *Final Report*.

After defendant's indictment, his trial was moved to Atlantic County, which he contends has the highest penalty-trial death-sentencing rate in the state. According to the *Final Report*, Atlantic County juries impose a death sentence in one out of every two penalty trials. That sentencing rate is twenty percentage points higher than the state average and is consistent with the rate in only one other county.

The State counters that defendant applies an oversimplistic reading to the Report's findings, which do not account for the case-mix differences across various areas. All of the cases identified by the *Final Report* as death eligible arising from Ocean County were prosecuted to the penalty trial as capital cases. Thus, the Report concludes that the county initiates capital prosecutions at a rate of 100%. However, a review of the aggravating factors presented by specific cases indicates that all cases identified as "death eligible" in Ocean County fell into either Category I or Category II of Dr. Weisberg's classifications. Thus, that county was presented with an unusually-culpable group of defendants, which could justify its high prosecution rate. In contrast, the Atlantic County cases represented a wider range, and one-half of the total Atlantic County cases were classified as Category IV, the only category for which capital prosecution is uncommon. Hence, a less-frequent-prosecution rate for that county would be reasonable.

Defendant makes a related argument with respect to his sentencing in Atlantic County. Because of a change of venue, defendant was tried in Atlantic County. Atlantic County is one of two counties with the highest penalty-trial death-sentencing

rates in the state. Juries in Atlantic County impose death in one out of every two penalty trials, a rate twenty percent higher than the state average.

The State argues that defendant's Atlantic County argument relies on flawed data that present no reliable evidence of arbitrariness. The State points out several mistakes in defendant's sentencing data. The Public Defender erroneously counted Craig Hart and Alfonso Timpson as non-penalty-trial Atlantic County cases. Recalculating defendant's figures, the State concludes that there were eight penalty-trial cases in Atlantic County (Gerald, Hart, Highlander, Huff, Long, Marshall, Perry, and Timpson) of which three (Gerald, Long, and Marshall) resulted in a death sentence. Such calculations arrive at a .375 frequency rate, a death-sentencing rate lower than Ocean County.

Apart from the statistics, the State contends that there is a basic element of defendant's case that precludes any legitimate argument regarding county-charging differences: the murder-for-hire setting and resulting aggravating factor c(4)(e). In three of the four cases identified by the Master as having aggravating factor c(4)(e) the prosecutor instituted a capital prosecution, disclosing that even with that small sample the circumstances of Robert Marshall's case cut across county lines and received uniform treatment.

We do not find defendant's argument on these issues to be persuasive. The prosecution and sentencing rates in Ocean and Atlantic Counties do not vary significantly from the rates of other counties. Moreover, any county-by-county disparities are the result of case mixes rather than of geography. Similarly, the fortuitous case mix presented to Ocean County, rather than geography, explains its high rate of capital prosecutions. Defendant has not convinced us that the prosecution or sentencing rates of either county amount to an aberration that resulted in an unjustified sentence.

## VIII

*Neither the Race of the Victim Nor the Race of the Defendant Has Been Shown to be an Impermissible Invidious Factor in the Imposition of the Death Penalty.*

### A.

A disturbing aspect of the Master's Report is the suggestion that there may be a discrepancy in capital-sentencing rates that correlate to the race of the defendant or the race of the victim.

The United States Supreme Court seems resigned to accept that such "[a]pparent disparities in sentencing are an inevitable part of our criminal justice system." *McCleskey v. Kemp,* 481 *U.S.* 279, 312, 107 *S.Ct.* 1756, 1778, 95 *L.Ed.*2d 262, 291 (1987). Absent purposeful discrimination, the Supreme Court apparently will not invalidate a death sentence on the basis of racial disparity, no matter how profound.

■ New Jersey's history and traditions would never countenance racial disparity in capital sentencing. As a people, we are uniquely committed to the elimination of racial discrimination. All of our institutions reflect that commitment. We were among the first of the states that enacted a civil rights law. *L.* 1945, *c.* 169, codified at *N.J.S.A.* 10:5–1 to –42. "[Racial] discrimination threatens not only the rights and proper privileges of the inhabitants of the State but menaces the institutions and foundation of a free democratic State * * *." *N.J.S.A.* 10:5–3. Our decisional law has always reflected the "strength of the State's policy" in this area. *Jackson v. Concord Co.,* 54 *N.J.* 113, 123, 253 *A.*2d 793 (1969). To countenance racial discrimination in capital sentencing would mock that tradition and our own constitutional guarantee of equal protection of the laws under New Jersey Constitution Article I, paragraph 1.

As a Court, we have repeatedly emphasized our special commitment to equality in the administration of justice. As we have stated, to exclude from jury service qualified groups " 'not

only violates our Constitution and the laws enacted under it but is at war with our basic concepts of a democratic society and a representative government.' " *State v. Gilmore*, 103 *N.J.* 508, 526, 511 *A.*2d 1150 (1986) (quoting *Smith v. Texas*, 311 *U.S.* 128, 130, 61 *S.Ct.* 164, 165, 85 *L.Ed.* 84, 86 (1940) (footnote omitted)). The imposition of capital-death sentences based solely on the race of the defendant or the victim would be equally at war with the basic concepts of a democratic society and a representative government.

### B.

We have no doubt that a white defendant may argue that our capital-sentencing system is constitutionally invalid. In *Spinkellink v. Wainwright*, 578 *F.*2d 582 (5th Cir.1978), *cert. denied*, 440 *U.S.* 976, 99 *S.Ct.* 1548, 59 *L.Ed.*2d 796 (1979), a convicted murderer raised Eighth and Fourteenth Amendment due-process and equal-protection challenges on the basis of a statistical study purporting to demonstrate a race-based disparate impact in sentencing. The court ruled: "Spenkelink[11] ha[d] standing to raise the equal protection issue, even though he is not a member of the class allegedly discriminated against, because such discrimination, if proven, impinges on his constitutional right under the Eighth and Fourteenth Amendments not to be subjected to cruel and unusual punishment." *Id.* at 612 n. 36. That court relied on the Supreme Court's reasoning in *Taylor v. Louisiana*, 419 *U.S.* 522, 95 *S.Ct.* 692, 42 *L.Ed.*2d 690 (1975). *Taylor* involved a male defendant who had objected to the exclusion of women from his jury. Although "Taylor was not a member of the [injured] class * * * there is no rule that claims such as Taylor presents may be made only by those defendants who are members of the [injured class]." 419 *U.S.* at 526, 95 *S.Ct.* at 695, 42 *L.Ed.*2d at 695.

---

[11] The court points out that the correct spelling of the defendant's name is "Spenkelink." 578 *F.*2d at 582 n. 1.

Defendant surely has a right to raise a structural challenge to the constitutional fairness of the New Jersey Capital Punishment Act. A death-penalty statute that systematically discriminates on the basis of race of the victim or race of the defendant "menaces the institutions and foundation of a free democratic State." *N.J.S.A.* 10:5–3.

The *McCleskey* Court reasoned that although the statistical data showed a discrepancy that may correlate with race, "disparities in sentencing are an inevitable part of our criminal justice system." 481 *U.S.* at 312, 107 *S.Ct.* at 1778, 95 *L.Ed.*2d at 291. The Court held that McCleskey's equal-protection claim must fail because there was no showing of purposeful discriminatory intent. It shrank from recognizing McCleskey's claim because "taken to its logical conclusion, [it] throws into serious question the principles that underlie our entire criminal justice system." *Id.* at 314–15, 107 *S.Ct.* at 1779, 95 *L.Ed.*2d at 293. The Court feared that if it accepted McCleskey's claim that racial bias impermissibly tainted the capital-sentencing decision, it "could soon be faced with similar claims as to other types of penalty." *Id.* at 315, 107 *S.Ct.* at 1779, 95 *L.Ed.*2d at 293. Carrying the parade of horribles to its extreme, the Court posited that it would have to study any set of arbitrary variables such as the defendant's physical characteristics or those of the victim that "some statistical study indicates may be influential in jury decisionmaking." *Id.* at 317–18, 107 *S.Ct.* at 1780–81, 95 *L.Ed.*2d at 295.

This Court cannot refuse to confront those terrible realities. We have committed ourselves to determining whether racial and ethnic bias exist in our judicial system and to "recommend ways of eliminating it wherever it is found." *Interim Report, supra,* at i. Hence, were we to believe that the race of the victim and race of the defendant played a significant part in capital-sentencing decisions in New Jersey, we would seek corrective measures, and if that failed we could not, consistent with our State's policy, tolerate discrimination that threatened the foundation of our system of law.

We do not find, however, in this case, evidence of constitutionally-significant race-based disparities in sentencing. By way of contrast, the statistics presented to the Court in *McCleskey* were startlingly disturbing. Justice Brennan's dissenting opinion recited the statistical data that the majority accepted as sound for purposes of its analysis. The unadjusted data (for mitigating or aggravating effect of other factors) showed that the capital-sentencing rate for all (at all culpability levels) white-victim cases was almost *"11 times* greater than the rate for black-victim cases. * * * [B]lacks who kill[ed] whites [were] sentenced to death at nearly *22 times* the rate of blacks who kill[ed] blacks, and more than *7 times* the rate of whites who kill[ed] blacks." 481 *U.S.* at 326–27, 107 *S.Ct.* at 1785, 95 *L.Ed.*2d at 300–01. In addition, prosecutors were shown to "seek the death penalty for 70% of black defendants with white victims, but for only 15% of black defendants with black victims, and only 19% of white defendants with black victims." *Id.* at 327, 107 *S.Ct.* at 1785, 95 *L.Ed.*2d at 301.

A more extensive set of relationships between the statistical variables was presented to the *McCleskey* Court. Here, the only statistics presented by the Master were the rate at which black defendants are sentenced to death and the rate at which cases with white victims proceed to a penalty trial.

With respect to the race of defendant, the most critical assertion made by the Public Defender, derived from an extrapolation of the Master's figures, is that

> [a]t the mid range of aggravation level, culpability Level 4, there is a 64–percentage–point higher risk that a black defendant will be sentenced to death than any other defendant * * * [and] at culpability Level 3, no non-black defendant has been sentenced to death, although 3 of 10 black defendants received death sentences.

The Public Defender emphasizes that point because racial effects seem undetectable at the highest culpability levels and at the lowest culpability levels. Hence, he asserts that when juries are faced with real choices, racial effects are striking.

Although the race-of-defendant disparities appeared in the pre-*Gerald* decisions, "[i]n the post-*Gerald* data, there were too few penalty-trial death-verdict cases involving black and non-black defendants with comparable levels of culpability to support any finding at all." *Final Report, supra,* at 103.

With respect to the race-of-victim analysis, the principal concern is the way in which cases advance to penalty trial. Again, extrapolating from the various culpability levels, the Public Defender suggests that "at the mid-range culpability level[ ] [,] * * * Level 4, white victim cases are 1.4 (.78/.56) times more likely to advance to a penalty trial than other cases [and] [a]t culpability Level 3, white victim cases are 3.4 (.67/.20) times more likely to advance to penalty trial than other cases." The Master reported that "on average, cases with a white victim may have a 14 percentage point or higher risk of advancing to a penalty trial than do other cases." *Ibid.* In this instance, his post-*Gerald* data actually demonstrated a slightly stronger race-of-victim effect than the pre-*Gerald* period data. *Id.* at 113–14.

The Master recognizes, however, that those results are not conclusive. He reports that

> [b]ecause discrimination was not the primary mandate in this project, we consider these results to be strictly preliminary. More work will be required to determine if they persist under closer scrutiny and alternative analyses, to determine, for example, whether they are statistical artifacts or flukes, and to assess their legal and practical significance.

> [*Final Report, supra,* at 101.]

We have but little knowledge of the science of statistical probabilities. We have had occasion to study that science in connection with the jury selection process in *Ramseur, supra,* 106 *N.J.* at 221, 524 *A.*2d 188. There we explained how statisticians determine the statistical significance of data to measure the likelihood that "aspects of [a] selection process do not operate randomly" and how courts may use the techniques of

statistical analysis to correct inequality in the process. *Ibid.*
We gave the example of how the

> jury selection process in which two groups are being compared can be likened to
> filling a box with a population of 1,000 slips of paper of which 600 are pink and
> 400 gray, and having someone randomly select a sample of 100 slips. The
> expected number of pink slips would be 60 and the expected number of gray
> slips would be 40. * * * However, a statistician would not be surprised if the
> number of pink slips "deviated" from the expected. Statisticians measure this
> deviation by a formula that enables them to tell whether the result is so far
> from the expected as to demonstrate that the result was not random [or by
> chance].

> [*Ibid.*]

A complex mathematical formula determines that standard
deviation. In the case of the 100 slip sample a statistician
expects that the standard deviation would be plus or minus 4.8
slips, and if a result is "more than 2 or 3 standard deviations
from the expected," a statistician assumes it is suspect. *Id.* at
222, 524 *A.*2d 188.

If a court concludes that the statistical evidence is so deviant
as to compel a conclusion of substantial significance, the court
must then look to the circumstances surrounding that statistical
showing to determine its full constitutional import. The consti-
tutional importance of the statistical showing depends in part
on the degree of subjectivity involved in the selection mecha-
nism. The more discretionary the selection process, the more
concern for bias. In addition, courts consider the time period
over which violations are alleged to have occurred, and, finally,
courts will look at the State's efforts to deal with the problem
of potential bias. *Id.* at 224–26, 524 *A.*2d 188.

Although those principles are not clearly applicable to the
circumstances of this case, they do give us guidance. We do
not have a definitive report that the deviations are sufficiently
alarming to compel a conclusion of substantial discriminatory
effect in the application of the New Jersey Capital Punishment
Act. Despite the apparent race-of-defendant disparities at the
mid-range culpability level, those same data show no race-of-

victim effects in the penalty-trial decisions.[12] *Final Report, supra,* at 101 n. 109. And, most importantly, the Master concluded that "the race of victim effects we have observed in these data for the * * * cases advancing to penalty trial are less stable than the effects we observe for the race of defendant variable in the penalty trial decisions." *Final Report, supra,* at 104 n. 114.. In short, we do not yet confront a record in which "[t]he statistical evidence * * * relentlessly documents the risk that [Marshall's] sentence was influenced by racial considerations." *McCleskey, supra,* 481 *U.S.* at 328, 107 *S.Ct.* at 1786, 95 *L.Ed.*2d at 301 (Brennan, J., dissenting). If that were so, we would not hesitate to invalidate the sentence of death.

Before oral argument, we denied the Public Defender's motion to remand these issues for further factual findings. There has been no showing that would warrant further consideration of this issue.

Although, then, we must be concerned by the disparate rate at which white-victim cases have moved toward capital disposition, we can balance that concern with the fact that the system discloses no significant race-of-victim effects in penalty decisions. Concerning race-of-defendant disparities, we need to examine over time whether those effects are systemic. We balance that concern with the observation drawn from the same data that since 1987 there "were too few penalty-trial death-verdict cases involving black and non-black defendants with comparable levels of culpability to support any finding at all." *Final Report, supra,* at 103. Whether due to the more-clearly-defined requirements for the death penalty, *e.g.,* an objective

---

[12] At the intermediate range in *McCleskey,* death was imposed in "34% of the white-victim crimes and 14% of the black-victim crimes." 481 *U.S.* at 325, 107 *S.Ct.* at 1784–85, 95 *L.Ed.*2d at 300 (Brennan, J., dissenting). This represents approximately a 2.4 times greater imposition of the death penalty in white-victim cases.

standard for the c(4)(c) torture/depravity factor, *Ramseur,*
*supra,* 106 *N.J.* at 211, 524 *A.*2d 188; the requirement of a
showing of an intent to kill, *Gerald, supra,* 113 *N.J.* at 69, 549
*A.*2d 792; the requirement that aggravating factors be found
unanimously beyond a reasonable doubt to outweigh non-unani-
mous findings of mitigating factors, *State v. Biegenwald,* 106
*N.J.* 13, 53, 524 *A.*2d 130; or to the State's own efforts to
channel and guide discretion, *see, e.g., Koedatich, supra,* 112
*N.J.* 225, 548 *A.*2d 939, "[t]he principal trend in New Jersey's
capital charging and sentencing system between 1983 and 1991
has been a marked decline in the frequency with which death
sentences are imposed among death-eligible cases. * * * 1987
marks the dividing line." *Final Report, supra,* at 15. Al-
though the Master does not attribute the decline to the interpre-
tative changes, the data suggest that the legislative and judicial
efforts to achieve the required "categorical narrowing" of
death-eligible cases apparently have not limited the effective-
ness of the State's Capital Punishment Act, but rather, have
strengthened the constitutionality of the Act by providing criti-
cally-needed guidance at all decisional stages. Decreasing dis-
cretion within the system decreases the likelihood that the
determination of who shall live and who shall die will be
arbitrary and capricious and the likelihood that death would be
considered a cruel and unusual punishment in violation of the
Eighth Amendment.

■ We have no doubt that the people of New Jersey would
not tolerate a system that condones disparate treatment for
black and white defendants or a system that would debase the
value of a black victim's life. Whether in the exercise of
statutory proportionality review or our constitutional duty to
assure the equal protection and due process of law, we cannot
escape the responsibility to review any effects of race in capital
sentencing. *See N.J. Const.* art. VI, § 5, par. 1(c); *State v.*
*Koedatich,* 98 *N.J.* 553, 489 *A.*2d 659 (1984) (finding that court

must review death sentence even when defendant wishes not to appeal).

We have encouraged the Attorney General, as the chief law-enforcement officer of the State of New Jersey, to exercise his undoubted authority to instill uniformity in charging and prosecuting practices throughout the state. We realize the differing attitudes in counties and the jurisdictional concerns. If the system fails to eliminate unconstitutional disparities, that failure should not be because of hesitancy to invoke authority currently conferred on the Attorney General. A statewide review panel, appointed by the Attorney General in consultation with prosecutors, would be able to screen out any possible effects of race or socioeconomic status in the charging and selection process. Certain of the statutory factors, *e.g.*, prior murder, contract killing, or multiple factors, obviously make a case more deathworthy. It does not seem burdensome to articulate such reasoning. In part IX, *infra* at 216, 613 *A*.2d at 1113, of this opinion we outline a process by which to resolve any differences between the Attorney General and Public Defender concerning the reliability of either the data-gathering process or the specifics of a particular case in the universe.

Although this generation ought not bear the burden of the past, we seem unable to rid ourselves of its vestiges of racial oppression. As Justice Brennan so eloquently stated in his dissent in *McCleskey:*

> In more recent times, we have sought to free ourselves from the burden of this history. Yet it has been scarcely a generation since this Court's first decision striking down racial segregation, and barely two decades since the legislative prohibition of racial discrimination in major domains of national life. These have been honorable steps, but we cannot pretend that in three decades we have completely escaped the grip of a historical legacy spanning centuries.
>
> [T]he Court[ ] fear[s] that McCleskey's claim is an invitation to descend a slippery slope * * * [believing] that any humanly imposed system of penalties will exhibit some imperfection. Yet to reject * * * evidence [of racial bias] on this basis is to ignore both the qualitatively different character of the death penalty and the particular repugnance of racial discrimination * * *.
>
> [481 *U.S.* at 339, 344, 107 *S.Ct.* at 1792, 1794, 95 *L.Ed.*2d at 309, 312.]

## IX

### *Revisions That Can be Made Now and in the Future to Simplify the Data–Gathering Process*

The Master has compiled the data base to assist the Court in its constitutional and statutory functions of death-sentence review. We must take steps to assure that it is kept current and accessible to the parties and the Court. Obviously, the extent of future maintenance of the data base must await the adjudication of parties' rights under *L.*1992, *c.* 5 (limiting statutory proportionality review to death-sentenced cases). Still, the data base is relevant to evaluate the system-wide claims of constitutional dimension, as well as potentially the claims of defendants whose offenses were committed before the Act's effective date.

In his *Final Report, supra,* at 107, the Master reflected on the project's first years of experience. The original proposal contemplated a collaborative effort with full participation by defense and prosecution. Initially, he expected that the studies of cases would be enhanced or corrected by input from the parties, particularly trial counsel. Input from trial counsel has varied greatly, however. In particular, the prosecutors have offered no assistance, even with death cases. The Attorney General provided appellate briefs, when available and requested, as well as jury verdicts for both death-sentenced cases and a residual group of life-sentenced penalty-trial cases. That the process can benefit greatly from a continuing collaborative process is self-evident.

The Master has made certain recommendations to the Court with respect to data-collection entry and retrieval and a possible continuing role for the AOC. We need not outline in detail those recommendations at this time.

We have no way of knowing how long the Master will continue to assist the Court in the data-gathering process. Any system we maintain should be able to operate efficiently even after his departure, and, indeed, after our departure. Hence, because the Attorney General and his consultant have questioned certain of the data-gathering methods employed by the Master, we shall appoint a Superior Court judge familiar with the relevant statistical and data-assembly concepts to oversee development of a recommended plan for future maintenance of the Court's records. That judge will entertain applications from any of the parties to correct any perceived inaccuracies or deficiencies in the record-gathering system. For example, questions about the *quantum* of premeditation (is five minutes enough?) and even clerical errors should be readily resolved. In addition, the data base may need revisions to accommodate our belief that the culpability models should be as objective as possible, *i.e.,* rooted in traditional sentencing considerations.

The pool of clearly death-eligible cases is the pool of cases that the Court must consider for constitutional review of impermissible bias. *See Ramseur, supra,* 106 *N.J.* at 186 & n. 18, 524 *A.*2d 188 (one feature that sustains constitutionality of Capital Punishment Act is mandatory "appellate review" that is "meaningful"). We expect that once the parties' adversarial positions have been resolved, the Attorney General and prosecutors will cooperate with the Court and its representatives in maintaining the data. Given society's many needs and the demands placed on all branches of government, to resolve many of the questions about accuracies in the data base by a telephone call rather than by an after-the-fact analysis of the transcripts and available documents will be far simpler.

In a collaborative setting, the parties may be able to develop a more efficient and cost-effective system as well. As noted in our discussion of geographic and racial disparity, much of the unease about those issues could be readily resolved if there were some type of inter-agency review to provide the most rudimentary monitoring of the capital-charging decisions. In

addition, the parties may wish to ask us to implement the type of reporting (or some variation of it) submitted to the Supreme Court of Delaware. *See Flamer, supra,* 490 *A.*2d 104. We gather that presentence reports with respect to the non-capital charges are regularly made available now to the proportionality-review office. With any necessary mid-course corrections and refinements suggested to us by the monitoring judge or the parties, we are confident that to implement the record-keeping process that is necessary to assure the constitutional and judicial integrity of capital sentencing on review will be both fair and feasible.

## X

### CONCLUSION

The extent to which the parties' arguments will have to be reconsidered under *L.*1992, *c.* 5 must await the eventuality of a case arising under that law. We have attempted, however, to make our judgment under the law that applies to this case as explicit as possible so that it could be tested against whatever objective measurements are available and applicable. Once defined, however, the process of proportionality review will not "frustrate and confuse the Court," as the State believes. *Weisberg Report, supra,* at 39. Although the process is thorough, the concepts are not overly difficult: use the information at our disposal to identify similar cases in terms of blameworthiness; examine the prosecutorial and jury patterns for frequency or of frequency of death verdicts in the similar cases; and, finally, look at the comparison cases to identify disproportionality.

The debate between the parties under the prior law has focused on the size of the envelope containing the comparison cases, not what the envelope contains or how to withdraw the information. We share some of the concerns of our concurring and dissenting member, Justice Garibaldi, about the reliability of the data base. *Post* at 224, 613 *A.*2d at 1117. For that reason, we have established in Part IX of this opinion, *supra,* at

216–218, 613 *A*.2d at 1113–1114, a procedure to test and resolve any doubts about the specifics of any case categorization as death eligible or deathworthy. Regardless of which method of cataloguing the cases we use, whether index card or computerized data base, we can never dispense with the obligation to assure that the burden of the past does not create a genuine risk that defendants will be sentenced to death either because of their race or the race of the victim. To repeat the words of our Legislature: "[Racial] discrimination threatens not only the rights and proper privileges of the inhabitants of the State but menaces the institutions and foundation of a free democratic State." *N.J.S.A.* 10:5–3.

And, finally, we cannot await a more certain state of proof before we render judgment. We must confront in this case the problem of the small sample of comparison cases. We do not know what will happen in the next ten similar cases, but we must nevertheless make our judgment now. Were the next ten similar cases to result in death and were we to declare this penalty disproportionate, we would have made a mistake; and if the next ten similar cases were to result in life and we were to affirm the death penalty, we would have made an even greater mistake.

Proportionality review recognizes in that sense that society's standards may change and that which is proportionate in one era may be disproportionate in another. There are no absolutes. Ours is a finite role defined by our obligation to see that justice is done at a given time. We have had to make some assumptions. For example, we have included for statistical purposes in our analysis death verdicts such as *Clausell* and *DiFrisco* that have been reversed. We recognize the argument made in Justice Handler's dissent, *post* at 253–258, 613 *A*.2d at 1132–1134, that there is a logical step in that process that may be scientifically unjustified. We continue, nonetheless, to believe that such jury verdicts provide sufficiently-reliable information concerning the characteristics that prosecutors and juries consider important to warrant the inclusion of those cases

in proportionality analysis. Although we have had a fairly large sampling in our universe (246 death-eligible cases), the system itself is new. Society is entitled to a longer experience before one can say that it cannot apply proportionally the punishment that it has legislated.

Our dissenting member, Justice Handler, sees in those uncertainties "the disquieting truth that capital punishment cannot really be made to work in a *civilized* society." *Marshall* I, *supra*, 123 *N.J.* at 266, 586 *A.*2d 85. He sees the death of one so sentenced as diminishing our common humanity. Yet, both proponents and opponents of the death penalty invoke the same ideal of justice. The opponents believe that we diminish ourselves when the State, representing organized society, takes a life without having established a system of certain predictability. Proponents believe that we diminish our common humanity as well when we do not respect the principle of just retribution for the taking of an innocent murder victim's life.

Even the most profound search for an essence of law must confront the reality of human experience. "Hence justice is traditionally thought of as maintaining or restoring a *balance* or *proportion,* and its leading precept is often formulated as 'Treat like cases alike'; though we need to add to the latter 'and treat different cases differently.'" H.L.A. Hart, *The Concept of Law* 155 (1961).

In the best of all worlds there would be no doubt about like cases being treated alike. From defendant's point of view, all that he knows is that he is the only one whose death sentence we have affirmed. But when our measuring system counts two cases as the same because both have the same mitigating factor—c(5)(h), "[a]ny other factor which is relevant to the defendant's character or record," it allows for a characterization of sameness that may conceal the greatest differences between the two cases.

The United States Constitution requires that juries be permitted to consider any aspect of the defendant's charac-

ter; therefore, to some extent, that each case be considered as a different case is not only inevitable but almost constitutionally required. Statutory proportionality review could not have been intended to invalidate that which the United States Constitution requires.

The sentence of death is affirmed.

GARIBALDI, J., concurring in part and dissenting in part.

I concur in the judgment of the Court affirming the sentence of death imposed on Robert O. Marshall. In addition, I concur in parts I, II, VI, VII, VIII, IX and X of the Court's opinion. Moreover, I agree with the majority that this appeal is properly decided under *N.J.S.A.* 2C:11–3e, prior to its recent amendment by the Legislature. *L.*1992, *c.* 5 (eff. May 12, 1992). However, I respectfully dissent from the conclusions contained in parts III, IV, and V of the Court's opinion regarding the scope of proportionality review contemplated by the former *N.J.S.A.* 2C:11–3e, and the universe of cases against which Marshall's death sentence should be compared.

I agree with the majority's careful construction of a system of proportionality review that incorporates both the analytical statistical study and the collective experience of the members of the Court. The majority's view correctly acknowledges the proper role of applied judgment in a process in which an enslavement to numbers is tempting. When reviewing sentences of death we must resist the "seductive appeal of science and mathematics," *North Carolina v. Williams,* 308 *N.C.* 47, 301 *S.E.*2d 335, 355 (citation omitted), *cert. denied,* 464 *U.S.* 865, 104 *S.Ct.* 202, 78 *L.Ed.*2d 177 (1983), which threatens to overcome the application of our seasoned judgment regarding the appropriateness of a capital sentence.

## I

I would limit the universe of cases considered during proportionality review to those in which a prosecutor has served a

notice of aggravating factor, thereby indicating an intention to seek a capital sentence. The majority on the other hand would include in the "universe" homicides that the Special Master deemed to be "death-worthy" but that were not prosecuted as capital offenses or that may not even have proceeded to trial. Such a universe fails to comport with the United States Supreme Court's concept of proportionality review or the Legislature's intent, and adds an unnecessary element of uncertainty and unreliability to New Jersey's capital-sentencing procedures.

Proportionality is not the vehicle chosen by the Supreme Court to correct the major constitutional infirmities in capital punishment statutes cited in *Furman v. Georgia*, 408 *U.S.* 238, 92 *S.Ct.* 2726, 33 *L.Ed.*2d 346 (1972). Instead the Supreme Court looks to newly-enacted death-penalty statutes to eliminate the arbitrary and freakish nature of imposing death sentences that caused the Court in *Furman* to strike down death-penalty statutes as cruel and unusual punishment.

In New Jersey, those concerns have been addressed by the New Jersey Capital Punishment Act ("the Act"), which provides for bifurcated jury determinations regarding guilt and sentencing, textually-delineated aggravating and mitigating factors for consideration by the capital-sentencing authority, a sufficient narrowing of the class of death-eligible defendants, and direct appellate review by this Court of all death sentences. Those are the safeguards that the Supreme Court has relied on strictly to limit arbitrary application of death sentences and to serve as the principal methods of protecting defendants from arbitrariness. "On its face, this system, without any requirement or practice of comparative proportionality review, cannot be successfully challenged under *Furman* and our subsequent cases." *Pulley v. Harris*, 465 *U.S.* 37, 53, 104 *S.Ct.* 871, 881, 79 *L.Ed.*2d 29, 42 (1984).

Under the federal constitution, proportionality review is concerned with correcting the occasional aberrational outcome of a death-penalty case that exceeds permissible individualized sen-

tencing. Neither the Supreme Court nor the New Jersey Legislature intended the majority's expansive view of proportionality review. Surely, nothing in the history of the proportionality statute suggests that the Legislature intended the Court's review of death sentences to include a comparison of cases that were not prosecuted as capital offenses. As noted by the majority, when the Legislature originally enacted the death-penalty statute, they most likely operated under the misconception that the United States Constitution required proportionality review as an essential element of a valid death-penalty system. *Ante* at 126, 613 *A*.2d at 1067. That assumption was proven incorrect by the holding in *Pulley v. Harris, supra,* 465 *U.S.* at 37, 104 *S.Ct.* at 871, 79 *L.Ed.*2d at 29, which held that a procedural proportionality review was not constitutionally mandated in order to effectuate a properly circumscribed system of capital punishment.

Proportionality review is not a second appellate review nor a broad review of due-process concerns or other constitutional issues. It is a narrow concept directed to whether the defendant received a sentence disproportionate to that imposed on other defendants, considering both the crime and the defendant. It is not a vehicle for determining whether prosecutors abused their discretion. Nor is proportionality review a means of addressing individual instances of racial discrimination or other denials of due process. Of course, this Court will not tolerate such impermissible influences, and any sentence of death that results therefrom will be fatally infected. However, the proper avenue for addressing those issues is the capital defendant's direct appeal, not on proportionality review.

If the Court wishes to undertake additional data-gathering for the purpose of examining prosecutorial misconduct or to address other issues, it should do so. But such unreliable and speculative data do not belong in a proportionality-review analysis, and its inclusion creates uncertainty and doubts about the validity of the Court's final result.

By the time a sentence of death is considered for its proportionality, the defendant will already have had an opportunity to challenge his or her conviction and sentence before this Court. Both will have survived the rigorous scrutiny that we consistently have applied to sentences of death. At that point, proportionality review is correctly limited to a determination of whether the criminal-justice system of the State generally imposes a death sentence or life sentence on those who have committed crimes of a similar magnitude to that of the death-sentenced defendant.

## II

As Special Master Baldus notes:

> The first goal of a realistic system of proportionality review, therefore, is to limit its focus to cases in which there was an identifiable judgment as to the defendant's deathworthiness.
>
> [David T. Baldus, Special Master, *Death Penalty Proportionality Review Project Final Report to the New Jersey Supreme Court*, 46, Sept. 24, 1991 (*Baldus Report*).]

The majority's universe makes securing an identifiable judgment on defendant's deathworthiness impossible. The problems unleashed by adopting the majority's universe are recognized by the Special Master:

> First, that the information required for the decision is either unknown or unavailable. Second, that even if all relevant information is known, the judgment called for is hopelessly speculative. And third, that even if valid judgments were possible, the information gained is not sufficiently helpful to justify the considerable expense involved in collecting the data required to make them.

[*Baldus Report* at 51.]

The validity of the entire system depends on the correctness of the subjective evaluations made by personnel of the Administrative Office of the Courts concerning the "deathworthiness of a case" as contrasted with the evidentiary concerns and other hazards of litigation that a case presents. Such evaluations,

made on a cold record, are extremely difficult, even if undertaken by experienced prosecutors and defense counsel. To replace the reasoned determination of prosecutors, trial judges, and, in some cases, juries, and to rely instead on the subjective evaluations of persons who have never faced the realistic difficulties of trying a criminal case creates an unreliable data-base and misleading conclusions.

I also disagree with the majority's apparent acceptance of the Special Master's conclusion that prosecutorial decisions not to seek the death penalty for certain homicides reflect a determination of death-worthiness. To the contrary, decisions by the prosecutor to decline to seek a capital sentence most likely reflect a determination regarding the likelihood that the available evidence will be insufficient to meet the State's burden of proof. Prosecutors are simply not in the business of discarding clearly death-eligible homicides for which significant evidence establishing guilt has been collected because of a personal decision that a death penalty would be undesirable. As we noted in *State v. Koedatich*, 112 *N.J.* 225, 548 *A.*2d 939 (1988), *cert. denied*, 488 *U.S.* 1017, 109 *S.Ct.* 813, 102 *L.Ed.*2d 803 (1989):

> Surely, there are a myriad of reasons why a prosecutor handles different cases differently, such as the willingness of a defendant to plead guilty, the strength of the State's case, a defendant's cooperation in the State's case against a co-defendant, the relative weight of the statutory aggravating and mitigating factors, the availability and relative credibility and persuasiveness of witnesses, and the resources of the county prosecutor's office, to list only a few.

[*Id.* at 256, 548 *A.*2d at 954.]

Most prosecutorial decisions concerning the pursuit of capital sentences rely on permissible considerations. Most prosecutors will seek the death penalty for homicides that objectively satisfy one or more of the aggravating factors and where the physical and testimonial evidence create a reasonable likelihood that the State will be able to meet its burden of proof.

Second-guessing prosecutorial decisions to pursue capital sentences will riddle the proportionality review with uncertainty.

For those matters that did not proceed to trial, there will be no established record. Undoubtedly, there will be disputes over what the facts of cases were and what role the defendant played. For example, suppose a capital defendant challenging the proportionality of his or her sentence argues that prosecutors had failed to seek the death penalty for a murder of similar magnitude to that for which he or she had been convicted. What that defendant may not know, however, is that the prosecutor could amass only limited physical evidence connecting the other defendant to the crime, had an inarticulate principal witness with a flawed recollection, and was not at all certain that the evidence would establish the requisite *mens rea*. Surely, to allow the defendant to argue that the prosecutor's choice not to dedicate limited resources to the pursuit of a death sentence in that case amounted to an indication that a capital sentence would be disproportionate for that homicide is unfair.

The Special Master's classification of the death-eligibility cases is an extremely-subjective process carried out in the absence of factual findings or jury determinations. Conversely, limiting the universe to those cases in which a notice of aggravating factor has been served will provide an easily-ascertainable set of cases, free from speculation concerning evidence. I am confident that defining the universe in that manner will provide an adequate foundation of cases against which a sentence of death can be compared but without the pure guesswork necessarily entailed in the majority's universe.

That approach was adopted in *Tichnell v. Maryland*, 297 *Md.* 432, 468 *A.*2d 1 (1983), *cert. denied*, 466 *U.S.* 993, 104 *S.Ct.* 2374, 80 *L.Ed.*2d 846 (1984), in which proportionality review was limited to those cases in which imposition of the death penalty was properly before the sentencing authority for determination. Thus, the universe in Maryland consists of "only those first degree murder cases in which the State sought the death penalty * * * whether it was imposed or not." *Id.* 297 *Md.* at 464, 468 *A.*2d at 17.

The dangers of expanding the universe to include those cases considered clearly death-eligible but that were not prosecuted as capital offenses were addressed in *Nebraska v. Palmer*, 224 *Neb.* 282, 399 *N.W.*2d 706 (1986), *cert. denied*, 484 *U.S.* 872, 108 *S.Ct.* 206, 98 *L.Ed.*2d 157 (1987). In *Palmer*, the Nebraska Supreme Court rejected proportionality review that included those cases that could have been prosecuted as capital offenses but had not been.

In examining prosecutorial discretion we would of necessity have to independently gather evidence. * * * We would then determine what charges we think should have been filed. * * * We would make a judgment about the chances of a conviction as against an acquittal * * *. [And, w]e would need to weigh the advisability of a plea bargain to secure a conviction on a lesser charge in order to avoid a likely acquittal of all charges.

[399 *N.W.*2d at 734.]

Such determinations are clearly outside the scope of a proper proportionality review.

Moreover, the Special Master's assumption that unfettered discretion exists at the level of prosecutorial decisionmaking in the capital arena is flawed. This Court has already significantly circumscribed the potential for abuse of discretion by prosecutors seeking a death sentence. In response to the Court's suggestion in *State v. Koedatich, supra*, 112 *N.J.* 225, 548 *A.*2d 939, the Attorney General and the various county prosecutors adopted guidelines for use throughout the state in selecting cases for capital prosecution. Moreover, we permitted judicial scrutiny of prosecutorial-charging decisions at the pre-trial level in *State v. McCrary*, 97 *N.J.* 132, 142, 478 *A.*2d 339, 343–44 (1984). In that opinion we held that defendants who had been served with a notice of an aggravating factor could, through summary proceedings before the trial court, challenge the sufficiency of the evidence to support those factors. *Ibid.* However, we were careful to limit that holding "to effect only a minimal intrusion into this area of prosecutorial discretion" in light of the "broad discretionary powers" historically exercised by prosecutors in determining charges. *Ibid.* The review

established in *McCrary* has resulted in the nullification of a defendant's exposure to capital sentencing in at least one case in which the prosecutors originally sought a death sentence. See *State v. Matulewicz*, 115 *N.J.* 191, 557 *A.*2d 1001 (1989).

### III

The majority acknowledges that a universe comprising cases in which a notice of aggravating factor was served would constitute a reliable pool. *Ante* at 139, 613 *A.*2d at 1074. Yet, the majority declines to adopt that universe, ingenuously remarking that "[h]ad it appeared to be an insurmountable task to examine all 'clearly death eligible cases,' we might have made a mid-course correction." *Ante* at 140, 613 *A.*2d at 1074 (citing *In re Proportionality Review Project*, 122 *N.J.* 345, 585 *A.*2d 358 (1990)). Although the majority makes short shrift of the time, effort and expense that will be needed to compile its universe of cases, the Special Master estimates that approximately 250–300 non-penalty-trial cases per year will result in a factual case screen for proportionality-review purposes, *Baldus Report* at 110—not an insignificant number to review and evaluate, when included with the penalty-trial cases.

After limiting the universe to those cases in which a notice of aggravating factor was served, I would winnow the cases to those similar to the challenged sentence by applying the procedures generally described by the majority in part IV of its opinion. In addition, I would conduct a comparative analysis similar to that employed by the majority in part V of its opinion. However, to the extent that those parts refer to prosecutorial decision-making, I dissent therefrom.

Because removal of those cases in which a notice of aggravating factor was not served from those cases included in the Court's universe would reduce the likelihood of Marshall's sentence being considered disproportionate, application of my universe in this case would not change the Court's ultimate conclusion that defendant's death sentence is sound.

## IV

The Special Master's report undeniably relies on subjective determinations of death-worthiness and repeated second-guessing of prosecutorial decisions. Such speculation undermines the objectives of proportionality review and unnecessarily complicates our analysis.

The majority concludes that the universe issue, although "vigorously contested," has been "significantly overstated." *Ante* at 132, 613 *A*.2d at 1070. I agree. Ultimately, the Court will use its common sense and collective experience in reviewing death sentences for proportionality. The Court will rely on those cases with which we are already familiar and for which a thorough record has been developed at trial and on appeal. That approach is most appropriate. Statistical analysis serves only as a departure point from which the Court can apply its judgment regarding the proportionality of a death sentence.

HANDLER, Justice, dissenting.

Last year this Court affirmed the death sentence of Robert Marshall. *State v. Marshall,* 123 *N.J.* 1, 586 *A*.2d 85 (1991) (*Marshall* I). Marshall, a Toms River insurance salesperson, had been convicted of capital murder for his hiring of a professional killer to kill his wife. Marshall's motive, apparently, had been to collect proceeds on insurance policies that he had taken out on his wife's life. Pursuant to the New Jersey capital-murder statute, every defendant in New Jersey who is sentenced to death may call on the Supreme Court to "determine whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." *N.J.S.A.* 2C:11–3e.

Marshall has requested proportionality review. Because his is the first death sentence affirmed under the 1982 capital-murder statute, he is the first defendant to do so. The Court has now decided that Marshall's death sentence is proportionate

to those of other comparable capital defendants and therefore Marshall may be executed. I disagree.

In my opinion, a defendant may not under the state constitution be sentenced to death unless that death sentence is proportionate to sentences imposed on other defendants who have committed similar crimes. That constitutional stricture places on courts the heavy obligation to adopt adequate standards to ensure that death sentencing is evenhanded and consistent. Measured against that exacting constitutional requirement, I conclude that the Court's methodology for determining whether a death sentence is proportionate is fundamentally flawed. I also believe, however, that even under the proportionality standards adopted by the Court, Marshall's death sentence is disproportionate.

When all is said and done, the Court's proportionality review reveals not only the inefficacy of our death-penalty statute but the inefficacy of proportionality review itself. This case confirms that proportionality, although constitutionally required, is practically unattainable. This case lends added support to the position that our capital-murder jurisprudence fails to meet our constitutional standards that prohibit cruel and unusual punishment and demand exacting procedural protections as a matter of due process and fundamental fairness. This case further confirms that capital punishment cannot be sensibly administered, soundly applied, or rationally managed. Our capital-murder law not only cannot be integrated into our system of criminal justice, it serves to weaken and distort it. The conclusion is irresistible: capital punishment is unconstitutional, unwise, and untenable. It should be abandoned.

## I

Proportionality review of capital sentencing must be appreciated as a constitutionally-inspired and constitutionally-founded procedural protection. That appreciation, more than any other insight, determines the standards for defining and applying

proportionality review and for validating capital sentences. The understanding of the constitutional significance of proportionality review encompasses, initially, federal constitutional doctrine, but finally turns on state constitutional principles.

—A—

In *Furman v. Georgia,* 408 *U.S.* 238, 92 *S.Ct.* 2726, 33 *L.Ed.*2d 346 (1972), the United States Supreme Court invalidated Georgia's death penalty statute as violating the Eighth Amendment. A central, constant theme throughout the nine opinions of *Furman* is that the statute lacked sufficient safeguards to prevent the arbitrary, inconsistent, and discriminatory imposition of the death penalty. Specifically, the statute did not provide a "meaningful basis for distinguishing the few cases in which it [was] imposed from the many cases in which it [was] not." *Id.* at 313, 92 *S.Ct.* at 2764, 33 *L.Ed.*2d at 392 (White, J., concurring); *see id.* at 248–50, 92 *S.Ct.* at 2731–32, 33 *L.Ed.*2d at 354–55 (Douglas, J., concurring); *id.* at 293–95, 92 *S.Ct.* at 2754–55, 33 *L.Ed.*2d at 380–81 (Brennan, J., concurring); *id.* at 309–10, 92 *S.Ct.* at 2762–63, 33 *L.Ed.*2d at 390 (Stewart, J., concurring); *id.* at 364–68, 92 *S.Ct.* at 2790–92, 33 *L.Ed.*2d at 421–23 (Marshall, J., concurring). This Court has understood that

> *Furman* suggested that to pass constitutional muster, a capital punishment statute must achieve two objectives: limit imposition of the penalty to what is assumed to be the small group for which it is appropriate, and ensure that the limited class selected for the penalty is chosen with rationality and consistency. Both requirements are aimed primarily at eliminating the arbitrary nature of capital proceedings in the past and their high risk of discrimination.
>
> [*State v. Ramseur,* 106 *N.J.* 123, 183, 524 *A.*2d 188 (1987) (citations omitted).]

In response to *Furman,* states drafted statutes that attempted to restrict the discretion available to capital juries either by guiding jury discretion through the enumeration of certain aggravating and mitigating factors or by eliminating jury discretion through mandatory death sentencing for certain crimes.

In *Gregg v. Georgia,* 428 *U.S.* 153, 96 *S.Ct.* 2909, 49 *L.Ed.*2d 859 (1976), and accompanying cases, the Court upheld guided discretion statutes. *See Jurek v. Texas,* 428 *U.S.* 262, 96 *S.Ct.* 2950, 49 *L.Ed.*2d 929 (1976); *Proffitt v. Florida,* 428 *U.S.* 242, 96 *S.Ct.* 2960, 49 *L.Ed.*2d 913 (1976).

Subsequent to *Gregg,* the Supreme Court made plain that capital-sentencing schemes are permitted only if they limit the range of crimes for which the death penalty may be imposed. See, *e.g., Maynard v. Cartwright,* 486 *U.S.* 356, 363–64, 108 *S.Ct.* 1853, 1858–59, 100 *L.Ed.*2d 372, 381–82 (1988); *Godfrey v. Georgia,* 446 *U.S.* 420, 100 *S.Ct.* 1759, 64 *L.Ed.*2d 398 (1980). However, in *Woodson v. North Carolina,* 428 *U.S.* 280, 96 *S.Ct.* 2978, 49 *L.Ed.*2d 944 (1976), the Supreme Court struck down schemes that made the death penalty mandatory for particular crimes. The Court stated that the Eighth Amendment "requires consideration of the character and record of the individual offender as a constitutionally indispensable part of the process of inflicting the penalty of death." *Id.* at 304–05, 96 *S.Ct.* at 2991, 49 *L.Ed.*2d at 961. Thus, although mandatory death sentencing may promote consistency in the imposition of punishments, it is forbidden because it would allow the State to take a defendant's life as if that defendant were a mere statistic and not a human being with unique, personal qualities. *Id.* at 301–03, 96 *S.Ct.* at 2989–91, 49 *L.Ed.*2d at 959–60; *see also Lockett v. Ohio,* 438 *U.S.* 586, 98 *S.Ct.* 2954, 57 *L.Ed.*2d 973 (1978) (ruling that sentencing juries may consider any characteristic of the defendant as evidence mitigating against imposition of the death penalty).

Thus two major strands run through United States Supreme Court jurisprudence. A death-penalty statute is constitutional only if (1) it limits or guides juror discretion and (2) it permits completely individualized consideration of a defendant's character and culpability. Both strands share a common purpose of "identifying a group of defendants most deserving of death." Scott E. Sundby, *The Lockett Paradox: Reconciling Guided Discretion and Unguided Mitigation in Capital Sentencing,*

38 *UCLA L.Rev.* 1147, 1176 (1991). Despite their broad common purpose, however, the two principles work in tension: *Furman* and *Gregg* strip juries of authority to deem certain crimes worthy of death, and thereby reduce the likelihood that individuals convicted of similar crimes will receive different sentences, while *Woodson* and *Lockett* endow juries with the power to act on any and all mitigating factors that they consider to be relevant to punishment, and thereby increase the likelihood that individuals convicted of similar crimes will receive different sentences. The inevitable result of the tension between those principles is some degree of arbitrariness. Disparate sentencing for defendants who commit comparable crimes will continue.

Proportionality review is the obvious antidote for the enduring arbitrariness of disparate sentencing. Nevertheless, the United States Supreme Court has held that comparative proportionality review is not required constitutionally of a capital-sentencing scheme if that scheme otherwise provides some rational mechanism to protect against arbitrariness. *Pulley v. Harris*, 465 *U.S.* 37, 45–46, 104 *S.Ct.* 871, 876–77, 79 *L.Ed.*2d 29, 37 (1984). In practice, following *Pulley*, no federal court ever has *required* a state to include comparative proportionality review in its system for imposing capital punishment.

—B—

This Court has taken a different approach with respect to the importance of proportionality in death sentencing. In *State v. Ramseur, supra*, 106 *N.J.* 123, 524 *A.*2d 188, the Court expressed preliminary views on the framework and purposes of proportionality review. The Court identified consistency as its paramount purpose. *Id.* at 331, 524 *A.*2d 188. According to the Court, proportionality review "is an important procedural mechanism to safeguard against the arbitrary and capricious imposition of the death penalty." *Id.* at 330, 524 *A.*2d 188. The Court identified two reasons for requiring proportionality review. First, because the death penalty is different from all

other punishments in its finality, the unfairness attendant to inconsistent sentencing is especially intolerable. *Id.* at 326, 524 *A.*2d 188. Second, proportionality review "is a means through which to monitor the imposition of death sentences and thereby to prevent any impermissible discrimination in imposing the death penalty." *Id.* at 327, 524 *A.*2d 188.

The legislative history to New Jersey's death-penalty statute evinces similar concerns: proportionality review ensures that death sentences "are being meted out in a fair, even-handed way throughout the State." *Hearings on S.112 Before the N.J. Senate Judiciary Comm.*, 200th Leg., 2d Sess. 20–21 (1982) (statement of Director of the Division of Criminal Justice Edwin H. Stier), *cited in* Joseph H. Rodriguez at al., *Proportionality Review in New Jersey: An Indispensable Safeguard in the Capital Sentencing Process*, 15 *Rutgers L.J.* 399, 421 (1984) (Rodriguez, *Proportionality Review*).

The policy that demands proportionality in capital sentencing also was acknowledged by the Special Master in this case. Evenhanded sentencing, he noted, assures that "death sentences are only imposed in categories of cases on which there is a clear societal consensus as to their deathworthiness." *Final Report* 25 n. 23. Proportionality review serves "(a) to insure that the cases in which death sentences are carried out can be meaningfully distinguished from those cases in which lesser penalties are normally imposed and (b) to limit death sentencing to categories of death eligible cases that are most aggravated and in which death sentences are the usual, routine practice." *Ibid.*

I believe that exacting proportionality review as a procedural protection is required by the state constitution, grounded in our own principles concerning cruel and unusual punishments, due process, and equal protection. *See State v. Ramseur, supra,* 106 *N.J.* at 370, 524 *A.*2d 188 (Handler, J., dissenting) (observing that death penalty implicates several constitutional provisions, particularly paragraphs 1 (right of enjoying life), 5 (no

civil rights denied because of discrimination); and 12 (cruel and unusual punishments shall not be inflicted) of Article I); *see also* Rodriguez, *Proportionality Review, supra,* 15 *Rutgers L.J.* at 421 (arguing that authority to conduct proportionality review is found in cruel and unusual punishment clause; the general appellate power to examine criminal sentence for manifest excessiveness; and the Supreme Court's power to insure that justice is truly and equally done). Those constitutional doctrines are to be interpreted in light of our strong and distinctive traditions demanding evenhandedness and consistency in all criminal sentencing, traditions that become absolute imperatives when criminal sentencing encompasses capital punishment. Any failure to assure evenhandedness and consistency in the sentencing of all capital defendants and any failure to assure comparative proportionality of individual death sentences violates those constitutional principles, and, indeed, fails to honor the constitutional values placed on individual dignity and human life.

We should not have the slightest hesitancy to look to our own constitution and jurisprudence to determine the rights that must be protected when the State seeks to impose capital punishment. The United States Supreme Court itself has recognized that the death penalty is a matter of peculiar state concern. *California v. Ramos,* 463 *U.S.* 992, 103 *S.Ct.* 3446, 77 *L.Ed.*2d 1171 (1983). States, without question, "are free to provide greater protections in their criminal justice system than the federal Constitution requires." *Id.* at 1013, 103 *S.Ct.* at 3460, 77 *L.Ed.*2d at 1188–89. The federal constitution sets only the barest minimum, leaving the heart of the matter to the individual states.

We already have acknowledged that proportionality review is an integral component of a constitutional capital-punishment scheme, providing a "means through which to monitor the imposition of death sentences." *State v. Ramseur, supra,* 106 *N.J.* at 327, 524 *A.*2d 188. We similarly have acknowledged that "capital punishment is a matter of particular state interest

or local concern and does not require a uniform national policy." *Id.* at 167, 524 *A.*2d 188. We have, in fact, analyzed our death-penalty statute under our state constitution many times. *E.g., State v. Gerald,* 113 *N.J.* 40, 75–76, 549 *A.*2d 792 (1988). Thus, it is exceedingly perplexing and regrettable that the majority, in expounding and applying a protection as essential as proportionality review, shuns our own constitution and timidly fails to exercise the freedom of action granted by the United States Supreme Court.

Proportionality review embodies two complementary policies, policies that provide a basis for the independent application of our constitution. The first is New Jersey's concern with even-handed sentencing. The policy of evenhanded sentencing is derived from constitutional sources that prevent cruel and unusual punishments, unequal treatment under the law, and invidious discrimination in the application of laws, as well as the guarantee of due process and the complementary doctrine of fundamental fairness in the administration of criminal justice. The policy is expressed in legislation, judicial decisions, and administrative rules and practices.

Closely associated with the policy of evenhandedness is the recognition that appellate review plays a principal role in vindicating substantive and procedural rights in criminal causes and effectuating the goal of evenhandedness. Conducted by the highest court with statewide jurisdiction, proportionality review is an indispensable aspect of appellate review that "tests the capital murder-death penalty scheme for fairness and consistency." *State v. Ramseur, supra,* 106 *N.J.* at 407, 524 *A.*2d 188 (Handler, J., dissenting). The principles of evenhanded sentencing and appellate review express a legal philosophy and tradition that is distinctive in our state. They constitute strong justification to seek within our own constitution the standards for determining the validity of capital sentencing. *See State v. Johnson,* 127 *N.J.* 458, 473–74, 606 *A.*2d 315 (1992) (declaring that matters of particular state interest and concern warrant reliance on state constitution) 606 *A.*2d at 322; *State v.*

*Williams,* 93 *N.J.* 39, 57, 459 *A.*2d 641 (1983); *State v. Hunt,* 91 *N.J.* 338, 366, 450 *A.*2d 952 (1982) (Handler, J., concurring).

The coalescence of those principles—substantive evenhandedness in sentencing and appellate review to secure evenhandedness—compels the conclusion that comparative proportionality review is constitutionally mandated. Because we are dealing with constitutional doctrine, we must examine those significant state principles to identify and understand the constitutional interests to be protected.

The judiciary has long committed itself to achieving greater uniformity in sentencing. Prior to the enactment of the Code of Criminal Justice (Code), when sentencing courts enjoyed unfettered discretion, this Court interposed the constraint of consistency onto the sentencing determination. Because the legislature had not corralled the virtually unrestrained sentencing discretion exercised by trial courts, our Court attempted to do so by identifying the legitimate, basic aims of criminal punishment, *see State v. Ivan,* 33 *N.J.* 197, 199–200, 162 *A.*2d 851 (1960), and by cataloguing the relevant sentencing considerations and requiring a statement of reasons to protect effective appellate review of the sentences. *See State v. Leggeadrini,* 75 *N.J.* 150, 380 *A.*2d 1112 (1977). Although the Court acknowledged the need for individualized sentencing, it also understood the importance of consistency and uniformity. *E.g., State v. DeStasio,* 49 *N.J.* 247, 254–55, 229 *A.*2d 636 (1967) (recognizing that "[u]niformity of treatment is an ideal of law enforcement" and requiring as a matter of administrative policy that all gambling sentences be handled by a single judge in each county), *cert. denied,* 389 *U.S.* 830, 88 *S.Ct.* 96, 19 *L.Ed.*2d 89 (1967); *see State v. Hodge,* 95 *N.J.* 369, 379–80, 471 *A.*2d 389 (1984) (Code decision explaining consistency as sentencing goal).

The legislature shared the judiciary's concern with evenhanded treatment of criminal offenders. Prompted by reports of arbitrary and disparate sentencing, the legislature overhauled the Code's sentencing provisions in 1978. *See* Robert F. Knowl-

ton, *Comments Upon the New Jersey Penal Code,* 32 *Rutgers L.Rev.* 1, 15 (1979). One of the key sentencing purposes of the reformed Code is "[t]o safeguard offenders against excessive, disproportionate or arbitrary punishment." *N.J.S.A.* 2C:1–2b(4). In *State v. Roth,* 95 *N.J.* 334, 345, 471 *A.*2d 370 (1984), the Court found that "[t]he central theme of the Code's sentencing reforms is the replacement of the unfettered sentencing discretion of prior law with a structured discretion designed to foster less arbitrary and more equal sentences." Taking its lead from this Court's efforts, the legislature identified the penological purpose of punishment and prescribed presumptive terms of imprisonment related to the gravity of crimes, and listed the determinative aggravating and mitigating factors that can justify modifications to the presumptive terms. *See id.* at 351, 471 *A.*2d 370.

This Court repeatedly has reaffirmed the overriding principle of uniformity in interpreting the sentencing sections of the Code. *E.g., State v. Pineda,* 119 *N.J.* 621, 575 *A.*2d 855 (1990) (stating that the polestar of the Code is uniformity in sentencing); *see State v. Pillot,* 115 *N.J.* 558, 577, 560 *A.*2d 634 (1989); *State v. Towey,* 114 *N.J.* 69, 79, 552 *A.*2d 994 (1989); *State v. O'Connor,* 105 *N.J.* 399, 405–06, 522 *A.*2d 423 (1987); *State v. Yarbough,* 100 *N.J.* 627, 498 *A.*2d 1239 (1985). Thus, in both interpreting and applying the Code and reviewing the sentencing decisions of lower courts, the Court has embraced the Code's dedication to uniform, evenhanded sentencing.

The sentencing reforms did not eliminate the need for judicial oversight, and appellate review constitutes an important tool in achieving the desired uniform results. *See* Knowlton, *supra,* 32 *Rutgers L.Rev.* at 15. "The Court foresaw a central role to be played by appellate courts in ... enhancing uniformity in the application of statutory standards to similar facts under similar circumstances." *State v. Jarbath,* 114 *N.J.* 394, 400–01, 555 *A.*2d 559 (1989); *State v. Dunbar,* 108 *N.J.* 80, 97, 527 *A.*2d 1346 (1987) (ruling that the trial court must explain basis of sentence to facilitate judicial review); *State v. Roth, supra,* 95

*N.J.* at 361, 471 *A.*2d 370 (commenting that "central to the reform of sentencing procedures is provision for appellate review of sentences to provide a greater degree of uniformity").

In addition to legislation and court decisions, other sources sustain the policy of evenhanded sentencing. In *Pillot,* we traced some of the measures taken by a variety of state bodies, noting that "[o]ur state's concern over the evils of sentencing inconsistency and disparity has been longstanding." 115 *N.J.* at 572, 560 *A.*2d 634. For example, various committees have studied sentencing uniformity and proposed measures to achieve it. *Id.* at 573, 560 *A.*2d 634 (noting that counties undertook studies as early as 1933 and 1940); *id.* at 575, 560 *A.*2d 634 (noting that this Court and the Administrative Office of the Courts both have established committees to address issues relating to consistency in sentencing). Judicial Rules also reflect the policy commitment to uniform sentencing. *See, e.g., R.* 3:25A (allowing consolidation of charges pending against one defendant in multiple jurisdictions). The resentencing panel constituted to reconcile pre-Code and post-Code sentences exemplifies one of the administrative steps taken to further uniformity in sentencing. *See* 104 *N.J.L.J.* 369 (1979).

Those sources—legislation, decisional law, Court Rules and directives, actual practices, and prevailing attitudes—manifest our state's commitment to the premise that "there can be no justice without a predictable degree of uniformity in sentencing." *State v. Hodge, supra,* 95 *N.J.* at 379, 471 *A.*2d 389. In the capital-sentencing context, we require an elevated level of uniformity, a level that cannot possibly be achieved in the absence of strong, well-thought-out, and honestly applied proportionality review.

This state's strong public policy of uniform sentencing and the concomitant role of appellate review to effectuate that policy clearly implicate significant state constitutional concerns. Those concerns involve the constitutional guarantees that prevent cruel and unusual punishments, unequal treatment under

the law, and invidious discrimination in the application of laws, and that assure due process and protect the right to life. Those concerns also involve the singular protection derived from the complementary doctrine of fundamental fairness in the administration of criminal justice.

Although the state constitution does not echo the federal constitution's precise language on equal protection of laws, Article I, paragraph 1 provides "analogous or superior" protections. *Peper v. Princeton Univ. Bd. of Trustees*, 77 *N.J.* 55, 79, 389 *A.*2d 465 (1978). This Court has always insisted on proper respect for the protection against unequal treatment of those who are similarly situated. The concern for equal protection of the laws intensifies when the law is applied to take a human life, and fully justifies recourse to the state constitution to require proportionality review.

Concededly, few defendants succeed on equal protection claims relating to sentencing in ordinary criminal cases. *See, e.g., State v. Corbitt*, 74 *N.J.* 379, 378 *A.*2d 235 (1977), *aff'd*, 439 *U.S.* 212, 99 *S.Ct.* 492, 58 *L.Ed.*2d 466 (1978); *State v. Fernandez*, 209 *N.J.Super.* 37, 506 *A.*2d 1245 (App.Div.1986). Nevertheless, as the relative severity of the punishment increases, sentencing disparities become more difficult to overlook. Of course, no punishment is more severe than the death penalty. As expressed by Justice Brennan:

> Although we may tolerate ... irrationality in other sentencing contexts, the premise of *Furman* was that such arbitrary and capricious decisionmaking is simply invalid when applied to "a matter [as] grave as the determination of whether a human life should be taken or spared."
>
> [*Pulley v. Harris, supra*, 465 *U.S.* at 64, 104 *S.Ct.* at 886, 79 *L.Ed.*2d at 49 (Brennan, J., dissenting) (quoting *Zant v. Stephens*, 462 *U.S.* 862, 874, 103 *S.Ct.* 2733, 2741, 77 *L.Ed.*2d 235, 248 (1983)). *Accord State v. Bey*, 112 *N.J.* 45, 105–19, 548 *A.*2d 846 (1988) (Handler, J., concurring) (*Bey* I).]

The equal protection concern invariably arises when the legislature has created categories of offenses that result in dispa-

rate treatment of offenders. That the death-penalty scheme is unfocused enough to generate disparate results, therefore, renders an equal protection analysis appropriate. "A capital sentencing system which results in differential treatment of similarly situated capital felons has effectively classified similar felons differently with respect to their rights to life." Gary Goodpaster, *Judicial Review of Death Sentences*, 74 *J. Crim. L. & Criminology* 786, 788, 802–03 (1983) (hereinafter *Judicial Review*).

The majority depreciates and excuses the occasional unequal sentencing treatment of similar defendants by attributing that to sentencer "mercy." *Ante* at 153, 613 *A.*2d at 1081. But that rationalization explains aberrational *life* sentences, not aberrational *death* sentences. As one commentator explained:

> [B]ecause individualized sentencing is constitutionally required, it may be argued that differential treatment of similar capital defendants is the inevitable result of the system. Given constitutional and human constraints, there is no way to perfect the system. It could further be argued that the fact that some defendants are underpenalized does not demonstrate that similar capital defendants who also deserve to die should not receive the death penalty or that the state has discriminated against the latter if they do. Sentencer mercy, as the argument runs, does not offend the Constitution.

> These arguments are correct when applied to isolated cases, for the Constitution requires only that the decision to impose the death penalty be principled. There is a tipping point, however, at which these arguments lose their validity. Where capital sentences cannot be rationally distinguished from a significant number of cases where the result was a life sentence, more is present than the irremediable failure of an imperfect human system. When this occurs, the capital sentencing system has become constitutionally arbitrary. Further, where mercy becomes the norm for specific crimes and defendants, there is no justification for an isolated capital sentence. At this point, which is determinable only be comparative review, the state's interests in executing the capitally sentenced criminal fail. As his fundamental right to life would then be taken without compelling justification, his execution would violate the equal protection clause of the Constitution.

> [Goodpaster, *Judicial Review, supra,* 74 *J.Crim.L. & Criminology* at 802 (footnotes omitted).]

Comparative proportionality review is required to ensure that the capital-murder sentencing scheme is producing overall fair

and consistent results—a principle firmly lodged in our tradition of equal treatment under the law.

Moreover, even accepting that the state has a legitimate penological goal for adopting capital punishment, the means chosen to effect that interest must minimize the possibility that defendants will be wrongly deprived of their right to life. *Ibid.* "Since the basic issue is whether a state's capital sentencing system differentially classifies similar defendants, a state must devise some means of ensuring proportional sentencing. Comparative review, since it is explicitly directed to this issue, is the least restrictive means of making this determination." *Ibid.* Again, appellate review surfaces as a basic mechanism by which to achieve the desired goal of equal treatment of those who are similarly situated.

The unequal treatment of capital defendants also implicates Article I, paragraph 5 of the Constitution, which bars the denial of civil rights or discrimination against persons in the exercise of any right because of religion, race, or national origin. When inequality arises from improper considerations such as race, those concerns are most acute. The Special Master's study preliminarily shows the race of the victim to be a factor in many decisions to impose the death penalty, *Final Report, supra,* at 100–06, and seems to confirm many long-held suspicions. *See State v. Gerald, supra,* 113 *N.J.* at 163–66, 549 *A.*2d 792 (Handler, J., dissenting); *State v. Ramseur, supra,* 106 *N.J.* at 181, 327, 524 *A.*2d 188; *id.* at 426, 524 *A.*2d 188 (Handler, J., dissenting). One purpose of proportionality review is to "prevent discrimination on an impermissible basis, including but not limited to, race and sex." *State v. Ramseur, supra,* 106 *N.J.* at 330, 524 *A.*2d 188.

The doctrine of evenhandedness and the accordant requirement of comprehensive proportionality review implicates, perhaps most directly, the protections secured by the cruel and unusual punishment clause. *N.J. Const.* art. I, ¶ 12. The Court has concluded that our state constitution's cruel and unusual

punishment clause "affords greater protections to capital defendants than does the eighth amendment of the federal constitution." *State v. Gerald, supra,* 113 *N.J.* at 76, 549 *A.*2d 792. In order to comport with the principles underlying the cruel and unusual punishment clause, there must be a "meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not." *Furman v. Georgia, supra,* 408 *U.S.* at 313, 92 *S.Ct.* at 2764, 33 *L.Ed.*2d at 392 (White, J., concurring). That purpose is accomplished by a proportionality review system "that assures similar results in similar cases." *State v. Ramseur, supra,* 106 *N.J.* at 330, 524 *A.*2d 188.

Implicit in the prohibition of cruel and unusual punishment is that arbitrary sentencing is unacceptable because it fails both to comport with contemporary standards of decency and to serve a legitimate penological purpose. *See id.* at 169, 524 *A.*2d 188 (citing *State v. Des Marets,* 92 *N.J.* 62, 82, 455 *A.*2d 1074 (1983)). A disproportionate death sentence, by definition, is inconsistent with contemporary standards of decency and morality and does not match the community consensus of an appropriate punishment for the crime and the defendant. Societal retribution cannot justify the imposition of an aberrant death sentence because society has not generally demanded capital punishment to vindicate the offenses of similarly situated offenders.

Whether a particular jury verdict accurately reflects contemporary standards cannot be determined in isolation or by looking at the death sentence on its face; instead, it must be assessed comparatively. Proportionality review serves that function. "[W]hen juries generally do not impose the death sentence in a certain kind of case, the appellate review procedures assure that no defendant convicted under such circumstances will suffer a death sentence." *Gregg v. Georgia, supra,* 428 *U.S.* at 206, 96 *S.Ct.* at 2940, 49 *L.Ed.*2d at 893. Moreover, "decisions to impose the death sentence must be consistent (in the sense of consistency with other decisions to

impose or not to impose death)." *State v. Ramseur, supra,* 106 *N.J.* at 185, 524 *A.*2d 188 (interpreting *Furman* and Eighth Amendment).

Constitutional due process and the complementary doctrine of fundamental fairness also support exhaustive proportionality review. Due process is strengthened by fundamental fairness, particularly in the context of capital punishment. The principle of fundamental fairness "serves to protect citizens generally against unjust and arbitrary government action, and specifically against governmental *procedures* that tend to operate arbitrarily." *Id.* at 377, 524 *A.*2d 188 (Handler, J., dissenting). "Considerations of fundamental fairness are particularly heightened where the potential harm to the individual from arbitrary state action is greatest." *Id.* at 378, 524 *A.*2d 188. When the potential harm is the taking of a human life, the concerns about arbitrary state action are greatest and the safeguards against that arbitrariness must be at their peak. Thus, the doctrine of fundamental fairness mandates that this Court guard against the infringement of a defendant's right to life by conducting an exhaustive, careful review of capital sentencing. *State v. Matulewicz,* 115 *N.J.* 191, 207, 557 *A.*2d 1001 (1989) (Handler, J., concurring) (observing that proportionality review is mandated by precepts of fundamental fairness).

—C—

I have called attention to the infirmities of our death-penalty statute many times. *E.g., State v. Jackson,* 128 *N.J.* 136, 607 *A.*2d 974, 975 (1992) (Handler, J., dissenting) (*Jackson* II) (noting that prosecutors have unguided discretion to decide who will be exposed to the death penalty); *State v. Hunt,* 115 *N.J.* 330, 391–95, 558 *A.*2d 1259 (1989) (Handler, J., dissenting) (noting that a bifurcated trial with the guilt phase conducted before a death-qualified jury unfairly increases a defendant's chance of being convicted); *State v. Ramseur, supra,* 106 *N.J.* at 382–404, 524 *A.*2d 188 (Handler, J., dissenting) (noting that

the statutory definitions of murder and the aggravating factors do not sufficiently narrow the class of death-eligible murderers). In a statutory scheme fraught with such inadequate protections, the role of judicial review to determine sentencing proportionality attains heightened significance. Judicial review provides the best vantage point from which to make an overall examination of how the system is functioning. It is a last bastion against arbitrariness in imposing capital punishment. Only such a review can measure whether " 'we have designed procedures which are appropriate to the decision between life and death and ... [whether] we have followed those procedures.' " *Pulley v. Harris, supra,* 465 *U.S.* at 68–69, 104 *S.Ct.* at 888–89, 79 *L.Ed.*2d at 52 (Brennan, J., dissenting) (quoting Kaplan, *The Problem of Capital Punishment,* 1983 *U.Ill. L.Rev.* 555, 576). As I stated in *State v. Ramseur:*

> The statute with its serious flaws of overbreadth, vagueness, and the blurring of decision-making, to which may be added unchecked prosecutorial discretion, is grossly defective if it cannot provide an ultimate fall-safe that could otherwise rectify individual injustice and spare the life of a defendant improvidently sentenced to death.

[106 *N.J.* at 406, 524 *A.*2d 188 (Handler, J., dissenting).]

Simply stated: "If a given system produces arbitrary results, and a procedural mechanism exists that can correct those arbitrary results, the procedural mechanism is constitutionally required." Goodpaster, *Judicial Review, supra,* 74 *J.Crim.L. & Criminology* at 799.

## II

The Court has made some fundamental assumptions about the purpose and methodology of proportionality review. By understanding the Court's philosophy and methodology, one can better assess the constitutional and statutory sufficiency of its standards for proportionality review of capital sentences.

The Court has determined that Marshall's death sentence is proportionate. The proportionality review undertaken by the Court does not in principle or in application bring the Court to a

sound and correct result. No method of proportionality review can fully remedy the constitutional defects inherent in our death-penalty statute, but some methods are better than others. Had the majority adopted a method genuinely designed to address inconsistent sentencing, it would have corrected the injustice done in this case.

—A—

Until today, the Court never has stated precisely its standard for assessing proportionality. Today the Court answers the most fundamental question that arises in the design of a system of proportionality review: what does "disproportionate" mean? The Court's answer is extremely disappointing. In several recent cases, I have observed that the Court has developed what I would now describe as a "split personality" on capital-punishment issues. At times, the Court has been laudably committed to fairness in capital punishment prosecutions, but at others it has applied the law with seeming severity and indifference. *E.g., Marshall* I, *supra,* 123 *N.J.* 1, 170, 586 *A.*2d 85 (noting the severe and rigid applications of principles derived from prior capital-punishment decisions) (Handler, J., dissenting). The Court's conflicted philosophy is exemplified by its holding today on the standard for assessing proportionality. The majority goes to great lengths to trumpet the virtues of evenhanded justice and to decry unfairness wherever it may lurk in capital sentencing. Yet, when the time arrives to deliver a holding that would impose real requirements of fairness and rationality on capital sentencing, the Court offers only a placebo.

As the Court points out, comparative proportionality review is supposed to be about consistency and evenhandedness; proportionality review "should seek to ensure that the death penalty is being administered in a rational, non-arbitrary, and evenhanded manner, fairly and with reasonable consistency." *Ante* at 130–131, 613 *A.*2d at 1069. When conducting comparative

proportionality review, courts determine whether it would be unfair to single out a particular defendant for capital punishment when similarly situated defendants receive life sentences. In that sense, comparative proportionality review is quite unlike traditional proportionality review, in which courts examine the crime committed and determine whether executing *any* defendant for that crime would offend contemporary standards of decency.

Like the majority, I emphasize at the outset the ways in which the meaning of "disproportionate" differs depending on the form of proportionality review being used. Traditional proportionality review is what all courts undertake when evaluating sentences under the Eighth Amendment to the United States Constitution and what New Jersey courts undertake when evaluating sentences under Article 1, Paragraph 12 of the state constitution. *See, e.g., Coker v. Georgia,* 433 *U.S.* 584, 97 *S.Ct.* 2861, 53 *L.Ed.*2d 982 (1977) (declaring death sentence disproportionate for crime of rape); *Enmund v. Florida,* 458 *U.S.* 782, 102 *S.Ct.* 3368, 73 *L.Ed.*2d 1140 (1982) (declaring death sentence disproportionate for crime of felony murder when defendant neither killed nor intended to kill); *Tison v. Arizona,* 481 *U.S.* 137, 107 *S.Ct.* 1676, 95 *L.Ed.*2d 127 (1987) (declaring death penalty *not* disproportionate under federal constitution for crime of felony murder when defendant was recklessly indifferent to human life and was a major participant in the felony committed); *State v. Gerald, supra,* 113 *N.J.* 40, 549 *A.*2d 792 (declaring death penalty disproportionate under New Jersey constitution when defendant acted without intent to kill and without knowledge that death would result). The death sentence is "disproportionate" in those cases in the sense that it *never* can be imposed for the commission of the offenses at issue, regardless of how consistently a particular jurisdiction tries to impose it.

The sort of review conducted in *Coker, Enmund,* and *Gerald* often helps to reduce arbitrariness in death sentencing. If a court deems a death sentence morally disproportionate, a

strong possibility exists that many juries would draw similar conclusions in similar cases. Thus, in *Coker* and *Enmund,* the Supreme Court amassed considerable evidence to show that most people convicted of the crimes in question did not receive the death penalty, and that the few who did had been terribly unlucky. Nevertheless, we must remember that the outcomes of those traditional proportionality cases did not depend on the inconsistencies the Court found in death-sentencing patterns. Those cases were not about evenhanded sentencing but were strictly moral decisions. *See Enmund,* 458 *U.S.* at 797, 102 *S.Ct.* at 3376–77, 73 *L.Ed.*2d at 1152; *Coker,* 433 *U.S.* at 597, 97 *S.Ct.* at 2868, 53 *L.Ed.*2d at 992. The majority correctly perceives that the traditional form of analysis (which the majority describes as "offense-oriented" analysis) is an unsuitable substitute for comparative proportionality review. *Ante* at 129, 613 *A.*2d at 1069. *See also State v. Ramseur, supra,* 106 *N.J.* at 324 n. 84, 524 *A.*2d 188 (noting that a claim that a death sentence is "manifestly excessive" and "inappropriate" is "distinct" from a claim that the death sentence is disproportionate when compared with the sentences of other defendants); *accord Pulley v. Harris, supra,* 465 *U.S.* at 43, 104 *S.Ct.* at 875, 79 *L.Ed.*2d at 36.

The majority succinctly states that a death sentence is comparatively disproportionate if " 'other defendants with similar characteristics generally receive sentences other than death for committing factually similar offenses.' " *Ante* at 129, 613 *A.*2d at 1069 (quoting *Tichnell v. State,* 297 *Md.* 432, 468 *A.*2d 1, 17 n. 18 (1983)). Had the Court genuinely embraced that holding, I still would have differed with it, for I believe that a death sentence is disproportionate unless defendants with similar characteristics generally receive death sentences for committing factually similar offenses. Nonetheless, had the Court been faithful to its announced standard, I would have agreed with it insofar as it identified the consistency of sentencing as the pivotal factor to be considered in the course of proportionality review.

Given the rule the Court announces, its review should have involved the following steps and only the following steps: the Court first should have identified a universe of cases from which comparison cases could be drawn (as it did); it then should have formulated comparison groups of cases similar to the case under review (as it did); it then should have documented the actual sentencing outcomes in those groups to determine how frequently death sentences actually have been imposed in them (it did not); finally, it should have decided whether life sentences were imposed with sufficient frequency—and death with sufficient infrequency—to warrant reversal of the sentence under review (again, it did not). Had the Court followed that procedure, Marshall's sentence would have been reversed. Unfortunately, the Court undertook only the first two steps, ignoring the final two.

Although the Court identifies a proper universe of cases from which to draw comparison cases, it dilutes its putative holding in two critical ways. First, it states that when a death sentence has been reversed, it still may be counted as a death sentence for the purpose of proportionality review, even if the defendant whose sentence has been reversed has been sentenced subsequently to life in prison. I cannot overemphasize that those sentences were reversed because we found errors at trial that infected the very deliberative process that led to the death verdicts in the first place. The reversals destroyed the reliability of those cases as valid determinations that the defendants deserved the death sentence. The Court's artificial construct thus produces a flawed survey of jurors' attitudes about the death penalty as well as a colossal exaggeration of the frequency with which that penalty is meted out in New Jersey. Second, by adopting a precedent-seeking method of proportionality review that is supposed to operate in some undefined "functional relationship" with the frequency analysis method of proportionality review, the Court blurs the focus of its endeavor. By grafting one method onto another entirely incompatible method, the Court creates a mutated and illogical definition of propor-

tionality: a death sentence is disproportionate if other defendants with similar characteristics generally receive sentences other than death for committing factually similar offenses *unless the Court concludes through its subjective intuitive examination of precedent that the sentence is fair.* In my view, that standard for determining proportionality is indefensible. By embracing it the Court turns its back on its earlier pronouncements in *Ramseur* that comparative proportionality review must ensure factual "statewide uniformity" in capital sentencing, 106 *N.J.* at 329, 524 *A.*2d 188, and that proportionality review is "distinct" from a review that asks if the punishment is morally justifiable. *Id.* at 325–26 n. 84, 524 *A.*2d 188.

—B—

The majority correctly concludes that the universe of cases to be considered in assessing the proportionality of death sentences must consist of all death-eligible cases. *Ante* at 137, 613 *A.*2d at 1073. It soundly rejects both the State's proposal that the universe be limited to death-sentenced cases and Justice Garibaldi's proposal that the universe be limited to cases in which prosecutors sought the death sentence. *Ante* at 222, 1138, 613 *A.*2d at 1116, 1073.

If one looks only at death-sentenced cases, one cannot know if the death sentence for a particular case is aberrational. If one cannot know if a particular death sentence is aberrational, one cannot know if it is disproportionate. The issue was addressed graphically and persuasively in an opinion by Chief Justice Krivosha of the Nebraska Supreme Court:

The purpose of [the Nebraska proportionality review statute] was to ensure that persons were not being arbitrarily sentenced to death. To therefore suggest that we look only at those individuals who may have been discriminated against to determine whether or not they have been discriminated against is an exercise in futility. If one wants to determine whether individuals are being discriminated against in public transportation, one does not merely look at those who are required to sit in the back of the bus and conclude that since everyone in the back of the bus looks alike, there is no discrimination. One, of necessity, must look at who is riding in the front of the bus as well in order to determine

whether the persons in the back are being discriminated against. So, too, there is no way that we can determine whether those who are sentenced to death are being discriminated against if we do not examine those cases having the same or similar circumstances which, for whatever reason, did not result in the imposition of a death sentence.

[*State v. Palmer*, 224 *Neb.* 282, 399 *N.W.*2d 706, 752 (1986) (Krivosha, C.J., concurring in part and dissenting in part).]

Further, because prosecutors are vested with initial authority to decide whether a defendant should die for his or her crime, confining the universe to cases in which prosecutors sought the death penalty would undermine proportionality review, for it would insulate arbitrary prosecutorial charging decisions from appellate review. As I noted in *Jackson* II, *supra*, 128 *N.J.* at 138, 607 *A.*2d 974, 975 our current decentralized system of capital prosecution is rife with potential for prosecutorial abuse of power. Prosecutors exercise their capital charging authority with almost no supervision, and the decisions they make are often highly idiosyncratic. All data collected to date reveal that prosecutors seek the death penalty for death-eligible defendants with little consistency or predictability. The report of the Special Master finds that there were 246 homicides committed in New Jersey since 1982 that could have been prosecuted as capital cases, but that prosecutors sought the death penalty in only 132 (fifty-six percent) of them. *Final Report, supra*, Table 13. The independent expert retained by the Attorney General reached very similar conclusions, estimating that 154 of 264 death-eligible cases (fifty-eight percent) resulted in capital prosecutions. Herbert I. Weisberg, *Proportionality Review of Death Sentences in New Jersey* (Nov. 26, 1991) at 19 (*Weisberg Report*). Even when the figures are broken down so that charging decisions are examined among sub-categories of crimes, wide charging disparities still exist. *See, e.g., Final Report, supra*, Table 13; *Weisberg Report, supra*, Table 2.

Thus, the need for judicial supervision of the capital-charging function is pressing, and the need to prevent arbitrary charging

from resulting in arbitrary capital sentencing even more so. Were we to look only at cases in which prosecutors actually sought the death penalty, we never would know if those prosecutorial decisions were aberrational. And if we could not know if a death sentence resulted from an aberrational charging decision, then we also could not know if it was disproportionate. I therefore conclude, with the majority, that the universe from which comparison cases are to be drawn must include all cases that could have resulted in the death penalty, including those cases in which prosecutors did not actually seek it.[1]

---

[1] As noted by the majority, the legislature amended the death-penalty act shortly after oral argument in this case to provide that proportionality review "be limited to a comparison of similar cases in which a sentence of death has been imposed." L.1992 c. 5 (eff. May 12, 1992). The State urges that the amendment be applied retroactively to Marshall's case. I believe that the amendment should not be applied to any death-sentenced case, let alone a case, like Marshall's, involving a crime committed prior to enactment of the amendment.

On its face, the amendment is unconstitutional. As noted, I believe that our constitution requires proportionate death sentencing and, to enforce that guarantee, it requires that this Court conduct comparative proportionality review. Were we to employ a death-only universe, we would completely undermine that constitutional guarantee, for proportionality review so conducted is an empty exercise. Under *Ramseur*, this Court cannot abide by the legislative amendment.

In any event, the amendment plainly cannot apply to Marshall, or to any other defendant who committed his or her crime prior to the date of the amendment's enactment. Article I of the United States Constitution provides that neither Congress nor any State shall pass any "ex post facto law." Article IV, para. 7 of the New Jersey Constitution imposes a similar prohibition. The Supreme Court has interpreted that provision as barring criminal laws that do all of the following: (1) they apply to events occurring before their enactment; (2) they disadvantage the offender affected by them; and (3) they change substantial personal rights and do not merely implicate the procedures used to establish a conviction or to fix a punishment. *Miller v. Florida*, 482 *U.S.* 423, 430, 107 *S.Ct.* 2446, 2451, 96 *L.Ed.*2d 351, 360 (1987). Those elements plainly would be met if the Court applied the amendment to a capital conviction for a crime committed before its enactment. Any defendant sentenced under the revised statute would be disadvantaged, for he or she would lose the chance to have the sentence set aside if found disproportionate. To be sure, the fact that a sentence is reviewed under the old statute does not mean that the sentence automatically will be vacated. Marshall's case certainly demonstrates that

—C—

The majority's calculation of death-sentencing frequencies is grossly distorted by its treatment of death-sentenced cases that have been reversed by this Court. The majority counts thirty-three cases as death-sentenced cases even though the death sentences handed down in them have been vacated and have not been reinstated. See Appendix A, *infra* at 289, 613 *A*.2d at 1149. In all but two cases, the Court does so without analysis, comment, or justification. See *Ante* at 169 n. 5, 613 *A*.2d at 1090 n. 5. In doing so it obscures both the extreme infrequency with which our state sentences death-eligible defendants to death and the glaring disproportionality of Marshall's sentence. I would count reversed death-sentenced cases as life-sentenced cases when conducting proportionality review unless the case has resulted in a valid death sentence on re-trial.

Since the current death-penalty statute was enacted, there have been important interpretations and applications of the laws governing capital punishment that have changed the results in many individual cases. For example, we now require that jurors be told that defendants may be acquitted of a death sentence by a non-unanimous verdict and that trial courts not coerce juries into unanimous verdicts. *State v. Clausell*, 121 *N.J.* 298, 345–46, 580 *A*.2d 221 (1990); *State v. Ramseur, supra*, 106 *N.J.* at 301, 524 *A*.2d 188. We have narrowed aggravating factor c(4)(c) so that a defendant may be sentenced

---

point. Nevertheless, the fact that a defendant cannot show "definitively" that he or she would have reaped the benefits of the old statute is not dispositive. *Id.* at 432, 107 *S.Ct.* at 2452, 96 *L.Ed.*2d at 361. Defendants cannot be deprived of the "opportunity" to have their sentences reversed. *See Weaver v. Graham*, 450 *U.S.* 24, 34, 101 *S.Ct.* 960, 967, 67 *L.Ed.*2d 17, 26 (1981). Even if our state constitution would permit the doing away with proportionality review, either by subverting it as the amendment would or by abandoning it entirely, the *ex post facto* law clauses of the federal and state constitutions would guarantee the right of every defendant who committed capital-murder prior to the enactment of the amendment to request a full scale review of the proportionality of his or her sentence. *Cf. In re Coruzzi*, 95 *N.J.* 557, 577–79, 472 *A*.2d 546 (1984).

to death based on it only if he or she intentionally inflicted "severe physical or psychological pain or suffering to the victim" or if he or she killed merely "for the enjoyment" of killing. *State v. Ramseur, supra,* 106 *N.J.* at 211, 524 *A.*2d 188. A defendant who killed his or her victim but intended to inflict only serious-bodily-injury no longer may be sentenced to death. *State v. Gerald, supra,* 113 *N.J.* at 85, 549 *A.*2d 792. A defendant may not be sentenced to death if the prosecution relied on victim-impact evidence. *Williams* II, *supra,* 113 *N.J.* at 453–54, 550 *A.*2d 1172. A defendant may not be sentenced to death if the jury was instructed incorrectly on how mitigating factors can be found and weighed. *State v. Bey,* 112 *N.J.* 123, 162–77, 548 *A.*2d 887 (1988) (*Bey* II).

Our capital-punishment rulings have different implications for the counting of cases in which juries returned life sentences from those that have for the counting of cases in which juries returned death sentences. As the Special Master explains,

[b]ecause the effect of the new penalty-trial procedural rules has been to lower the likelihood of a death sentence, we can be confident that had the new procedural rules been applied in the earlier penalty trials that resulted in life sentences the life sentencing outcome would have been the same.

[*Final Report, supra,* at 58.]

The Special Master points out that "[t]he same cannot be said ... for the earlier death sentenced cases." *Ibid.* That is because the new procedural rules have made the obtaining of death sentences more difficult. Every reversed case was reversed because the error "was clearly capable of affecting either the verdict or the sentence." *Bey* I, *supra,* 112 *N.J.* at 94, 548 *A.*2d 846. The unfathomable irony of the Court's holding today is that although the Court found the reversed verdicts too untrustworthy for use in sentencing the individual defendants subject to them, it now finds them sufficiently trustworthy for use in sentencing other defendants who were not subject to them. Given the Court's determination that the errors were sufficiently harmful to warrant reversals, the

Court's current use of reversed cases as death-sentenced cases is utterly unprincipled.

The majority's distorted calculation of death-sentencing frequency destroys the foundation of proportionality review. Proportionality review is about evenhanded sentencing in fact, not evenhanded sentencing in theory. The Court's task is to look at how the system, *as a whole,* actually functions. To repeat, proportionality review exists to ensure that the procedures we have established do what they are supposed to do. *State v. Ramseur, supra,* 106 *N.J.* at 326, 524 *A.*2d 188. It is supposed to "protect defendants from the arbitrary and capricious *imposition* of the death penalty." *Id.* at 328, 524 *A.*2d 188 (emphasis added). If the death penalty is not consistently *imposed* for a specific sort of crime, then the aberrant death sentences for that sort of crime should be vacated. Under our system *as it actually works,* the vacated deathworthiness judgments are not the final deathworthiness judgments in these cases. The final judgments—that is, the ones that govern the outcomes of cases—belong to the prosecutors who decide not to retry reversed cases capitally, and to the second juries that decide to sentence defendants to life in prison.

Reversed death sentences cannot be used reliably as "predictors" of future jury behavior. Death-sentencing rates have been decreasing in recent years. *Final Report, supra,* at 15–16. Juries do not return death sentences with the same frequency that they once did, and prosecutors, who base their charging decisions in part on their own predictions of what juries will do, do not charge cases capitally with the same frequency that they once did. *Id.* at 20. When prosecutors choose not to seek the death penalty in reversed cases, or when juries choose not to impose it, *those* decisions are the best indicators of contemporary values as they interact with our state's current laws on capital punishment. Thus, the prior sentencing decisions—made as they were under misguided legal notions that this Court has condemned in its own opinions—cannot serve as data in a legitimate proportionality review.

The majority may be taking its cues from the Special Master, who believes that *some* reversed death-sentenced cases can be "rehabilitated" if, on retrial, they result in a new death sentence, or if they were reversed for certain guilt-phase errors rather than for penalty-trial errors. According to the Special Master, the reversed deathworthiness judgments in *some* cases may reflect community opinions concerning crimes of the sort that the juries in those cases *thought* had occurred. *Final Report, supra,* at 61–62. Still, the Special Master cautions that reversed death-sentenced cases should be "rehabilitated" *only* if the Court analyzes each one individually to ensure that the error causing reversal does not impugn its reliability. *Id.* at 61. The Court barely undertakes that requisite analysis, and instead uncritically assumes that all reversed cases can be salvaged. See *ante* at 194 n. 10, 613 *A.*2d at 1102 n. 10.

In the few cases in which the Court purports to "rehabilitate" a reversed death sentence, the analysis is untenable and unjustifiable. *See* Appendix B. To illustrate, the majority finds that Clausell's case can be reported as a death verdict because the Court's reversal on *Gerald* grounds did not "undermine the findings of deathworthiness." *Ante* at 169 n. 5, 613 *A.*2d at 1090 n. 5. That conclusion is insupportable given the nature and scope of error that pervaded Clausell's trial. In addition to the *Gerald* error, which itself impugns the jury's sentencing conclusions, several errors related directly to the jury's deliberations on the appropriateness of death as a punishment for Clausell's crimes. For example, the trial court did not define the mental state in the "grave risk" aggravating factor, a problem exacerbated by its incorrect instruction on the aggravated assault charge. *Clausell, supra,* 121 *N.J.* at 344, 580 *A.*2d 221. The court's explanation of the c(4)(d) aggravating factor was inadequate, *ibid.,* as were its instructions on the mitigating factors. *Id.* at 344–45, 580 *A.*2d 221. By not explaining the function and meaning of mitigating factors, the instructions risked diluting the importance of the factors relied on by the defendant. *Ibid.* Moreover, the trial court improper-

ly instructed the jury on the weighing process. *Id.* at 347, 580
*A.*2d 221. Further, the verdict form and instructions misled the
jury on whether unanimity was required on the death verdict.
*Id.* at 346, 580 *A.*2d 221. Finally, the jury instructions diminish-
ed the jury's sense of responsibility for the death sentence. *Id.*
at 346–47, 580 *A.*2d 221. Each of those errors significantly
undermines the reliability of the decision to sentence Clausell to
death independently of the *Gerald* issue. Accordingly, we can
have no confidence that the death verdict accurately reflects
the community's assessment of Clausell's deathworthiness. I
do not believe that *any* case can be considered a death-sen-
tenced case when, as in *Clausell*, the State has decided not to
seek a retrial of the penalty phase and has accepted a life
sentence. However, even if one were to accept the possibility
that certain cases could be "rehabilitated," Clausell's case is not
one of them. The Court's erroneous "rehabilitation" of Clau-
sell's case clearly is an error, an error highlighted by its
inclusion of both the original death judgment *and* the subse-
quent life judgment in several comparison groups.

I think the Court's engaging in a theoretical construct to
justify a death sentence when the reality is that the system
generally is not imposing death sentences for similar crimes is
highly inappropriate. Unlike the majority, I would not count a
case twice when the person sentenced to death can be executed
for the crime only once. And unlike the majority, I would not
count cases that resulted in life sentences as death-sentenced
cases.[2]

---

[2] I should point out that the Special Master raises an important point that
could justify a single exception to that rule. With respect to sentences vacated
as disproportionate pursuant to proportionality review, the Special Master
argues that they should be included in the universe as death-sentenced cases.
If they are not, he observes, then it will be impossible for changed community
values to result in changed sentencing practices. *Final Report, supra,* at 64.
That issue could arise, for example, if the first five cases of a certain type result
in life sentences, but the next twenty result in death. The initial death-
sentenced cases might be reversed as disproportionate. The twentieth death-

—D—

Compounding the Court's mistake in counting death-sentenced cases is its decision to use a "precedent-seeking" approach, which, according to the Court, is to operate in some undefined "functional relationship" with the frequency approach. The Court's explication of that aspect of its methodology is unclear and unconvincing, and, by the end, it appears to be virtually indistinguishable from traditional proportionality review that determines only whether the sentence is morally justified. Its irretrievable defects demonstrate that only a frequency approach can come close to measuring comparative proportionality.

The Court writes that "[i]f we are correct that death need not be normal or general to be a licit sentence, it follows that the frequency approach will not provide a sole-source, fail safe method of proportionality review." *Ante* at 152–153, 613 *A*.2d at 1081. That conclusion hardly follows the premise. The Court is saying, in effect, that if it is correct in rejecting a *high* cut-off point for death-sentencing frequency, then the conclusion follows that *no* level of infrequency can justify a finding that a death sentence is aberrational or the product of inconsistent and arbitrary decisionmaking. The Court's assumptions and analysis are simply wrong. Even accepting the notion that a moderate death-sentencing rate for similar cases would not impugn a sentence under review, it still may be true that a low or a very low death-sentencing rate for similar cases would impugn a sentence under review.

The Court writes: "Rather than employ the frequency method as a cutoff, we believe that it will serve as a coefficient of consistency." *Ante* at 153, 613 *A*.2d at 1081. What the Court

---

sentenced case also would be reversed as disproportionate—despite the fact that eighty percent of juries gave verdicts of death in that type of case—unless the reversed cases were treated as death-sentenced cases notwithstanding the fact that they actually resulted in life sentences by virtue of proportionality review.

means by that expression is difficult to know. When the Court concludes that "[t]he lower the frequency, the more strictly the Court must scrutinize the case for the possible influence of impermissible factors," *ibid.*, it all but abandons two of its three stated objectives for proportionality review. Those were described initially as a protection against (1) arbitrary decisions made by juries, (2) arbitrary decisions made by prosecutors, and (3) decisions made by either juries or prosecutors based on impermissible considerations such as race. *Ante* at 133–135, 613 *A.*2d at 1070–1072. However, now only the third purpose seems to remain. In effect, the majority holds that defendants *may* be singled out unfairly for capital punishment *unless* they were the victims of discrimination based on race or sex or some other impermissible factor. See also *ante* at 181, 613 *A.*2d at 1096 (stating that when conducting precedent seeking the Court's "search should be for some impermissible or invidious factor or pattern").

The precedent-seeking approach to proportionality review is based, at least loosely, on the traditional form of legal reasoning in which courts decide cases by following the rules enunciated in similar, previously decided, cases. When courts conduct proportionality review using the precedent-seeking method, they identify prior cases similar to the case under review and decide if the case under review more closely resembles the prior cases that resulted in death sentences or the prior cases that resulted in life sentences. *Moore v. State*, 233 *Ga.* 861, 213 *S.E.*2d 829, 832–33 (1975), *cert. denied*, 428 *U.S.* 910, 96 *S.Ct.* 3222, 49 *L.Ed.*2d 1218 (1976); *cf. Coleman v. State*, 378 *So.*2d 640, 650 (Miss.1979) (finding no comparable cases, but holding death sentence excessive because case was less aggravated than the death cases to which it was compared). The obvious failing of that approach is that when there are cases in both the life-sentenced group and the death-sentenced group that resemble the case under review, the approach fails to account for the number of cases that fall within each group. If the cases that are *most* similar fall within the death-sentenced group, then the

sentence will be affirmed, even if the vast majority of *very* similar cases resulted in life sentences.

One might hope that the Court would respond to such a situation by taking into account the fact that the bulk of the precedent was in the life-sentenced group. In other words, one might hope that the Court would reverse the death sentence in the case under review because the similar precedents generally result in life sentences. If the Court did so, of course, it simply would be employing a surreptitious and less rigorous form of frequency analysis. It would engage in no distinctive precedent-seeking analysis at all.

When discussing its selection of a universe of comparison cases, the Court aptly observes that the selection of a universe for proportionality review "depends on the purposes to be served by that review." *Ante* at 132, 613 *A*.2d at 1070. The Court then soundly concludes that because proportionality review was designed to ensure consistency in sentencing decisions by juries and prosecutors, a universe is required that includes all death-sentenced cases and all cases that could have resulted in the death sentences. Somehow the Court fails to appreciate that the reasoning it uses in choosing a universe applies with greater force to the choice of the standard for assessing proportionality. The frequency-analysis method is the only method of review that addresses the core concern of comparative proportionality review: whether the death penalty is being imposed in an arbitrary or non-evenhanded way. That conclusion is tautological. Because the core concern relates not to the abstract appropriateness of the death penalty but to the consistency with which the criminal justice system hands down death sentences in particular circumstances, the Court's final determination must depend on the actual frequency with which the death sentence is imposed in those circumstances.

The Court's discursive methodology appears to have been spawned from a concern that the frequency approach simply would not work standing alone. The majority suggests that a

frequency analysis, by relying too heavily on statistics, can ignore real human experiences. *Ante* at 154, 613 *A.*2d at 1082. That objection is well taken, but it applies not so much to the frequency approach as to the entire enterprise of comparative proportionality review. To the extent that the criticism is valid, the conclusion to be drawn from it is that even soundly conducted proportionality review cannot prevent arbitrary sentencing. I, in fact, draw that very conclusion. *See infra* at 159–163, 613 *A.*2d at 1085–1087.

I agree with the Court insofar as it disapproves of formulaic or mechanical classification of defendants. To be sure, any decent proportionality review must focus, to the extent possible, on "real people," *ante* at 154, 613 *A.*2d at 1082, and must take into account, to the extent possible, the unique characteristics of defendants and crimes that render certain cases especially aggravated. The Court fails to grasp that those features are considered in frequency analysis during the selection of cases for inclusion in the comparison groups whose death-sentencing rates are to be calculated. When a comparison case bears only superficial similarities to a case under review, it is excluded from the comparison group, notwithstanding the similarities, for the frequency calculation must be made for truly similar cases.[3] *See Final Report, supra,* 34 (suggesting that cases

---

[3] Whether a court employs a frequency analysis or a precedent-seeking analysis, it must incorporate some notion of what makes cases similar or dissimilar to one another. I do not believe I differ very much from the majority on that issue. Like the majority, I reject the notion that a fair proportionality review should be or can be constructed by looking only at the aggravating and mitigating factors enumerated in the capital-murder statute. Under that statute, the jury in a sentencing trial is supposed to identify aggravating and mitigating factors and then, after those factors have been identified, it is supposed to weigh them. I believe that there are many facts that are not themselves enumerated as aggravating or mitigating factors that endow the enumerated factors with their respective weights. For example, in cases involving the c(4)(b) aggravating factor—that is, cases in which defendant put persons other than the victim at grave risk—that factor would have more weight if the defendant killed someone by setting fire to a crowded arena than if the defendant killed someone by shooting a single bullet into a small

sharing common facts may be dissimilar and unsuitable as comparison cases in a frequency analysis if they reflect distinctly different levels of culpability). In the end, however, once proper comparison groups have been formulated (taking into account special individual characteristics of the cases under consideration), the only issue that remains is the consistency with which the cases in those groups have resulted in death sentences or life sentences.[4] The Court mistrusts numbers, but numerical questions require numerical answers.

A second objection of the majority to the frequency approach is that it does not work well in cases such as Marshall's, which are similar to few other cases. When the comparison groups are small, as the majority implicitly recognizes, the frequencies may be the products of chance more than anything else. *Ante* at 167, 613 *A.*2d at 1089. Unfortunately, replacing the frequency approach with a more obscure, less rigorous method like the precedent-seeking approach does not solve the problem of having few comparison cases. Irrespective of the method of analysis the Court chooses, the Court still must make extraordinarily weighty life-or-death decisions on the basis of only a handful of

---

group of people gathered on a street corner. Thus, when deciding whether cases are similar to the case under review, I would consider the statutory factors as the central determinant of similarity and other identifiable circumstances that can be thought of as clustered to or constituent parts of the enumerated statutory factors themselves.

[4] The Court may be concerned about situations in which the bulk of the cases in the comparison group of similar cases result in death sentences, but the bulk of cases that involve murders even more aggravated than the one under review (but dissimilar to it) result in life sentences. In that situation, imposition of the death sentence plainly would be unfair, for the death sentences in the similar cases would be the product of irrational and arbitrary decisionmaking. I should point out, however, that reversal of the death sentences in the less aggravated cases would have nothing to do with precedent seeking. Rather, reversal would be dictated by a recognition that death sentencing was *infrequent* in cases as aggravated as or more aggravated than the case under review. In other words, in that situation, the Court would have to formulate a special comparison group, but it would have no occasion to abandon frequency analysis.

cases. If the decision would be unreliable using a frequency method, it cannot be made any more reliable by using some other method that does not even purport to address issues of evenhandedness.

Instead of confronting the related problems of (1) how to draw empirical conclusions based on little data and (2) what to do when no reliable empirical conclusions can be reached, the majority simply pretends that proportionality review can be conducted without reference to the actual conduct of juries and prosecutors. If the Court truly were committed to evenhanded capital sentencing and to the proposition that there must be a coherent basis for distinguishing the cases in which the death penalty is imposed from those in which it is not, then the Court would not have "supplemented" the frequency approach with another non-empirical method.

The infirmity of the precedent-seeking approach is magnified when the reviewing court uses the approach *and includes the case under review in the comparison group*. The majority does precisely that. When the case under review is in the comparison group, the case under review *always* will resemble the death-sentenced group more closely than the life-sentenced group because the case under review always will resemble itself more closely than it resembles any other case. Here the cases most similar to the *Marshall* case, other than the *Marshall* case itself, are the cases of William and Herbert Engel, both of which resulted in life sentences. The Court concedes that those cases are almost on all fours with the subject case. See *ante* at 179–182, 613 *A*.2d at 1095–1096, but affirms Marshall's sentence anyway. Had Marshall's case itself not been considered as precedent, any precedent-seeking analysis would have dictated the reversal Marshall's sentence. Only by including Marshall's sentence in the death-sentenced group is the majority able to circumvent the *Engel* precedents. And, only by including Marshall's sentence in the death-sentenced group is the majority able to overcome the fact that after ten years of murder prosecutions under the capital-murder statute there has

been no independent precedent—not even reversed precedent—to support imposition of the death sentence in cases like Marshall's.

I should point out, moreover, that even if one were to accept the majority's designation of reversed death-sentenced cases as valid death-sentenced cases, the controlling precedent still would come from the life-sentenced category. Of the so-called death-sentenced cases, the majority concludes that John Martini and James Clausell possessed higher culpability than Marshall, *ante* at 170, 183, 186, 188, 613 *A*.2d at 1090, 1097, 1098, 1099, while Anthony Di Frisco was of equal culpability. *Ante* at 183, 613 *A*.2d at 1096. The life-sentenced cases were almost equally divided between those of equal culpability (William Engel, Herbert Engel, Michael Rose, David Russo) and those of less culpability (Francis Brand, Miguel Melendez, and Randy Burroughs). *Ante* at 182–186, 613 *A*.2d at 1096–1098. The majority's conclusion from that configuration is a striking departure from the conclusions suggested by the Special Master.

In a hypothetical given in the Special Master's report to the Court, the Special Master assumes that six similar cases exist with two death sentences and four life sentences. *Final Report, supra,* at 33. Under the precedent-seeking approach, the Special Master describes the examination a court should undertake:

> If the review case was deemed of comparable or greater culpability than the death-sentenced cases ..., the sentence would be affirmed. However, if some features of the review case made it appear less culpable than the two death-sentenced cases or comparable to one or more life-sentenced cases ..., the death sentence would be vacated.

### [*Id.* at 34.]

That hypothetical fairly reflects the situation that the majority says it is facing, as it has deemed Marshall to be less culpable than two death-sentenced cases (Martini and Clausell) and of equal culpability to one death-sentenced case (Di Frisco) and four life-sentenced cases (H. Engel, W. Engel, M. Rose, and Russo). Despite the majority's conclusion that the review case

is not of greater culpability than the death-sentenced cases, the majority misapplies the approach to conclude that Marshall's case is not disproportionate.

The results of the Court's precedent-seeking analysis are hardly surprising, for the Court does not even define that process, let alone conscientiously apply it. *Ante* at 181, 613 *A*.2d at 1095 (asking whether some invidious factor or pattern has been discerned from the precedent); *ante* at 187, 613 *A*.2d at 1099 (concluding without analysis that Marshall's sentence is not disproportionate). The Court's judgments that some cases are similar to Marshall's and that others are not are moral and hopelessly subjective and value-laden assessments. On the one hand, I cannot blame the majority for its failure to use the precedent-seeking method as the Special Master, and several other courts, suggest it be used. On the other hand, however, I find unconscionable the Court's use of some utterly unstructured method of review, its calling that method "precedent-seeking," and its claim that that method justifies affirmance of a death sentence when the most reliable measures dictate that the sentence be reversed.

—F—

By definition, a court engaged in frequency analysis must establish at least a loose cut-off point for permissible death-sentencing frequencies among comparison cases. As noted, the majority purports to hold that a death sentence is disproportionate *only if other defendants* with similar characteristics *generally receive life sentences* for committing factually similar offenses. *Ante* at 131, 613 *A*.2d at 1070. I believe that a death sentence is disproportionate *unless other defendants* with similar characteristics *generally receive death sentences* for committing factually similar offenses.

In *State v. Jeffries,* 105 *Wash*.2d 398, 717 *P*.2d 722 (1986), a case in which the Washington Supreme Court applied a precedent-seeking approach using a universe containing only death-

sentenced cases, Justice Utter dissented from the holding of the Court, arguing that a frequency approach was required by the Washington proportionality review statute. *Id.* 717 *P.*2d at 743. Elaborating on the approach he thought required, he said: "If the frequency [of death sentencing for similar cases] is less than 'generally,' the death sentence should be reversed. Use of the word 'generally' suggests that the 'threshold frequency' at which a death sentence becomes appropriate is significantly greater than 50 percent." *Ibid.*

If the death penalty is not imposed generally in cases similar to the crime under review, the death sentence should be vacated. Contrary to the position of the majority, the constitutional requirement that there be individualized sentencing does not mean that the State may impose the death penalty only occasionally for a certain type of crime. *Ante* at 152, 613 *A.*2d at 1081. The constitutional requirement of individualized sentencing means that the death penalty *cannot* be imposed *invariably* for a certain type of crime, not that the death penalty *can* be imposed *sporadically* for a certain type of crime. *See Woodson v. North Carolina, supra,* 428 *U.S.* at 296–98, 96 *S.Ct.* at 2987–88, 49 *L.Ed.*2d at 956–57.

Once the death penalty is not imposed generally for a type of crime, two conclusions can be drawn that should bar the imposition of the death penalty in the cases involving that type of crime. Both of those conclusions have constitutional dimensions. First, when the death penalty is not imposed generally for a type of crime, there is no societal consensus that those who commit that type of crime deserve the death penalty. "[J]ury sentencing constitutes the link between contemporary community values and the penal system." *Bey* II, *supra,* 112 *N.J.* at 162, 548 *A.*2d 887. When juries routinely find that the mitigating factors outweigh the aggravating factors even when no obvious mitigating factors are present, and when prosecutors follow their lead and routinely decide not to charge cases capitally, see, *e.g., Jackson* II, *supra,* 128 *N.J.* at 146, 607 *A.*2d 974, 979, those judgments must reflect public ambivalence

about imposing the death penalty in those cases. *See* Goodpaster, *Judicial Review, supra,* 74 *J.Crim.L. & Criminology,* at 802–03. Execution of defendants in those cases would be unconstitutional, for doing so would offend " ' "the evolving standards of decency that mark the progress of a maturing society." ' " *Bey* II, *supra,* 112 *N.J.* at 162, 548 *A.*2d 887 (quoting *Gregg v. Georgia, supra,* 428 *U.S.* at 173, 96 *S.Ct.* at 2925, 49 *L.Ed.*2d at 874 (quoting *Trop v. Dulles,* 356 *U.S.* 86, 101, 78 *S.Ct.* 590, 598, 2 *L.Ed.*2d 630, 642 (1958))).

Second, when juries assessing a certain type of crime and defendant routinely find that the mitigating factors outweigh the aggravating factors, the conclusion follows that many of the defendants who receive the death penalty are no more deserving of death than are the defendants whose lives are spared. There is no rational basis on which to distinguish those who are sentenced to death from those who are not. The ones who are sentenced to death just happen to be unlucky. When that occurs, the lives of the few who have been sentenced to death must be spared. *State v. Ramseur, supra,* 106 *N.J.* at 183, 197, 524 *A.*2d 188. Moreover, when that occurs, one can infer that the system has not been designed in a way that enables jurors to make rational, informed, and reasonably consistent decisions. *See id.* at 382–404, 524 *A.*2d 188 (Handler, J., dissenting).

For both of those reasons, I still would have dissented from the majority's putative holding, even had that holding not been diluted by methodological errors. Our constitution requires no less.

—F—

The majority would draw comfort from the Special Master's observation that contract murderers are among the defendants most likely to receive the death penalty, behind only those who kill multiple victims, those who have killed before, those who have kidnapped their victims, and those who kill public ser-

vants. *See ante* at 171–172, 613 *A.*2d at 1091; *Final Report, supra,* Table 7. That observation ignores both the fact that the only contract-murderer currently under death sentence is Marshall and the fact that, even counting reversed death-sentenced cases as valid, in no group of cases has the death sentence regularly been imposed. The fact that cases like Marshall's are among the most likely to result in a death sentence is inconsequential unless the cases that are most likely to result in a death sentence actually result in death sentences with regularity. Because, after ten years, *no* types of capital murder cases regularly result in death sentences, the fact that contract-killings are more likely to result in the death penalty than other types of killings cannot alter or mitigate the irregularity attendant to death sentencing in general.

### III

The Court's standards for proportionality review are profoundly deficient. Only by proceeding as it does from a misguided understanding of the essential requirements of proportionate sentencing is the Court able to uphold Marshall's sentence. To reiterate, there is a sounder approach: a frequency analysis based on actual sentencing practices. A conscientious application of that approach leads inexorably to one conclusion: the death penalty rarely is imposed in New Jersey in cases like Marshall's.

### —A—

One obstacle to conducting proportionality review in this case—and in any case—is that many defendants do not have the benefit of thorough penalty hearings. If the universe contains cases in which some defendants were able to establish a record of mitigating evidence and others were not, the comparisons made among the cases in the universe necessarily will be prone to error. Moreover, the comparisons will work to the

disadvantage of defendants like Marshall whose trials did not include the presentation of mitigating evidence.

As I pointed out in my dissent in *Marshall* I, Marshall's penalty trial was a perfunctory exercise that involved little more than the recitation by counsel of facts brought out during the guilt phase. 123 *N.J.* at 242, 586 *A.*2d 85 (Handler, J., dissenting). The defense presented no new information concerning defendant's character, his personal history, or his relationship with his children. The only evidence the jury considered was that bearing on Marshall's guilt, not on whether he deserved to live. Having convicted Marshall of capital murder, the jury already had rejected that guilt-phase evidence. In the absence of any other evidence or a genuinely independent penalty hearing, Marshall's fate effectively had been decided before the jury even commenced sentencing-phase deliberations. "There is no reason to suppose that the evidence offered by defendant at the guilt trial by way of defense to the charges could be more than marginally helpful to whether he deserved only life imprisonment." *Ibid.* The brevity of the hearing, coupled with the fact that it was held only hours after the guilty verdict had been announced, severely undermined defendant's ability to establish the applicability of particular mitigating factors. Today that flaw hampers our ability to conduct a proportionality review of his sentence. However, even in the absence of a complete record of mitigation in Marshall's case, the data still suggest that Marshall's sentence is disproportionate when compared with those of other defendants who committed similar crimes and who, like Marshall, failed to produce substantial mitigating evidence.

—B—

Like the majority, I acknowledge that proportionality review must use several comparison groups, each reflecting a different measure of similarity. Each comparison group must serve as a

cross-check on the others. In this case, because the results derived from the various comparisons are consistent, the ultimate conclusion derived from them may be regarded as reliable. Had the results been inconsistent, a closer re-evaluation or a refined approach would have been necessary.

Distilled to its essence, Marshall's crime was a contract murder of a family member for pecuniary gain. The murder was carefully planned and was not committed in the heat of passion. However, the murder was not especially brutal—for a capital murder—and did not involve torture or depravity of mind. Marshall had no criminal record prior to his conviction. I consider the case to be similar, for the purposes of proportionality review, to several types of cases. Closest to Marshall's case, perhaps, are those cases involving contract killings. Because I consider the ends of a crime to be as important as or more important than the means, I also consider Marshall's crime to be similar to those cases involving murders for pecuniary gain and murders of spouses, family members, and friends.

For the most part, therefore, I settle on the same criteria for creating comparison groups that the majority uses. I rely heavily on comparison groups comprised of cases involving the following types of criminals: contract-murderers (both principals and agents); spousal murderers who did not kill in the heat of passion and whose victims were defenseless; and murderers who robbed or kidnapped their victims, planned their crimes extensively, had pecuniary motives, and deceived or entrapped defenseless victims. In addition, I consider two comparison groups proposed by the Special Master that the majority did not consider: cases involving murderers who killed for pecuniary gain whose crimes did not involve burglary, robbery, or kidnapping, *Final Report, supra,* at 80–84; table 7, app. E at 5, app. F at 8, and cases involving murderers who robbed acquaintances, relatives, or friends. *Final Report, supra,* at 80–84; table 7, app. E at 3, app. F at 5–6.

In Appendix D to this opinion the death-sentencing frequencies for several comparison groups are listed. Those frequencies are based on a universe of all death-eligible cases. All living defendants not currently under death sentence are counted as life-sentenced defendants. No case is counted more than once, unless it is a case in which a defendant was sentenced separately for more than one murder. I have excluded from the universe all defendants not currently under conviction for the homicides of which they have been accused. All comparison groups are listed in Appendix F.

A frequency calculation for each comparison group reveals that the death sentence in Marshall's case is disproportionate. For example, of the nine contract murderers convicted of murder in the last decade, only one, Marshall, was sentenced to death. Of the ten murderers who killed for pecuniary gain and whose killings did not involve robbery, burglary, or kidnapping, only one, Marshall, was sentenced to death. Of the eleven murderers who killed while robbing friends, acquaintances, or relatives, none was sentenced to death. In most of the comparison groups, the death-sentencing frequency hovers around one in ten. In only one comparison group—that consisting of spousal murderers—does the death-sentencing frequency reach as high as one in three; in that group there were only three cases, and Marshall's is the one that resulted in the death penalty.

Marshall's case has achieved considerable notoriety. That notoriety, coupled with the highly unusual nature of the facts of the murder itself, might lead one to believe that Marshall's case must be more aggravated than most other capital-murder cases, and that his sentence must be proportionate. In fact, although Marshall's was a horrible crime, it was no worse (by many different standards) than several murders committed in New Jersey since 1982, when the current capital-murder statute

was enacted. Yet since 1982 only four death sentences [5] have been returned that still may be understood as valid death sentences, and the vast majority of murderers who committed crimes comparable to and more heinous than the killing of Maria Marshall have received life sentences. Those facts operate to make Marshall's death sentence disproportionate.

—C—

Marshall's sentence is disproportionate when compared both to defendants who committed other crimes and to defendants who participated in Marshall's crime with him. His case exemplifies the intra-case disparity that is rampant in our death-penalty system. In *State v. Di Frisco*, 118 *N.J.* 253, 571 *A.*2d 914 (1990), I expressed concern that the system allowed the hired killer to be tried for capital murder while the principal was not pursued or indicted. *Id.* at 302–05, 571 *A.*2d 914 (Handler, J., concurring in part and dissenting in part). The exercise of prosecutorial discretion appeared to have been unguided and unsupervised, and appeared to have resulted in arbitrary and disproportionate outcomes. The concern over disproportionality within a case also was present in the *Clausell* case, *see State v. Clausell, supra,* 121 *N.J.* at 309, 312, 580 *A.*2d 221 (principal not prosecuted), and in the *Brand* case. *See Final Report, supra,* at 54, 62.

Here Marshall was prosecuted capitally as a contract-murder principal, but the death penalty was waived against the confessed contract-killer agent, Billy Wayne McKinnon, in order to secure his testimony against Marshall. See *Final Report, supra,* at 11 n. 8. McKinnon pleaded guilty to conspiracy to commit murder and received a sentence of five years. The disparate results are even more magnified as the alleged shoot-

---

[5] The defendants whose death sentences have not been overturned are Dominick Schiavo (who died in prison), Robert Marshall, Marko Bey (from the retrial of the Peniston murder), and John Martini.

er, Larry Thompson, was acquitted of capital murder and conspiracy—his defense was that McKinnon had been the shooter—and the other participant, Robert Cumber, was sentenced to thirty-three years for his role as an accomplice in the conspiracy. Intra-case disparity alone might not justify the vacation of Marshall's death sentence, but it does bolster the conclusion that his sentence is disproportionate.

## IV

Although I believe proportionality review is required constitutionally, I do not believe that its use can save an otherwise unconstitutional death-penalty statute from constitutional infirmity. Proportionality review has its limits. It cannot keep its own promise—it cannot assure evenhandedness, uniformity, or consistency in the imposition of the death sentence. It does not and cannot overcome the arbitrariness that plagues the imposition of the death penalty. Our experience with proportionality review itself now confirms that chronic and profound constitutional deficiencies endure in the New Jersey system for administering capital punishment. Finally, proportionality review is not simply a final straw placed on the back of the public. It is a massive undertaking that adds substantially to the enormous governmental, institutional, and social burdens that are imposed and sacrifices that are exacted as a result of the decision to maintain capital punishment as part of our criminal justice system.

## —A—

The fallacy of proportionality review inheres in its attempt to identify precisely what makes some cases similar and others dissimilar. It inheres in the notion that we, as judges, can identify the qualities that make some murderers deathworthy and others not. The Court's efforts to do that—by assessing moral culpability—amply demonstrates that proportionality review often serves to perpetuate rather than eliminate arbitrary

sentencing. Moral culpability determinations may appear to be a more sophisticated and refined exercise than the statutory process by which jurors determine death eligibility and death-worthiness. As I have often said, the latter process does not sufficiently restrict the discretion of jurors or direct and guide them to sound and reliable decisions concerning capital murder and life-and-death judgments. *E.g., State v. Ramseur, supra,* 106 *N.J.* at 382–404, 524 *A.*2d 188 (Handler, J., dissenting). The objective of proportionality review is to enable the reviewing court to compensate for such subjectivity and correct its unfair results, as when similar defendants committing similar crimes do not in fact receive the same sentence. The irony of proportionality review is that the reviewing court itself resorts to extra-statutory factors that are also inherently subjective. Because the Court at this end-point of capital prosecution validates or invalidates the defendant's death sentence based on its own judgment of culpability, the Court, make no mistake about it, becomes the ultimate sentencer.

As the majority itself recognizes, a "value judgment is built into practically every measurement" of proportionality. *Ante* at 119, 613 *A.*2d at 1064. That inescapable entanglement with subjective moralistic judgment renders proportionality part of the problems rather than the remedy to the problems inherent in the statutory scheme. The Court's decision only perpetuates the myth that the death penalty can be imposed in an objective, principled, non-random manner, and that any given death sentence can be validated as a fair, reliable expression of just punishment or community values. The Court thus makes comparison after comparison with absolutely no legal or logical foundation for support. Is it worse to kill for money or for hatred? Is it worse to kill over a woman or over a dog? Is it worse to kill to support a gambling habit or to support a drug habit? Is it worse to kill a relative or a stranger? To pose those questions is to pose insoluble moral conundrums. Because life or death is determined by the answer, no process will give us an answer that can assure us that it is right. We are

then not reasonably better off then when we first heard the brilliant insight of Justice Stewart, who fingered the critical deficiency of capital punishment: its freakish and wanton selection of persons who are to be sentenced to death. The selection of defendants for death always will be freakish and wanton, proportionality review notwithstanding.

—B—

In *Ramseur*, I expressed the view that the death penalty is unconstitutional because it offends contemporary standards of decency. I there observed with respect to paragraphs 1, 5, and 12 of Article I of the New Jersey Constitution:

> Both the language and structure of these provisions affirm that the life of the individual—including a quality of life embodied in liberty, safety, security and happiness—is accorded the highest value and greatest protection possible under the State Constitution. Government cannot take life, or detract from the essence of life, or restrict the rights that are supportive of life, based on arbitrary and unreasoned actions or invidious factors; even when sanctions must be imposed, the State may not impose any punishments that are cruel and unusual. It follows logically from these provisions and their obvious purpose that when life itself is at stake government must be its most scrupulous to avoid any wrongful harm.

[106 *N.J.* at 370–71, 524 *A.*2d 188 (Handler, J., dissenting).]

I felt that our own experience with the application of capital punishment and the history of its use and evolution revealed valid measures of our common moral values as they related to the death penalty. *Id.* at 371, 524 *A.*2d 188. The clearest feature of that historical experience was "the decreasing use of the capital murder sanction." *Ibid.* The societal disaffection from capital punishment was reflected in the fact that for almost three-quarters of a century relatively few murderers faced capital trials. *Ibid.* The courts judicially barred practices that could provide "a ready and facile road to the gallows." *Id.* at 372, 524 *A.*2d 188 (quoting *State v. Genz*, 57 *N.J.L.* 459, 462, 31 *A.* 1037 (Sup.Ct.1895)). The Legislature enacted added protections to the imposition of capital punishment. Our actual experience demonstrates that the imposition of the death penal-

ty was becoming progressively and dramatically less tolerated and less frequent. *Id.* 106 *N.J.* at 372–73, 524 *A.*2d 188. History and experience teach us that, despite a commonly held belief that capital punishment can be a useful part of a criminal justice system, capital punishment founders on stronger and deeper feelings that will not abide the immorality in the arbitrary or capricious taking of life.

I continue to believe that our death penalty regime cannot be reconciled with contemporary standards of decency. Thus our current experience indeed validates our past experience. Our hesitancy and ambivalence, our angst and travail over capital punishment represent more than a quixotic quest for an ideally fair system. Rather, they reflect a very pervasive and deep-seated antipathy against the taking of a life when the fairness in taking that life cannot be assured. Plainly, proportionality review is no assurance, although we may pretend that it is. Capital punishment continues to offend our common decency.

Our recent experience ratifies the lesson to be taken from our failure to devise a capital punishment system that is fair. Death-sentencing rates since the death penalty statute was enacted have declined dramatically. Not one jury in New Jersey has returned a death sentence since 1990. *See Final Report, supra,* at 15–16. Prosecutors, who base their charging decisions in part on their own predictions of what juries will do, charge cases capitally far less often than they once did. *Id.* at 20. Prosecutors sometimes strain to avoid capital prosecutions. *E.g., Jackson* II, *supra,* 128 *N.J.* at 142, 607 *A.*2d 974, 977 (Handler, J., dissenting).

I said in *Ramseur:*

> Our history thus not only confirms that society places extraordinary value on individual life, but also teaches us society's moral judgment that the death penalty should not be applied unless it is right to do so, unless, in other words, substantive and procedural protections have been maximized so that the risk of arbitrariness is reduced and the possibility of the ultimate injustice is eliminated.

[*State v. Ramseur, supra,* 106 *N.J.* at 374, 524 *A.*2d 188.]

Our experience over the last ten years with capital punishment, capped by the lessons wrought from our gargantuan effort to attain proportionate sentencing, confirms the constitutional impossibility of capital punishment.

—C—

Our efforts to achieve satisfactory proportionality review has been a gigantic undertaking. It has taken about three years, untold hours, substantial outlays of moneys, and the absorption of significant resources to attempt to develop an adequate methodology. That fresh experience makes highly relevant the consideration anew of the enormous governmental, institutional, and social sacrifices entailed in capital punishment and the obvious, disturbing policy implications flowing from those sacrifices.

Although the overall costs for estimating a capital trial vary depending on the jurisdiction and the costs included, the estimates uniformly confirm that the death penalty is a costly mechanism. In California, the fourteen cases recently affirmed by the California Supreme Court cost an average of $1.7 million each, though another case cost $5 million and most cases range from $750,000 to $1 million for the trial and direct appeal. Stephen Maganini, *Closing Death Row would Save State $90 Million a Year,* The Sacramento Bee, Mar. 28, 1988, at A14 (estimating the average death-penalty case at $592,000 compared to $93,000 for the average murder case). A study prepared for New York estimated the costs to bring a capital case up to the point of a death sentence at $1,498,000. New York State Defenders Association, Inc., *Capital Losses: The Price of the Death Penalty for New York State,* Apr. 1, 1982, at 19 (*Capital Losses*); *see also* Dave Von Drehle, *Bottom Line: Life in Prison One–Sixth as Expensive,* The Miami Herald, July 10, 1988, at 12A (citing studies from Maryland and Kansas suggesting that the total additional cost for a bifurcat-

ed capital trial· over a non-capital murder trial is estimated at between $36,000 and $116,700) (*Bottom Line*); *Bar Panel Reports Death Penalty is Too Expensive,* Newsday, Feb. 10, 1989, City Section 34 (reporting that New York State Bar Association had estimated that the cost of a capital case is $2 million in Texas and more than $3 million in Florida).

In New Jersey, sentencing one person to death has been estimated to cost about $7.3 million. Tabak and Lane, *The Execution of Injustice,* 23 *Loyola of L.A.L.Rev.* 59, 136 (1989). At every stage of the judicial proceedings the costs are higher for the death-penalty case than for the non-capital case. The first and most enduring cost to the state is the assignment of counsel. Ninety percent of those on death row nationwide cannot afford counsel and receive court appointed counsel. Howard Goodman, *Helping Those Sentenced to Die,* Philadelphia Inquirer, May 11, 1991, at B1; Leigh B. Bienen, et al., *The Reimposition of Capital Punishment in New Jersey: The Role of Prosecutorial Discretion,* 41 *Rutgers L.Rev.* 27, 163 n. 671 (1988) (noting that 81.5% of 703 homicide cases in New Jersey between 1982 and 1986 were handled by the State Public Defender's office or court appointed counsel). The state therefore pays for those defenses, straining the resources of the Public Defender's Office. For example, an audit established that New Jersey spent nearly $3 million extra in 1984 to defend indigent defendants charged with capital crimes. Jo Astrid Glading, *Bills to Defend Indigents Climbing,* Trenton Times, July 4, 1985. Because of the complexity of capital cases, the State Public Defender assigns two defense attorneys to each case, compared to the single assignment for most murder cases. Ames Alexander, *Penalty Comes at High Price,* Asbury Park Press, July 22, 1991, at 1. Normally two prosecutors are needed in New Jersey death penalty cases, further increasing the costs throughout the proceedings. Michael Booth, *Mercer Leads State in Pending Death–Penalty Cases,* Trenton Times, Oct. 17, 1988, at A1. For example, the prosecution estimated that the *Ramseur* case cost $60,000 a year to litigate. Pat R.

Gilbert, *Bills Add up in a Hurry for Death Row Inmates*, Trenton Times, Feb. 14, 1988, at A1. Moreover, competent counsel on both sides are essential not only to ensure the fairness of the proceedings but because inadequate legal services will lead to greater costs as cases progress. "The dangers of additional extraordinary and successful post-conviction applications increases, with the likelihood for new trials, if counsel at the trial level is not thoroughly effective." Criminal Justice Section, New York State Bar Assn., *Reinstitution of Death as Punishment*, Feb. 13, 1989, at 4 (*Reinstitution of Death*).

Although nine out of ten non-capital cases resolve themselves in plea negotiations, few capital defendants enter guilty pleas. *See* Margot Garey, *The Cost of Taking a Life: Dollars and Sense of the Death Penalty*, 18 *U.C. Davis L.Rev.* 1221, 1247 n. 114 (1989) (stating that capital cases go to trial ten times as often as non-capital cases). In effect, the result of the decision to seek the death sentence is trial. *Bottom Line, supra,* at 12A (noting that capital cases almost always require a trial because, due to the extensive pretrial publicity and notoriety of the cases, prosecutors are reluctant to plea bargain).

The pretrial process is longer and more complicated in capital cases than in non-capital criminal cases. Maganini, *supra,* at A1 (stating that non-capital trials average one day of pretrial motions, whereas capital trials average twelve days); *see also* Bienen, *supra,* 41 *Rutgers L.Rev.* at 242–45 (describing the impact that the allegation of an aggravating factor has throughout proceedings). The usual number of pretrial motions in a non-capital case is five to seven, whereas the typical capital case requires the filing of between ten and twenty-five motions. *Capital Losses, supra,* at 12. While pretrial practice plays an important role in most criminal cases, it takes on an added significance in the capital case. The capital case requires not only motions on the underlying offense but motions attacking the death penalty itself, for example, its constitutionality or the sufficiency of evidence to support alleged aggravating factors. Capital cases also generate a need for motions to

appoint experts and employ investigators, and the notoriety of capital cases requires change of venue and sequestration motions. Garey, *supra*, 18 *U.C. Davis L.Rev.* at 1247–51. The standard motions concerning discovery and the suppression of evidence also become critical, taking more time to prepare and stimulating heavy litigation. *Capital Losses, supra,* at 12–13.

Preparation for the pretrial motions, as well as the guilt and penalty trials, can take months of expensive investigation. Defense counsel often call psychiatrists, family members, former teachers, even accomplices in past crimes. Those witnesses must be located, interviewed, and persuaded to cooperate, all of which requires competent investigators, time, and money. *Bottom Line, supra,* at 12A. School, work, military, and medical records must be located and retrieved. In California, a typical death-penalty defense costs an additional $25,000 to $50,000 in special investigation costs and $15,000 for psychiatrists or other expert witnesses. Maganini, *supra,* at A14 (quoting a San Francisco Public Defender); *Capital Losses, supra,* at 15 (listing fees of various experts: crime scene reconstructionists and blood stain analysts range from $700 to $1,000 per day; psychiatrists' average daily fees are $700, or $125 to $150 per hour of courtroom testimony; polygraph expert average bill amounts to $500; eyewitness identification expert courtroom fee is $500 per day). Specifically, of the $296,449.41 the Public Defender's Office spent to defend Thomas Ramseur at trial, the largest portion, $191,881, was spent on psychiatrists. Gilbert, *supra,* at A1. The Public Defender spent more than $75,000 successfully attacking the makeup of grand and petit juries in Atlantic County. Joseph F. Sullivan, *New Jersey Defenders Battle Death Law,* New York Times, Feb. 26, 1991, at B1. Steep investigation expenses are not limited to the defense side. The cost of the prosecutor's investigation of the Robert Marshall case alone was more than $200,000. Alexander, *supra,* at 1 (quoting detective at Ocean County prosecutor's office).

Jury selection in a death case is on the average 5.3 times longer, and hence more costly, than in a non-capital case. Garey, *supra,* 18 *U.C. Davis L.Rev.* at 1257 (stating that courtroom time alone may increase cost to the system by as much as $87,440). Jury selection, a process that ordinarily takes three days, can consume two to six weeks of court time. Maganini, *supra,* at A14 (reporting that jury selection routinely takes six weeks or more); *Capital Losses, supra,* at 13 (reporting that individual examination of jurors can take two to four weeks). Potential jurors must be questioned individually to explore their personal biases and feelings on capital punishment, an inquiry that does not arise in non-capital cases. Jury voir dire also may increase the cost of experts, as both sides use jury experts to assist in the selection of fair, impartial jurors. *Id.* at 15 (reporting that *Witherspoon* consultant fee is $100 per hour); Sullivan, *supra,* at B1 (reporting that defense counsel at capital trials in New Jersey routinely hire juristic psychologists to help pick a jury).

Court testimony at average non-capital trials covers three court days at an average cost of $6,200 a day. By comparison, capital-murder trials take thirty days of court time at an estimated $7,500 a day. Maganini, *supra,* at A14 (citing a California report).

The penalty trial in death cases has no analogy in non-capital cases. The resources expended in pretrial investigation bear fruit here, as family members, friends, neighbors, teachers, and employers are called to provide the jury with a complete retrospective of the defendant's life from prenatal care to the date of sentence. A majority of New Jersey defendants rely on mitigating factors that touch on mental conditions. Bienen, *supra,* 41 *Rutgers L.Rev.* at 259–61 & table 51 (reporting that in sixty-nine New Jersey cases proceeding to penalty trials, mitigating factor c(5)(a), mental or emotional disturbance, was alleged in 59.4% and mitigating factor c(5)(d), impairment of defendant's capacity to appreciate the wrongfulness of his or her conduct, in 68.1% of those trials). In order to persuade the

jury that the alleged mental and emotional characteristics exist, the defense must rely on expert testimony. The prosecution, in seeking to rebut that evidence, also relies heavily on psychiatric testimony. *See Bottom Line, supra,* at 12A; *Capital Losses, supra,* at 17.

Moreover, the costs stemming from the high stakes involved in a capital prosecution are incurred even when the jury acquits, convicts of a lesser offense, or returns a life sentence. In 1988, for example, none of the twenty New Jersey capital juries returned a death sentence. Kathy Barrett Carter, *Jurors Avoid the Responsibility for Killing a Stranger in 20 Trials,* Star Ledger, Dec. 18, 1988, at 32. Of the ninety-four homicides that went to trial in New Jersey between 1982 and 1986, sixty-nine resulted in capital murder convictions, but only twenty-five defendants were sentenced to death. Bienen, *supra,* 41 *Rutgers L.Rev.* at 159–60. In other words, although the heavy machinery of a capital trial is invoked in nearly twenty percent of all homicides, only a quarter of those trials resulted in a death sentence. *Id.; Final Report, supra,* Tables 2 & 3 (reporting thirty percent rate between 1983 and 1991); John Rofe, *Death Penalty Evades Prosecutors,* The Dispatch, June 10, 1987, at 1 (reporting statewide rate around one sentence in three penalty trials). Further, the deterrence of capital punishment may be questioned in light of the fact that the number of persons executed likely will be no more than a minute percentage of those accused, tried, and convicted of capital murder. We must recognize a parallel concern "with the disproportion between the enormous costs—financially and in terms of scarce, overburdened judicial, prosecution, and defense services—and the putative 'benefit' of the actual infrequent imposition of death, given its infrequency." *Reinstitution of Death, supra,* at 6.

Every death-sentenced defendant is entitled to a direct appeal to this Court. Those mandatory reviews for defense alone cost an average of $37,740. *Bottom Line, supra,* at 12A (quoting consultant for American Bar Association); *see also* Maganini,

*supra,* at A14 (estimating that typical death penalty appeal takes about 1,000 attorney hours, or about $62,000). Studies show that the prosecution matches those defense attorney costs dollar-for-dollar. *Bottom Line, supra,* at 12A; *Capital Losses, supra,* at 10 n. 28 (using defense-prosecution ratios of one-to-one at appellate stage). The length of the pre-trial and trial proceedings also means voluminous transcripts must be prepared for appeal. Ramseur's trial transcript cost $33,000. Gilbert, *supra,* at A1.

The complexity of our capital jurisprudence and the shear volume of the records in capital trials compel appellate courts to expend inordinate energy on capital cases. *See, e.g.,* Magani-ni, *supra,* at A14 (reporting that the California Supreme Court spends one half its time reviewing death cases); Andrew H. Malcolm, *Capital Punishment is Popular, But So Are Its Alternatives,* New York Times, Sept. 10, 1989, at A4 (reporting that Florida's Supreme Court devotes one-third of its time to capital cases); Jonathan E. Gradess, *Execution Does Not Pay,* The Washington Post, at 5 (noting that thirty percent of the docket of the United States Court of Appeals for the Eleventh Circuit consists of death penalty cases).

Half of all death sentences are overturned on appeal. David J. Gottlieb, *The Death Penalty in the Legislature: Some Thoughts About Money, Myth, and Morality,* 37 *Kan.L.Rev.* 443, 449 (1989); Dave Von Drehle, *Capital Punishment in Paralysis,* The Miami Herald, July 10, 1988, at 1A (*"Punishment in Paralysis"*); Gradess, *supra,* at 5; David A. Kaplan, *Death Mill, USA,* National Law Journal, May 2, 1989, at 38 (observing that Louisiana Supreme Court has reversed 36.8% of the death sentences to come before it; Texas 32.9%; Florida, 46.3%). Even if the case is upheld by the state courts, federal courts, reviewing the sentences in habeas corpus proceedings, find reversible error in 40.7 percent of the death sentences. Kaplan, *supra,* at 38.

When prosecutors pursue retrials, many of the costs discussed above are repeated. *See, e.g.,* Renee Winkler, *Prosecutors Pleased but Wait for Chance to Study Opinion,* May 6, 1987, at 27 (quoting a Camden County prosecutor as concluding that a retrial of sentencing phase requires "a virtual retrial of the whole case"); Matt Lait, *Second Death Penalty Seen as Costly Effort,* Los Angeles Times, Apr. 5, 1992, at B1 (quoting attorneys and court officials in California as estimating that retrial of one defendant would eventually cost county taxpayers between $500,000 to $1 million, even though the defendant changed his plea to guilty early in the trial); Ian Gray, *A Shameful—and Expensive—Logjam at Death's Door,* Los Angeles Times, Dec. 17, 1989, at M3 (reporting that retrial carried a $4.6 million price tag after defendant had received ineffective assistance of counsel during the original trial). Although the high costs continue, the death-sentencing rate on retrial is low. *See* Nick Fox, *Condemned Inmates may Win Review of Sentences,* Bergen Record, Mar. 2, 1988, at A1 (citing NAACP Legal Defense Fund figures showing that of the 696 resentencing trials nationwide, only 197 resulted in a second death sentence).

Additional appellate costs are incurred when the death-sentenced defendant seeks post-conviction relief in state and federal courts. In most states, volunteer lawyers must be found for collateral review in which they can incur out-of-pocket expenses of $10,000 and spend an average of 665 hours. Linda Greenhouse, *Right to Death–Row Lawyer Curbed,* New York Times, June 24, 1988, at A8; *see* Stephen Wermiel, *Delays on Death Row Fuel Hot Debate,* Wall Street Journal, Mar. 6, 1989, at 136 (noting that federally funded death-penalty centers, which together have budgets totalling $5.9 million budget, recruit and train lawyers, and that the 1989 federal budget allocated $10 million for appointing attorneys to represent death-row inmates); *Punishment in Paralysis, supra,* at 1A (estimating that capital cases reviewed in federal courts will cost the nation's taxpayers $30 million a year for appointed counsel).

New Jersey, however, is one of the few states that authorize the Public Defender to represent a capital defendant through all stages of judicial review. Thus, the costs of post-conviction review also will be incurred by the state. Alexander, *supra,* at 1.

The strain on the court system is also felt in non-monetary terms. The burden on the judiciary increases when courts must address last-minute appeals during midnight vigils. *See* Dave Von Drehle, *Fairness was Fatal Blow to Fast Executions,* The Miami Herald, July 11, 1988, at 1A (describing midnight appeal handled by Justice Powell); *Punishment in Paralysis, supra,* at 1A (reporting that the Florida Supreme Court hears thirty to forty last minute appeals a year). In those frenzied appeals, reams of documents and legal arguments are deposited on the courts' doorstep. Incidental costs also increase during these last-chance proceedings, as the process shifts into overdrive, air travel must be arranged and overnight couriers used. Dave Von Drehle, *Political Pressure Thwarts Clemency,* The Miami Herald, July 12, 1988, at 1A.

Clemency proceedings before the Governor are another stage in the process, which increases the cost of executing a criminal defendant. Amnesty International USA, *The Truth About the Death Penalty in the United States is Real News,* June 1990.

The prisons, entrusted with housing and protecting the defendants awaiting execution, account for additional costs. When defendants face a death sentence, they receive individual cells and increased security. Housing a death sentenced inmate in the New Jersey State Prison's Capital Sentence Unit at Trenton costs an additional $3,000 a year or 20 percent more than housing a non-death-sentenced inmate in the general prison population. Gilbert, *supra,* at A1 (noting that the close supervision of death row inmates requires two officers to escort an inmate anywhere and notations in the file every ten minutes on the inmate's activities); Pamela Geurds, *The "Fantasy World" of Life on Death Row,* Trenton Times, Feb. 15, 1988, at A10

(reporting that death row inmate must be strip searched before and after greeting a visitor); Jack Knarr, *Spaces on Death Row Available at $22G a Year*, Trenton Times, Sept. 21, 1987, at A3 (reporting that the cost per inmate in Trenton's capital sentence unit is $22,000 a year, or $2,000 above that of the general population because of additional supervision). The total cost to operate the special unit amounted to $465,355 in 1986. *Ibid.; see also* Maganini, *supra,* at A14 (noting that California spends an extra $2.8 million for special housing of death row inmates); *Capital Losses, supra,* at 23 (estimating that Florida spends an additional $15,000 per year for each inmate to maintain individual cells and to separate the death row inmates from the general prison population). In Florida, once a death warrant is signed, the guards keep a twenty-four-hour watch to ensure that the inmate does not commit suicide. The cost in overtime for those guards is $13,800. *Bottom Line, supra,* at 12A.

The actual execution can generate additional costs. Georgia spent more than $250,000 for the anticipated but aborted execution of one inmate in 1980. *Capital Losses, supra,* at 27. Incidental costs such as special telephone lines between the prison and the United States Supreme Court and Governor's office are necessary as are costs for extra police personnel for crowd control, security, and the shutdown of federal airspace over the prison. *Ibid.* In New Jersey, volunteer executioners—two are used so that neither knows who was responsible for the actual lethal injection—are paid $500 for the procedure. Pat R. Gilbert, *N.J.'s Lethal Injections are Ready*, Trenton Times, Feb. 15, 1988, at A1.

Once those figures are totaled, the sums are staggering. Between 1973 and 1988, Florida spent an estimated $57 million on death-penalty costs. *Punishment in Paralysis, supra,* at 1A. The re-enactment of the death penalty cost Texas $183.2 million. Leigh Bienen, *No Savings in Lives or Money with Death Penalty*, New York Times, Aug. 7, 1988, at 24. Because the capital machinery is summoned for many cases in which the

jury returns a life verdict or the death sentence is reversed on appeal, much of those costs are "unsuccessful" expenditures in the death-penalty system. For example, the $57 million expended in Florida resulted in eighteen executions, meaning that each execution cost $3.2 million. *Bottom Line, supra,* at 12A; Amnesty International USA, *supra* (reporting Florida's cost at $3,178,000 per person executed). In California, where one out of every ten cases filed as a capital case results in a death verdict, the estimated six executions per year will each cost taxpayers about $15 million. Maganini, *supra,* at A14.

By contrast, the cost to house an inmate for life, based on an average life of forty years, is $930,240. *Id.* at A1; *Capital Losses, supra,* at 23 (estimating cost in 1978 at $602,000 for forty years of imprisonment); *see also* Andrew H. Malcolm, *Society's Conflict on Death Penalty Stalls Procession of the Condemned,* New York Times, June 19, 1989, at B10 (*Society's Conflict*) (stating that "Life imprisonment would require massive prison construction, costing about $55,000 per cell"). Thus the public cost of each battle over a death sentence, including courts, judges, prosecutors, defense attorneys, and guards, may be three times the cost of imprisoning a typical thirty-year-old defendant for life. *Society's Conflict, supra,* at B10 (quoting consultant for ABA).

Ultimately the question is one of policy, whether the money expended could be dedicated to more productive uses. *See, e.g.,* Dave Von Drehle, *Cries for Change,* The Miami Herald, July 13, 1988, at 1A (quoting Florida Supreme Court Justice McDonald as saying, "I think society needs to ask itself if the results justify the cost," and former Florida Supreme Court Chief Justice England as asking, "Is the value derived really worth all the trouble?"); Maganini, *supra,* at A1 (reporting that small California county was forced to cut police services to finance capital prosecution). The millions of dollars spent on the death penalty could be spent to prevent crime, to compensate victims, or other criminal justice costs, *see Reinstitution of Death, supra,* at 6. In these times of scarce governmental

resources, million dollar expenditures on capital punishment can hardly be justified.

## —D—

No matter how sincere and conscientious, a genuinely civilized society cannot, consistently with its own legal and moral code, punish by death its most reprehensible criminals. Perhaps law, which limits its logic and vision to fair punishments in the administration of criminal justice, could accomplish capital punishment. But law cannot ignore the dictates of morality or reject the influences of decency that a civilized society absorbs into its criminal justice system.

We have in our society a constitution that places a moral value on human life and a jurisprudence that accommodates decency as a component of justice. To oppose capital punishment one need not stigmatize a sentence of death as atavistic or barbaric. Governments struggle to protect their citizens, and they attempt to mold criminal laws that will effectively punish and deter criminals. Capital punishment understandably may be thought to be responsive to a public need for retribution and deterrence. That need, however, is not repudiated or denigrated if it must yield to, because it cannot be reconciled with, a much stronger need on the part of a civilized society for a criminal justice system that recognizes both a core morality that values life and a basic common decency that insists on fair and humane punishments.

GARIBALDI, J., concurring in result.

*For affirmance*—Chief Justice WILENTZ and Justices CLIFFORD, POLLOCK, O'HERN, GARIBALDI and STEIN—6.

*For reversal*—Justice HANDLER—1.

# APPENDIX A

## *Cases in Which Death Sentences Have Been Vacated and Not Re-imposed*

The majority counts the following cases as death-sentenced cases even though the death sentences returned in them have been reversed and have not been re-instated. *See ante* at 194 n. 10, 613 *A*.2d at 1102 n. 10.

The majority regards cases preceded by asterisks as similar to Marshall's and counts them as death-sentenced cases for the purpose of determining whether his sentence is disproportionate when compared to sentences handed down in similar cases.

1. Bey, Marko (Alston murder)
*2. Biegenwald, Richard (Olesiewicz murder) (first trial and second trial)
*3. Clausell, James
4. Coyle, Brian
5. Davis, Steven
*6. Di Frisco, Anthony
7. Dixon, Phillip
*8. Erazo, Samuel
9. Gerald, Walter
*10. Harvey, Nathaniel
*11. Hightower, Jacinto
*12. Hunt, James
*13. Jackson, Kevin
*14. Johnson, Walter (Sharp, A. murder)
15. Kise, Raymond
16. Koedatich, James (Hoffman murder)
17. Lodato, Benjamin
*18. Long, Ronald
*19. McDougald, Anthony (Bass, W. murder)
*20. McDougald, Anthony (Bass. M. murder)
21. Moore, Marie
*22. Moore, Samuel (Moore, M. murder)
*23. Moore, Samuel (Moore, K. murder)
*24. Oglesby, Walter
25. Pennington, Frank
26. Perry, Arthur

27. Pitts, Darryl
28. Purnell, Braynard
29. Ramseur, Thomas
30. Rose, Teddy
*31. Savage, Roy (first trial)
*32. Williams, James
*33. Zola, James (first trial)

The majority also counts Marko Bey's conviction for the Pensiton murder twice, both times as a death-sentenced case. I also count it as a death-sentenced case, but I count it only one time.

## APPENDIX B

### Analysis of Illustrative Reversed Death–Sentenced Cases Used as Part of the Majority's Precedent–Seeking Analysis

(1) *State v. Clausell*

[See discussion *supra* at 142–143, 613 *A.*2d at 1075–1076]

(2) *State v. Oglesby*

The majority includes *Oglesby* in several of its comparison groups, including those with the same number of aggravating and mitigating factors and the index of outcomes test. *Ante* at 170–172, 613 *A.*2d at 1090–1091. The majority reports *Oglesby* as a death verdict without analyzing or commenting on whether this Court's reversal of that death sentence undermines the confidence in the jury's death verdict. That oversight is unconscionable, as the Court reversed because the jury instructions on the sole aggravating factor in the case, c(4)(c), were constitutionally deficient. *State v. Oglesby,* 122 *N.J.* 522, 532, 585 *A.*2d 916 (1991). The instruction did not comply with this Court's narrowing construction of that factor in *Ramseur.* Although the conviction was overturned due to an erroneous jury instruction on the burden of proof of the diminished-capacity defense, the Court found that error in the aggravating factor instruction provided an independent basis for the vacation of the sentence.

Clearly, an overbroad definition of the sole aggravating factor in the case raises substantial questions about the reliability of the jury's decision to sentence Oglesby to death.

### (3) *State v. Zola*

Zola's case provides yet another example of the Court's questionable treatment of reversed cases. Zola's death sentence was reversed on grounds that affected the weight and treatment of the aggravating and mitigating factors, rendering its value as precedent for a death sentence highly suspect. The trial court failed to inform the jury that the aggravating factors must outweigh the mitigating factors beyond a reasonable doubt. *State v. Zola*, 112 *N.J.* 384, 390–91, 548 *A*.2d 1022. That error alone forces the conclusion that the deathworthiness judgment is unreliable. Yet the deathworthiness decision is also suspect because the trial court told the jury that the mitigating factors must be found unanimously. *Id.* at 433, 548 *A*.2d 1022. The combined effect of the two errors firmly establishes that the death verdict is untrustworthy. Zola pleaded guilty to murder and was sentenced to life after the reversal, further supporting the counting of his case as a life-sentenced case.

### (4) *State v. Erazo*

Although Erazo's conviction was overturned on errors in the guilt phase (a jury instruction shifted the burden of proof to defendant to prove passion/provocation, and the jury instruction did not comply with *Gerald*), error in the penalty phase makes Erazo's death sentence especially untrustworthy. The Court found that the record was "devoid of any evidence" to support the submission of the c(4)(c) aggravating factor to the jury because there was no evidence that Erazo had intended to inflict pain beyond above the act of killing on his victim. *State v. Erazo*, 126 *N.J.* 112, 137–38, 594 *A*.2d 232 (1991). The State

was prohibited from alleging that factor on retrial. The unwarranted inclusion of the c(4)(c) aggravating factor almost certainly affected the jury's deliberations on the deathworthiness of defendant.

## APPENDIX C

*Factual Analysis of Cases Similar to Marshall's in Which Prosecutors Did not Seek the Death Penalty or Juries Did not Impose It*

(1) and (2) *State v. William Engel* and *State v. Herbert Engel*

The cases of William Engel and his brother, Herbert Engel, are strikingly similar to Marshall's. The murder they committed, like the murder Marshall committed, was a contract-killing of a defenseless spouse. The majority recognizes that there is little to distinguish the culpability of the Engels and Marshall. *Ante* at 179, 613 *A.*2d at 1095. After a penalty trial, a jury sentenced the Engels to life terms in prison.

### (3) *State v. Collins*

Darrell Collins killed his wife and eighteen-month-old son to obtain the proceeds from of insurance policies on their lives, which had been taken out nine weeks before the murders. The jury convicted Collins of the murder of his wife and of the capital murder of his son, but it did not find the alleged c(4)(d) (murder for pecuniary value) aggravating factor to be present. Because the evidence was overwhelming that he killed for pecuniary gain, I regard the jury's determination that there were no aggravating factors as a deathworthiness judgment rather than a death-eligibility judgment. The case is similar to Marshall's in that there was a pecuniary motive (the trial court cited that motive in sentencing Collins) and it involved the murder of defenseless family members. Moreover, Collins's was a multiple murder, and therefore easily could be seen as having enhanced culpability. *See Final Report* 81 & table 7

(multiple victims is first on list of factors that increase a defendant's culpability). The murder of the wife was violent and brutal as he slashed her neck and stabbed her neck and breasts; and the evidence showed that the victim had fought back during the attack, suggesting that she, unlike Maria Marshall, was aware of her impending death. Collins suffocated his infant son—a defenseless victim—by pressing his head into the mattress of the crib, causing hemorrhages on the child's head.

### (4) *State v. Dreher*

Although John Dreher's murder conviction has been reversed, I discuss it because the majority does and, equally importantly, because the prosecution's theory of the case was similar to the prosecution's theory in Marshall's case.

Dreher's case was not prosecuted capitally. The majority assumes that that was because the prosecutor did not believe the c(4)(c) aggravating factor, a wantonly vile murder, was present in that there was insufficient evidence to show that Dreher had intended that his wife suffer pain beyond that incident to her death. *Ante* at 177, 613 *A*.2d at 1094. Yet Dreher's case (as described by the prosecutor at trial) and Marshall's are similar in terms of both the crime and the defendant. Both Marshall and Dreher were alleged to have killed their wives for pecuniary gain so that they could live in luxury with their mistresses. Both defendants were financially secure, mature adults without prior criminal records. Neither cooperated with authorities, and neither, consistent with his claims of innocence, expressed remorse for his crime. Both had indicated to their lovers that they wished their wives were out of their lives at a time some months before the actual murder, indicating a long period of premeditation and a motive to eliminate the spouse in order to be with another woman. Both could be understood as having involved aborted attempts to kill the victims, as Dreher sought a gun several months before the

murder and Marshall arranged an opportunity to have his wife killed at a restaurant parking lot a few nights before the murder. In neither case were extenuating circumstances present that would explain or justify the defendant's actions.

One element enhancing Dreher's culpability is that he enlisted the help of his mistress, Nance Seifrit, in the killing. The c(4)(d) and c(4)(e) aggravating factors reflect the notion that killing for profit is reprehensible and deserving of the death penalty. In part, those factors reflect the concept that hiring a killer is offensive because it involves another person in a criminal enterprise beyond the person who intends the victim to die. That notion is grounded in a concern that the plan is more likely to succeed if others are involved as partners in crime, as the partners will prod one another into action. That element was present in Marshall's case, inasmuch as he had hired another person to kill his wife for him. The payment of money triggered the c(4)(d) aggravating factor. Similarly, Dreher was said to have involved another person in his plan to kill his wife. According to the prosecution, he asked Seifrit to bring him something sharp while he was in the process of strangling his wife; only after she gave him a pair of scissors, said the prosecution, did Dreher stab his wife in the throat.

In comparing Dreher's case with Marshall's, one point that stands out is that Dreher's victim was terrified when she died, whereas Marshall's victim seems not to have known what was about to happen to her. Before her death, Gail Dreher was said to have begged for her life as her husband dragged her down the stairs to the basement and beat her. If, as the State claims, she overheard her husband ask for "something sharp," then she almost certainly was aware of her impending death. Marshall's victim appears to have suffered much less by comparison. The evidence suggests that when Maria Marshall died she was dozing on the front seat of the car and probably was unaware of her assailant. Unlike Gail Dreher, who was in pain for a considerable period, Maria Marshall died immediately

from two bullet wounds. 123 *N.J.* at 32–33, 586 *A.*2d 85 (noting that Marshall told police that his wife was asleep but that he had asked her to pop the trunk lever); *id.* at 34, 586 *A.*2d 85 (noting that pathologist had testified that victim had been lying down at time of shooting).

### (5) *Walter Williams*

The majority distinguishes Walter Williams's case from Marshall's because the jury did not find a pecuniary motive and thus rejected the c(4)(d) aggravating factor. *Ante* at 181, 613 *A.*2d at 1096. Although the majority treats that occurrence as a distinguishing fact, I would note, first, that the jury did not find that aggravating factor in Marshall's case either, so that jury's failure to find it in the *Williams* case hardly distinguishes it from Marshall's. More importantly, however, I would point out that our underlying concern that motivates our entire undertaking is that disparate treatment of similar cases—by prosecutors or by juries—can lead to disproportionate sentencing. The fact that a jury treated a similar case differently does not prove that the case is dissimilar.

*Williams* is included in the comparison group of defendants selected as similar because the case, like Marshall's, involved a spousal murder of a defenseless victim and high levels of blameworthiness. *State v. Robert Marshall: A Report to the New Jersey Supreme Court* 27 *(Marshall Report)*. Williams advanced to a penalty trial and the jury returned a life verdict. The Special Master concluded that Williams's culpability was equal to Marshall's. *Marshall Report* 28.

Williams's crime is particularly relevant. Williams, a police officer with no prior record, poisoned his wife with cyanide to prevent his detection as a bigamist and to inherit her estate (he forged her will). The jury rejected the pecuniary-motive aggravating factor, but found that Williams had killed in order to escape detection for another crime. Like Marshall, Williams had a long-settled plan to murder the victim, obtaining the

cyanide at least five months before his wife's death. Williams
used his official position as a police officer to obtain the cyanide
poison. Both cases involved a man killing his wife in order to
be with another woman. Like Marshall, Williams had no prior
record, was a mature, educated adult involved in his communi-
ty, and had no extenuating circumstances to justify his crime.
Unlike Marshall's victim, Williams's wife died a painful death
after hours of suffering, reflecting a significant level of victim-
ization.

## APPENDIX D

### Sentencing Frequencies for Various
### Types of Capital–Murder Cases

1. Factually Comparable Cases (Cases Sharing Salient Fea-
 tures)

#### Contract–Murderers (Principals)

The first comparison group of similar cases consists of con-
tract-murder principals. The salient feature, hiring another
person to kill a victim, is also a statutory aggravating factor,
c(4)(e); thus this group is equivalent to a group of cases that
match have the same statutory aggravating factor that Mar-
shall's had. This comparison group is small, consisting of only
four cases, but it includes cases very similar to Marshall's. The
death sentencing frequencies for this comparison group are as
follows:

| | |
|---|---|
| Marshall Excluded: | .00 (0/3) |
| Marshall Included: | .25 (1/4) |

#### Contract–Murderers (Agents)

Unlike Marshall, who was alleged to have participated in a
contract-murder both out of greed and out of dissatisfaction
with his marriage, these killers killed solely for pecuniary gain.

The death sentencing frequency for this comparison group is as follows:

Marshall Excluded: .00 (0/5)

*All Contract–Murderers (Both Principals and Agents)*

We never have distinguished between contract-murder principals and contract-murder agents in terms of death-worthiness. *See State v. Di Frisco*, 118 *N.J.* 253, 269, 571 *A.*2d 914 (1990). Accordingly, I have created a comparison group that includes all death-eligible defendants who participated in contract murders. The death sentencing frequencies for this comparison group are as follows:

Marshall Excluded: .00 (0/8)
Marshall Included: .11 (1/9)

*Spousal Murderers Who Did Not Kill in the Heat of Passion and Whose Victims Were Defenseless*

This group consists of three cases. The death-sentencing frequencies for this comparison group are as follows:

Marshall Excluded: .00 (0/2)
Marshall Included: .33 (1/3)

*Murderers Who Robbed or Kidnapped Their Victims, Planned Their Crimes Extensively, Had Pecuniary Motives, and Deceived or Entrapped Defenseless Victims*

The Master created a group of five cases sharing several common facts: extensive premeditation to kill, a pecuniary motive, a significant measure of deception or entrapment, and a defenseless victim. These cases did not involve contract killings, unlike Marshall's, but they did involve either robbery or

kidnapping. The death-sentencing frequency for this comparison group is as follows:

Marshall Excluded: .20 (1/5)

*Murderers Who Killed For Pecuniary Gain Whose Crimes Did Not Involve Burglary, Robbery, or Kidnapping*

Although not charged with aggravating factor c(4)(d), Marshall seems to fall within the group of murderers who had a pecuniary motive and who did not commit robbery or burglary. The death-sentencing frequencies for this comparison group are as follows:

Marshall Excluded: .00 (0/9)
Marshall Included: .10 (1/10)

*Murderers Who Robbed Acquaintances, Relatives, or Friends*

Like Marshall's case, all of these murders were for pecuniary gain and involved the killing of a person who trusted the defendant. The death sentencing frequency for this group is as follows:

Marshall Excluded: .00 (0/11)

2. Numerical Preponderance of Aggravating and Mitigating Factors

The majority includes two variations on this general approach: cases with one aggravating factor and two mitigating

factors and cases with one aggravating factor. I would tend to agree with the majority that such a comparison group has extremely limited applicability given our repeated admonition that jurors are supposed to make qualitative rather than quantitative judgments concerning the aggravating and mitigating factors. *Ante* at 171, 613 *A*.2d at 1091. Nevertheless, I do use a comparison group consisting of cases involving one aggravating factor and two mitigating factors, because it tends to confirm the results suggested by the other comparisons. Moreover, although the jury found only one aggravating factor, specifically, the contract murder factor, I also create a comparison group of cases involving two aggravating factors and two mitigating factors because the killing of Maria Marshall appears to have been both a contract-murder and a murder for pecuniary gain. Because a comparison group that fails to consider mitigating factors is virtually useless in conducting proportionality review, I do not undertake a comparison involving all cases with one aggravating factor.

*Cases With One Aggravating Factor and Two Mitigating Factors*

Marshall's jury found one aggravating factor, c(4)(e), and two mitigating factors, c(5)(f) and c(5)(h). There are forty-three other cases that had one aggravating factor and two mitigating factors. The death sentencing frequencies for this group are as follows:

| | |
|---|---|
| Marshall Excluded: | .00 (0/43) |
| Marshall Included: | .02 (1/44) |

*Cases With Two Aggravating Factors and Two Mitigating Factors*

Although many of the cases in this group could be regarded fairly as more aggravated than Marshall's, I consider the group

because, as noted, the evidence suggests that Marshall killed for pecuniary gain, implicating aggravating factor c(4)(d), and that he hired another to kill, implicating aggravating factor c(4)(e). Marshall doubtless would object that the cases in this group are too aggravated to be regarded as similar to his, but even this comparison group yields a result suggesting disproportionality in Marshall's sentence. The death-sentencing frequency for this group is as follows:

Marshall Excluded: .06 (2/34)

### 3. Cases with a Similar Likelihood of Receiving a Death Sentence (Index of Outcomes Measure)

The majority also applies the Master's index-of-outcomes method of constituting comparison groups. The index method recognizes that there may not be enough cases on all fours with the case under review to conduct a reliable proportionality review. To compensate, the method gathers a group of cases that are similar in terms of culpability but not necessarily similar in terms of their factual contexts. The Master's index is based on empirical evidence of the types of factual characteristics that best explain sentencing outcomes. Using a statistical technique called multiple regression analysis, each factor is weighted according to its tendency to induce juries to sentence defendants to death. Each case is given a "score" based on the factors present. Cases then are arranged in order of their scores, and cases with similar scores ("near neighbors") are chosen to form a comparison group. The index method is designed to generate a group of cases that may be quite disparate factually but quite similar in their overall levels of culpability. According to the Master, with the index method "it is possible to determine the relative culpability of different defendants based on the case characteristics that, on a statisti-

cal basis, best explain which defendants actually received death sentences." *Final Report, supra,* at 87.

Because I have reservations concerning the index method for creating comparison groups, I would tend to emphasize the more straightforward methods for constructing comparison groups that involve the identification of salient factors. As noted, the Master's index is based on a multiple regression that identifies what factors tend to persuade juries to impose the death penalty and what factors do not. For that sort of multiple regression to work with any accuracy, a substantial number of juries must have returned death verdicts. If there are only three or four death verdicts, conducting the multiple regression analysis may be pointless. The Master addressed that problem by mislabeling over thirty life-sentenced cases as death-sentenced cases. *See Final Report, supra,* Appendix B. In doing so, he created enough data to make an analysis feasible, but he also created an analysis that may not identify accurately the factors that sway juries *in the system that uses the rules the Court has laid down.* Stated simply, too few death verdicts issued by properly instructed juries may exist for anyone to know what factors tend to induce such juries to return death verdicts.

Because the majority seems to rely in part on the index method of forming comparison groups, I review the results those groups produce notwithstanding my concerns regarding the methodology used to create them. I include two sets of results, one using only statutorily enumerated aggravating and mitigating factors, the other using factors that have little obvious relationship to the factors enumerated in the statute.

*Index Method Based Only on Statutorily Derived Factors*

Using only statutorily enumerated factors to evaluate the likelihood of a death sentence, Marshall falls into culpability level "2" (with level "1" being the least aggravated and level "5" being the most aggravated cases). Twenty-one other cases

fell into level "2". *Marshall Report* 37. The death-sentencing frequencies for this comparison group are as follows:

| | |
|---|---|
| Marshall Excluded: | .05 (1/20) |
| Marshall Included: | .10 (2/21) |

*Index Method Based on Statutorily Derived Factors and Other Factors*

Using all death-eligible cases in the proposed universe and using the index based on both statutorily enumerated factors and other factors, Marshall falls into culpability level "1" (to repeat, the lowest of the Master's five levels), a ranking he shares with 177 cases. The list is too large to include in this opinion, but in the Appendix I do include a list of Marshall's "near neighbors." The death sentencing frequencies for this comparison group are as follows:

| | |
|---|---|
| Marshall Excluded: | .10 (1/10) |
| Marshall Included: | .18 (2/11) |

4. Weisberg's Model

As an alternative to the models created the Master, the State offers a method fashioned by its own expert, Herbert Weisberg. Even comparison groups formulated under Weisberg's criteria reveal that the death penalty rarely is imposed in cases like Marshall's.

Weisberg's approach is similar to approaches based on the counting of statutory aggravating factors. Using what amounts to a form of "educated intuition," Weisberg divided all death-eligible cases into four "culpability categories," with Category 1 including the defendants he thought most culpable.

According to Weisberg, Marshall fell into Category 1. Category 1 includes cases with the following configurations of statutory aggravating factors: c(4)(a); c(4)(a) and (c); c(4)(a), (c), and (g); c(4)(a) and (g); c(4)(b) and (d); c(4)(b), (f), and (h); c(4) (c), (f), and (g); c(4)(d); c(4)(d) and (f); c(4)(e); and c(4)(f) and (h). *Weisberg Report, supra,* at 15–16. Weisberg does not list death-eligible cases that did not result in a penalty trial, but even using the universe he uses, thereby creating a bias in favor of a finding of proportionate sentencing, Marshall's sentence still appears to be disproportionate. The death sentencing frequencies for this comparison group are as follows (counting only cases that resulted in penalty trials):

| | |
|---|---|
| Marshall Included: | .12 (3/26) |
| Marshall Excluded: | .08 (2/25) |

## APPENDIX E

The following two graphs indicate the death-sentencing frequencies for each comparison group. Death-sentenced cases are shaded in black. Life-sentenced cases that once were death sentenced cases are shaded with diagonal lines. Life-sentenced cases that never were death-sentenced cases are shaded with dots. The graphs make plain the fact that, even if cases in which death sentences were returned and subsequently vacated are counted as death-sentenced cases, Marshall's sentence still is disproportionate.

The first graph expresses death-sentencing rates in percentages, the second in number of cases. One can see by looking at the graphs that mere percentages occasionally can mislead. For example, in one comparison group the death-sentencing rate reaches thirty-three percent if Marshall's case is included in the group; one must look at the graph that expresses death-sentencing rates in numbers of cases to understand that Marshall's case is aberrational even in that comparison group, for

in that group the total number of cases is *three,* Marshall's being the *one* that resulted in a death sentence. (Hence, when Marshall's case is excluded from the group, one hundred percent of the cases are reported as life-sentenced cases.)

## Sentencing Outcomes for Similar Cases
### Expressed in Number of Cases

**Total Number**

## Codes
### Composition of Comparison Groups

| Code | Type of Cases |
|------|---------------|
| A | Contract-murderers (principals) |
| B | Contract-murderers (agents) |
| C | All contract-murderers |
| D | Spousal murderers who did not kill in the heat of passion and whose victims were defenseless |
| E | Murderers who robbed or kidnapped their victims, planned their crimes extensively, had pecuniary motives, and deceived or entrapped defenseless victims |
| F | Murderers who killed for pecuniary gain whose crimes did not involve burglary, robbery or kidnapping |
| G | Murderers who robbed acquaintances, relatives, or friends |
| 1 | Marshall excluded |
| 2 | Marshall included |

## Sentencing Outcomes for Similar Cases
### Expressed in Percentages

**Death** **Life-death reversed** **Life**

## Codes
### Composition of Comparison Groups

| Code | Type of Cases |
|------|---------------|
| A | Contract-murderers (principals) |
| B | Contract-murderers (agents) |
| C | All contract-murderers |
| D | Spousal murderers who did not kill in the heat of passion and whose victims were defenseless |
| E | Murderers who robbed or kidnapped their victims, planned their crimes extensively, had pecuniary motives, and deceived or entrapped defenseless victims |
| F | Murderers who killed for pecuniary gain whose crimes did not involve burglary, robbery or kidnapping |
| G | Murderers who robbed acquaintances, relatives, or friends |
| H | Cases with one aggravating factor and two mitigating factors |
| I | Cases with two aggravating factors and two mitigating factors |
| J | Index method based only on statutorily derived factors |
| K | Index method based on statutorily derived and other factors |
| L | Weisberg's Model |
| 1 | Marshall excluded |
| 2 | Marshall included |

## APPENDIX F

### Lists of Comparison Cases

In this appendix I list the names of the defendants whose cases are placed within each comparison group.

I have coded the cases with the following abbreviations:

PT: case went to a penalty trial;
noPT: case decided without penalty trial;
L: life-sentence defendant;
D: death-sentenced defendant; and
[ ]: a life-sentenced defendant treated by the majority as a death-sentenced defendant.

1. Factually Comparable Cases (Cases Sharing Salient Features)

Contract–Murderers (Principals)

| Life Sentence | Death Sentence |
|---|---|
| 1. Engel, William (PT/L) | 4. Marshall, Robert (PT/D) |
| 2. Engel, Herbert (PT/L) | |
| 3. Brand, Francis (noPT/L) | |

Contract–Murderers (Agents)

| Life Sentence | Death Sentence |
|---|---|
| 1. Melendez, Miquel (PT/L) | |
| 2. Rose, Michael (PT/L) | |
| 3. Burroughs, Randy (noPT/L) | |
| 4. [DiFrisco, Anthony (PT/D/Rev'd)] | |
| 5. [Clausell, James (PT/D/rev'd/PT/L)] | |

All Contract–Murderers (Both Principals and Agents)

| Life Sentence | Death Sentence |
|---|---|
| 1. Engel, William (PT/L) | 9. Marshall, Robert (PT/D) |
| 2. Engel, Herbert (PT/L) | |
| 3. Brand, Francis (noPT/L) | |
| 4. Melendez, Miquel (PT/L) | |
| 5. Burroughs, Randy (noPT/L) | |
| 6. [Rose, Teddy (PT/D/rev'd/PT/L)] | |
| 7. [DiFrisco, Anthony (PT/D/Rev'd)] | |
| 8. [Clausell, James (PT/D/rev'd/PT/L)] | |

Spousal Murderers Who Did Not Kill in the Heat of Passion and Whose Victims Were Defenseless

Life Sentence
1. Collins, Darrell (PT/L)
2. Williams, Walter (PT/L)

Death Sentence
3. Marshall, Robert (PT/D)

Murderers Who Robbed or Kidnapped Their Victims, Planned Their Crimes Extensively, Had Pecuniary Motives, and Deceived or Entrapped Defenseless Victims

Life Sentence
1. Scales, Terrence (PT/L)
2. Russo, David (PT/L)
3. McIver, Vernon (noPT/L)
4. Thompson, Howard (noPT/L)

Death Sentence
5. Martini, John (PT/D)

Murderers Who Killed For Pecuniary Gain Whose Crimes Did Not Involve Burglary, Robbery, or Kidnapping

Life Sentence
1. Rose, Michael (PT/L)
2. Burroughs, Randy (noPT/L)
3. Melendez, Miguel (PT/L)
4. Brand, Francis (noPT/L)
5. Engel, Herbert (PT/L)
6. Engel, William (PT/L)
7. Williams, Walter (PT/L)
8. [Clausell, James (PT/D/rev'd/PT/L)]
9. [DiFrisco, Anthony (PT/D/rev'd)]

Death Sentence
10. Marshall, Robert (PT/D)

Murderers Who Robbed Acquaintances, Relatives, or Friends

Life Sentence
1. Ferrari, Salvatore (noPT/L)
2. Jefferson, Richard (noPT/L)
3. Lazorisak, George (PT/L)
4. McIver, Vernon (noPT/L)
5. James, Marvin (noPT/L)
6. Grant, Michael (noPT/L)
7. Sullivan, Roy (noPT/L)
8. Clark, Reginald (noPT/L)
9. Graf, Clifford (noPT/L)
10. Johnson, Nathaniel (PT/L)
11. Neapolitano, Anthony (PT/L)

Death Sentence

2. Numerical Preponderance of Aggravating and Mitigating Factors

Cases With One Aggravating Factor and Two Mitigating Factors

| Life Sentence | Death Sentence |
|---|---|
| 1. Jones, Tracy (noPT/L) | 44. Marshall, Robert |
| 2. Sullivan, Roy (noPT/L) | (PT/D) |
| 3. Dinkins, Robert (noPT/L) | |
| 4. Worthington, Earl (noPT/L) | |
| 5. Messam, Gladstone (noPT/L) | |
| 6. Stevens, Larry (noPT/L) | |
| 7. Floyd, Lamont (noPT/L) | |
| 8. LaPointe, Pierre (noPT/L) | |
| 9. Delvalle, Efrain (noPT/L) | |
| 10. Williams, Gerald (noPT/L) | |
| 11. Calloway, Derrick (noPT/L) | |
| 12. Williams, Walter (PT/L) | |
| 13. Anderson, Antoine (noPT/L) | |
| 14. Preston, Johnie (noPT/L) | |
| 15. Graf, Clifford (noPT/L) | |
| 16. Perry, Harold (PT/L) | |
| 17. Jones, Jimmie (PT/L) | |
| 18. Stamps, Aaron (PT/L) | |
| 19. Dollard, Thomas (noPT/L) | |
| 20. Norman, Anthony (noPT/L) | |
| 21. McNeil, Keith (noPT/L) | |
| 22. Turner, John (noPT/L) | |
| 23. Clark, Hashona (noPT/L) | |
| 24. Montalvo, Orlando (noPT/L) | |
| 25. Armstrong, Joseph (noPT/L) | |
| 26. Ruano, Heriberto (noPT/L) | |
| 27. Keresty, Walter (noPT/L) | |
| 28. Scales, Terrence (PT/L) | |
| 29. Hudson, Franklin (noPT/L) | |
| 30. Slaughter, Rafael (PT/L) | |
| 31. Kershaw, Albert (noPT/L) | |
| 32. Jacoby–Irwin, Barbara (noPT/L) | |
| 33. Deeves, William (PT/L) | |
| 34. Muscio, Nicholas (PT/L) | |
| 35. Edwards, Eugene (noPT/L) | |
| 36. Melendez, Miguel (PT/L) | |
| 37. Mendez, Oscar (noPT/L) | |
| 38. Biegenwald, Richard (Ward murder) (PT/L) | |
| 39. Guagenti, Joseph (PT/L) | |
| 40. Dreher, John (noPT/L) | |
| 41. Reyes, Jose (PT/L) | |
| 42. [Oglesby, Walter (PT/D/rev'd)] | |
| 43. [Long, Ronald (PT/D/rev'd)] | |

## Cases with Two Aggravating Factors and Two Mitigating Factors

| Life Sentence | Death Sentence |
|---|---|
| 1. Brown, Vincent (noPT/L) | 33. Martini, John (PT/D) |
| 2. Holmes, Gregory (noPT/L) | 34. Bey, Marko (Peniston |
| 3. Culley, Carl (noPT/L) | murder) (PT/D/ |
| 4. Melendez, Angel (noPT/L) | rev'd/PT/D) |
| 5. Taylor, Wiley (noPT/L) | |
| 6. Huff, Aaron (PT/L) | |
| 7. Cancio, Gustavio (PT/N) | |
| 8. Morton, Adrian (noPT/L) | |
| 9. Thomas, Christopher (noPT/L) | |
| 10. Tucker, Stanley (noPT/L) | |
| 11. Merola, Thomas (noPT/L) | |
| 12. McCollum, William (noPT/L) | |
| 13. Wheeler, Ronald (noPT/L) | |
| 14. Jones, Larry (PT/L) | |
| 15. Mujahid, Rasheed (noPT/L) | |
| 16. Washington, Corey (noPT/L) | |
| 17. Rivera, Rafael (PT/L) | |
| 18. Watkins, Ricky (noPT/L) | |
| 19. Mendez, Incenzio (PT/L) | |
| 20. Jalil, Nelson (noPT/L) | |
| 21. Barone, Jamie (PT/L) | |
| 22. Nieves, Alberto (PT/L) | |
| 23. Spraggins, Jerry (PT/L) | |
| 24. Reese, John (PT/L) | |
| 25. [Zola, James (PT/D/Rev'd/noPT/L)] | |
| 26. [Purnell, Braynard (PT/D/rev'd)] | |
| 27. [Dixon, Phillip (PT/D/rev'd)] | |
| 28. [Biegenwald, Richard (Olesiewicz murder) (PT/D/rev'd/PT/D/rev'd)]. | |
| 29. [Lodato, Benjamin (PT/D/rev'd)] | |
| 30. [Rose, Teddy (PT/D/rev'd)] | |
| 31. [Jackson, Kevin (PT/D/rev'd)] | |
| 32. [Ramseur, Thomas (PT/D/rev'd)] | |

3. **Cases with a Similar Likelihood of Receiving a Death Sentence (Index of Outcomes Measure)**

### Index Method Based Only on Statutorily Derived Factors

| Life Sentence | Death Sentence |
|---|---|
| 1. Weston, Elisha (PT/L) | 20. Marshall, Robert |

2. Brand, Francis (noPT/L)
3. Carrol, John (PT/L)
4. Melendez, Miguel (PT/L)
5. Mincey, Samuel (noPT/L)
6. Nieves, Alberto (PT/L)
7. Reyes, Jose (PT/L)
8. Spraggins, Jerry (PT/L)
9. Taylor, Leroy (noPT/L)
10. Johnson, Walter (Sharp, B. murder) (PT/L)
11. [Johnson, Walter (Sharp, A. murder) (PT/D/rev'd)]
12. [Hightower, Jacinto (PT/D/rev'd)]
13. [McDougald, Anthony (Bass, W. murder) (PT/D/rev'd)
14. [McDougald, Anthony (Bass. M. murder) (PT/D/rev'd)
15. [Savage, Roy (PT/D/Rev'd/PT/L)]
16. [Moore, Samuel (Moore, M. murder) (PT/D/rev'd)]
17. [Moore, Samuel (Moore, K. murder) (PT/D/rev'd)]
18. [Biegenwald, Richard (Olesiewicz murder) (PT/D/rev'd/PT/D/Rev'd)]
19. [Zola, James (PT/D/rev'd/noPT/L)]

21. Bey, Marko (Peniston murder) (PT/D/rev'd/PT/D)

### Index Method Based on Statutorily Derived Factors and Other Factors

| Life Sentence | Death Sentence |
|---|---|
| 1. Brand, Francis (noPT/L) | 10. Martini, John (PT/D) |
| 2. Engel, William (PT/L) | 11. Marshall, Robert (PT/D) |
| 3. Muhammed, Jihad (noPT/L) | |
| 4. Neapolitano, Anthony (PT/L) | |
| 5. Mendez, Oscar (noPT/L) | |
| 6. Biegenwald, Richard (Ward murder) (PT/L) | |
| 7. Reese, John (PT/L) | |
| 8. Guagenti, Joseph (PT/L) | |
| 9. [Zola, James (PT/D/rev'd/noPT/L)] | |

4. Weisberg's Model

| Life Sentence | Death Sentence |
|---|---|
| 1. Melendez, Miguel (PT/L) | 24. Schiavo, Dominick (PT/D) |
| 2. Biegenwald, Richard (Ward murder) (PT/L) | |
| 3. Engel, Herbert (PT/L) | 25. Marshall, Robert (PT/D) |
| 4. Engel, William (PT/L) | |

5. Manfredonia, Michael
 (PT/L)

 26. Bey, Marko (Peniston murder)
 (PT/D/rev'd/PT/D)

6. Weston, Elisha (PT/L)
7. Ploppert, Charles (PT/L)
8. Booker, George (1st Victim) (PT/L)
9. Johnson, Walter (Sharp, B. murder) (PT/L)
10. [Johnson, Walter (Sharp, A. murder) (PT/D/rev'd) ]
11. [Pennington, Frank (PT/D/rev'd) ]
12. [DiFrisco, Anthony (PT/D/rev'd) ]
13. [Coyle, Bryan (PT/D/rev'd) ]
14. [Biegenwald, Richard (Oslewicz murder) (PT/D/rev'd/PT/D/rev'd) ]
15. [Rose, Teddy (PT/D/rev'd/PT/L) ]
16. [Ramseur, Thomas (PT/D/rev'd/L) ]
17. [Clausell, James (PT/D/rev'd/PT/L) ]
18. [Erazo, Samuel (PT/D/rev'd) ]
19. [Hightower, Jacinto (PT/D/rev'd) ]
20. [McDougald, Anthony (Bass, W. murder) (PT/D/rev'd) ]
21. [McDougald, Anthony (Bass, M. murder) (PT/D/rev'd) ]
22. [Kise, Raymond (PT/D/rev'd/PT/L) ]
23. [Koedatich, James (PT/D/rev'd/PT/L) ]